# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **UNITED STATES OF AMERICA**, | Case No. 3:15-cr-00238-SI-2 |
| v. | **OPINION AND ORDER ON THE BANK OF OSWEGO'S MOTION TO QUASH SUBPOENA FROM DIANA YATES** |
| **DAN HEINE and DIANA YATES**, | |
| Defendants. | |

Billy J. Williams, United States Attorney, and Claire M. Fay and Michelle Holman Kerin, Assistant United States Attorneys, UNITED STATES ATTORNEY'S OFFICE FOR THE DISTRICT OF OREGON, 1000 S.W. Third Avenue, Suite 600, Portland, OR 97204. Of Attorneys for the United States of America.

Caroline Harris Crowne, TONKON TORP, LLP, 1600 Pioneer Tower, 888 S.W. Fifth Avenue, Portland, OR 97204; Jeffrey Alberts, PRYOR CASHMAN, LLP, 7 Times Square, New York, NY 10036. Of Attorneys for Defendant Dan Heine.

Janet Lee Hoffman and Andrew Weiner, JANET HOFFMAN & ASSOCIATES, LLC, 1000 S.W. Broadway, Suite 1500, Portland OR 97205. Of Attorneys for Defendant Diana Yates.

G. Kevin Kiely, Casey M. Nokes, and Nicole M. Swift, CABLE HUSTON, LLP, 1001 S.W. Fifth Avenue, Suite 2000, Portland, OR 97204. Of Attorneys for The Bank of Oswego.

**Michael H. Simon, District Judge.**

Defendants Diana Yates ("Yates") and Dan Heine ("Heine") are charged with conspiracy

to commit bank fraud and making false bank entries, reports, and transactions during the time

that she was affiliated with The Bank of Oswego (the "Bank"). On January 20, 2016, Yates

served a subpoena *duces tecum* pursuant to Rule 17(c) of the Federal Rules of Criminal

Procedure on the Bank (the "Subpoena"). Before the Court is the Bank's Motion to Quash or

Modify Yates's Subpoena. For the reasons that follow, the Bank's Motion is granted in part and

denied in part.

## STANDARDS

Rule 17(c)(1) of the Federal Rules of Criminal Procedure provides, in relevant part:

> A subpoena may order the witness to produce any books, papers,
> documents, data, or other objects the subpoena designates. The
> court may direct the witness to produce the designated items in
> court before trial or before they are to be offered in evidence.

Rule 17(c) is not intended to provide a means of discovery in criminal cases; rather, its purpose

is to expedite trial by "providing a time and place before trial for the inspection of subpoenaed

materials." *United States v. Nixon*, 418 U.S. 683, 698-99 (1974) (citing *Bowman Dairy Co. v.

United States*, 341 U.S. 214, 220 (1951)); *see also Weatherford v. Bursey*, 429 U.S. 545, 559

(1977) (stating that there "is no general constitutional right to discovery in criminal cases");

*United States v. MacKey*, 647 F.2d 898, 901 (9th Cir. 1981) (citation omitted) (instructing that "a

Rule 17(c) subpoena is not intended to serve as a discovery tool, or to allow a blind fishing

expedition seeking unknown evidence").

In addition, Rule 17(c)(2) provides that a district court may quash or modify a subpoena

"if compliance would be unreasonable or oppressive." The decision whether to quash or modify

a subpoena is within the discretion of the district court. *Nixon*, 418 U.S. at 702 ("Enforcement of

a pretrial subpoena *duces tecum* must necessarily be committed to the sound discretion of the

trial court since the necessity for the subpoena most often turns upon a determination of factual

issues").

The party issuing a subpoena under Rule 17(c) bears the burden of showing the relevancy, admissibility, and specificity of the requested materials. *Id.* "Even upon a showing of relevance, admissibility, and specificity, a court must consider whether the material is 'otherwise procurable,' whether the proponent can 'properly prepare for trial without such production,' and whether 'the failure to obtain such inspection may tend unreasonably to delay the trial.'" *United States v. Mason*, 2008 WL 1909115, at *1 (D. Or. Apr. 25, 2008) (quoting *Nixon*, 418 U.S. at 699); *see also United States v. Eden*, 659 F.2d 1376, 1381 (9th Cir. 1981) ("In order to justify a subpoena for production before trial, the proponent must also demonstrate that the subpoenaed materials are not available from any other source and their examination and processing should not await trial in the circumstances shown"). "Further, a Rule 17(c) subpoena 'should be quashed or modified if it calls for privileged matter.'" *United States v. Reyes*, 239 F.R.D. 591, 598 (N.D. Cal. 2006) (quoting 2 Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 275).

## A. Relevancy

A party seeking to enforce a subpoena issued under Rule 17(c) must demonstrate "a sufficient likelihood" that the documents or information sought are "relevant to the offenses charged in the indictment." *Nixon*, 418 U.S. at 700; *see also Mason*, 2008 WL 1909115, at *1 (quoting *Nixon*, 418 U.S. at 700) (restating the standard as requiring the party to demonstrate "a 'sufficient likelihood' that the documents sought are material to any issue in the case.").[1] "Thus,

---

[1] One treatise describes the "relevancy" requirement as follows:

> Because evidence that is not relevant is not admissible, the "relevancy" hurdle of Rule 17(c) is really a subset of the "admissibility" hurdle and not an independent requirement at all. But reciting it as a separate requirement does serve to emphasize that the proponent of the subpoena must show that the requested

a subpoena is limited to evidentiary materials, and courts will not allow general requests for categories of only arguably relevant documents that indicate the subpoena falls in the category of the much maligned 'fishing expedition.'" 2 Charles Alan Wright, Andrew J. Leipold, Peter J. Henning & Sarah N. Welling, *Federal Practice and Procedure* § 275 (4th ed. 2015) (hereinafter *Federal Practice and Procedure*). Further, "mere conclusory statements" of relevancy are insufficient to satisfy the *Nixon* requirement. *Eden*, 659 F.2d at 1381.

For example, in *United States v. Reed*, 726 F.2d 570 (9th Cir. 1984), the appellants were convicted by a jury of charges related to two fires that occurred at a restaurant. *Id.* at 572. Before trial, the defendants issued a Rule 17(c) subpoena requesting from the third-party city the production of investigative reports that described other incidents of suspected arson that occurred in the same general time frame as the fires for which the defendants were convicted. *Id.* at 576. The defendants argued that the files from these other suspected arsons "would aid their defense by indicating that certain others, named as co-defendants but not on trial, might have been contemporaneously involved in other arson activities and thus might have had independent motives to burn" the restaurant. *Id.* at 576-77. The district court, after reviewing the files *in camera*, denied the application and quashed the Rule 17(c) subpoena. *Id.* at 577. The Ninth Circuit held that the trial court did not err in quashing the subpoena. *Id.* The Ninth Circuit found that the appellants did not sufficiently demonstrate the relevancy of the city's files from other suspected arsons because the appellants did not point "to any substantial foundation for believing that the investigative reports would furnish defense matter, or would even suggest that the fires

---

documents are relevant to an issue that will be of consequence at the trial or hearing.

Robert M. Cary, Craig D. Singer & Simon A. Latcovich, *Federal Criminal Discovery* 226 (ABA Criminal Justice Section 2011) (footnotes omitted).

charged in the indictment were probably set by others." *Id.* Additionally, the Ninth Circuit's

independent review of the files "support[ed] the trial court's finding that the incidents described

in the arson reports were different in nature from those in [the defendants'] case, and g[a]ve no

indication that others were involved." *Id.*

      Similarly, in *United States v. Mason*, the court quashed a Rule 17(c) subpoena that sought

tax records, financial documents, and email and telephone records from a third party because the

defendants failed to establish the relevancy of the requested documents. 2008 WL 1909115,

at *2. The court characterized the defendants' arguments that the third party's "records 'may' or

'might' help impeach [the third party's] credibility, or demonstrate bias or motive" as "nothing

more than speculation." *Id.* at *3. The court reasoned that the subpoena sought "numerous

documents that pre-date or post-date the FBI's investigation, which are clearly not relevant to

any issue at trial." *Id.* at *2. The court explained that "[w]hatever marginal relevance the other

documents might have as to [the third party's] credibility, motive, and bias would likely be

outweighed by the substantial risk [of] confusing the issues, misleading the jury, and needless

presentation of cumulative evidence." *Id.* Further, the court found that discovery provided by the

government was "sufficient to appraise [*sic*] the jury of [the third party's] potential biases and

motivations." *Id.*

## B.  Admissibility

      A party seeking to enforce a subpoena issued under Rule 17(c) also must make "a

sufficient preliminary showing that each of the subpoenaed [materials] contains evidence

admissible with respect to the offenses charged in the indictment." *Nixon*, 418 U.S. at 700. A

district court "must seek to predict whether the materials will be admissible as evidence based on

the best information before the court at the time the subpoena is evaluated." Robert M. Cary,

Craig D. Singer & Simon A. Latcovich, *Federal Criminal Discovery* 227 (ABA Criminal Justice

Section 2011) (hereinafter *Federal Criminal Discovery*); *see also id.* at 228 (footnote omitted) ("the 'admissibility' requirement obliges the proponent of a subpoena to articulate what admissible evidence the subpoena is likely to produce"). In *Reed*, the Ninth Circuit upheld the district court's decision to quash the Rule 17(c) subpoena for the city's arson files in part because the "appellants did not demonstrate that the reports would have been admissible under the limitations of Federal Rule of Evidence 803(8)(B)." 726 F.2d at 577; *see also Reyes*, 239 F.R.D. at 599-600 (quashing two Rule 17(c) subpoenas for failure to meet the admissibility requirement where the documents sought were hearsay and not subject to any exception to the hearsay rule).

"Generally, the need for evidence to impeach witnesses is insufficient to require its production in advance of trial." *Nixon*, 418 U.S. at 701. For example, in *United States v. Fields*, 663 F.2d 880 (9th Cir. 1981), the Ninth Circuit reversed the district court's order denying a third-party bank's motion to quash a Rule 17(c) subpoena because the "only evidentiary use that defendants have been able to advance is that the statements and transcribed interviews of witnesses could be used for impeachment purposes." *Id.* at 881. The Ninth Circuit, relying on *Nixon*, stated that such "use is generally insufficient to justify the pretrial production of documents, and held that "requiring [the bank] to produce the documents before any witnesses had testified was an abuse of discretion." *Id.*

In *United States v. Schinderman*, 432 F. Supp. 2d 157 (D. Me. 2006), however, Judge Hornby rejected the government's argument that *Fields* stood for "an absolute prohibition on the use of a Rule 17(c) subpoena to obtain documents solely for impeachment purposes." *Id.* at 160 (quotation marks omitted). Judge Hornby explained that the government's reading of *Fields* was "too broad" because that case "held only that impeachment documents under Rule 17 need not be produced *until the relevant witness testified*." *Id.* (emphasis in original) (citing *Fields*,

663 F.2d at 881); *see also Federal Practice and Procedure* § 275 n.24 (citing *United States v. Cuthbertson*, 630 F.2d 139, 144 (3d Cir. 1980)) ("Although material usable for impeachment is evidentiary, and within Rule 17(c), it does not become evidentiary until the witness has testified at trial. Thus, prior inconsistent statements of a witness are not subject to production and inspection prior to trial . . . .").

## C. Specificity

In addition, when a party seeks to enforce a subpoena under Rule 17(c), the "subpoena must refer to specific documents or, at least, to specific kinds of documents." *United States v. Venecia*, 1997 WL 325328, at *3 (D. Or. May 16, 1997); *see also Federal Criminal Discovery* 232 (stating that a Rule 17(c) subpoena "must seek particular documents, or narrow categories of documents, that the proponent reasonably believes exist and are likely to satisfy the relevancy and admissibility requirements"). Although "the proponent of a subpoena cannot be expected to identify the materials he seeks in exacting detail, when (as demonstrated by the fact he must employ a subpoena) he does not have access to them," a party must "provide details sufficient to establish that the subpoena's proponent has made a good-faith effort to obtain evidentiary material and is not engaged in the proverbial 'fishing expedition.'" *Reyes*, 239 F.R.D. at 599 (quoting *Nixon*, 418 U.S. at 699-700); *see also Federal Practice and Procedure* § 275 (footnotes omitted) ("A subpoena that fails to describe any specific documents is too broad, but it is not necessary that the subpoena designate each particular paper desired. It is sufficient if kinds of documents are designated with reasonable particularity.").

Within the Ninth Circuit, "requesting entire files instead of specific documents indicates a fishing expedition." *Venecia*, 1997 WL 325328, at *3 (citing *Reed*, 726 F.2d at 577). For example, in *Reed*, the Ninth Circuit upheld the district court's decision to quash a Rule 17(c) subpoena for the city's arson files in part because the appellants "did not request specific

documents, but sought entire arson investigation files." 726 F.2d at 577. The Ninth Circuit explained that "Rule 17(c) was not intended as a discovery device, or to 'allow a blind fishing expedition seeking unknown evidence.'" *Id.* (quoting *MacKey*, 647 F.2d at 901).

Similarly, in *United States v. Venecia*, the court refused to reauthorize a Rule 17(c) subpoena directed to the Klickitat County District Attorney and quashed a Rule 17(c) subpoena directed to the Washington State Patrol because they failed the specificity requirement. 1997 WL 325328 at *3. The subpoena served on the district attorney sought the "[c]omplete file and all log notes and work product" from the defendant's case. *Id.* (alteration in original) (quotation marks omitted). The subpoena served on the Washington State Patrol also sought the defendant's complete case file as well as all accompanying case notes. *Id.* The court found that the "subpoenas do not refer to specific documents or specific kinds of documents," and thus did "not meet the requirements of Rule 17(c)." *Id.*

The case *United States v. Reyes* illustrates two ends of the specificity spectrum. In *Reyes*, the defendant, a former chief executive officer of a publicly traded company, issued Rule 17(c) subpoenas on two law firms that assisted with the company's internal investigation as well as on a third-party company. 239 F.R.D. at 596-97. Each of the three entities moved to quash the respective subpoenas for failure to comply with Rule 17(c). *Id.* at 597. The court found that the subpoenas issued to the two law firms—which referred to particular summaries, notes, memoranda, and reports—satisfied the specificity requirement. *Id.* at 599-600. The court explained that the requests were "neither improperly broad, nor overly vague; instead, [the defendant] demands access to a discrete set of existing written materials, within the possession of the subpoenaed parties, that pertain to events and conversations that actually occurred and relate to specific subject matter." *Id.* at 599.

In contrast, the court held in *Reyes* that the subpoena issued to the third-party company failed the specificity requirement where the requests sought "all documents" relating to a number of policy and practices of the company as well as documents relating to a former employee of the company. *Id.* at 605-06. The defendant asserted that the documents were necessary to his defense because they would help him gather evidence that the former employee and not the defendant was responsible for the crimes alleged. The court, however, characterized the request as "enormous in scope" and "the quintessential fishing expedition," and noted that the subpoena "adopts a particular theory of defense and then casts a wide net with the goal of reeling in something to support it." *Id.* The court explained:

> A demand for "any and all documents relating to several categories of subject matter . . . rather than specific evidentiary items," suggests that the subpoena's proponent "seeks to obtain information helpful to the defense by examining large quantities of documents, rather than to use Rule 17 for its intended purpose—to secure the production for a court proceeding of specific admissible evidence."

*Id.* at 606 (quoting *United States v. Louis*, 2005 WL 180885, at *5 (S.D.N.Y. Jan. 27, 2005)). The court also noted that "[a] specific theory of defense . . . is not the same thing as a request for specific information," and that while Rule 17(c) "demands the latter," the defendant's "subpoena provides only the former." *Id.* Accordingly, the court granted the third-party company's motion to quash the defendant's Rule 17(c) subpoena. *Id.*

## BACKGROUND

### A.  The Indictment

In 2004, Yates and Heine co-founded the Bank, a financial institution engaged in the business of personal and commercial banking and lending. The Bank is headquartered in Lake Oswego, Oregon. Heine served as the Bank's President and Chief Executive Officer. As President and Chief Executive Officer ("CEO"), Heine supervised and managed the Bank's

affairs and operations. Heine was also a member of the Bank's Board of Directors (the "Board"). Heine left the Bank in 2014. Yates, a certified public accountant, served as the Bank's Executive Vice President and Chief Financial Officer ("CFO"). As CFO, Yates was responsible for ensuring the Bank's compliance with state and federal regulations. Yates was also the Secretary of the Board. She resigned from the Bank in March 2012.

Both Yates and Heine were responsible for ensuring that the Bank operated in a sound and safe manner and for keeping the Board informed about the Bank's financial condition and the adequacy of the Bank's policies, procedures, and internal controls. Additionally, Yates and Heine were members of the Bank's Internal Loan Committee (the "ILC"). The duties of the ILC included approving loans that were outside the authority of individual Bank loan officers, ensuring the quality of the Bank's loan portfolio, and minimizing risks in that portfolio.

On June 24, 2015, a federal grand jury issued a twenty-seven count indictment (the "Indictment") against both Yates and Heine for alleged conduct related to their time with the Bank. The Indictment charges Yates and Heine with one count of conspiracy to commit bank fraud, in violation of 18 U.S.C. § 1349, and twenty-six counts of making false bank entries, reports, and transactions, in violation of 18 U.S.C. § 1005. The Indictment alleges that beginning in about September 2009 and continuing through at least September 2014, Yates and Heine conspired to defraud the Bank by means of materially false representations and promises. The Indictment further alleges that the purpose of the conspiracy was to conceal the true financial condition of the Bank from the Board, the Bank's shareholders, regulators, and the public. According to the Indictment, Yates and Heine reported false and misleading information about loan performance, concealed information about the status of foreclosed properties, made

unauthorized transfers of Bank proceeds, and failed to disclose material facts about loans to the

Board, shareholders, and regulators, all in an effort to conceal the Bank's financial condition.

The Indictment also names Geoffrey Walsh ("Walsh") as a person who played a role in

the alleged conspiracy. Walsh was the former Senior Vice President of Lending at the Bank.

Yates was Walsh's manager. In May 2012, the Bank, acting through Heine, terminated the

employment of Walsh for cause, in part based on Walsh's alleged misconduct concerning

lending practices. Walsh was later indicted and charged in a separate case, *United States v.*

*Walsh*, 3:13-cr-00332-SI-1 (D. Or. 2013), for conspiracy to commit wire fraud, wire fraud, and

conspiracy to make false entries in bank records, among other charges. On July 22, 2015, Walsh

pleaded guilty to certain charges alleged in a superseding indictment and a second superseding

information. In Walsh's plea agreement, he accepted responsibility for acts related to those

described in the Indictment against Yates and Heine. Walsh is currently awaiting sentencing.

The Indictment against Yates and Heine alleges five schemes that purportedly advanced

the alleged conspiracy's purpose of creating a healthier appearance of the Bank's finances than

actually existed:

1. <u>Payments Made on Delinquent Loans</u>. The Indictment alleges that Yates and
   Heine made payments, using Bank proceeds, on behalf of Bank customers who
   were delinquent on their loans. The payments were sometimes made without the
   knowledge or consent of the Bank customer. The payments were made so that the
   delinquent loans would not appear in the "Call Reports."[2] Between approximately
   September 2009 and May 2012, Yates and Heine directed Walsh to make
   payments from his personal banking account to the accounts of Bank customers
   who were delinquent on their loans. On March 31, 2011, Yates transferred funds
   from a Bank customer's business checking account to the customer's personal
   loan account, which was delinquent, without the customer's consent. Yates and

_____

[2] Federal regulations required the Bank to file with the Federal Deposit Insurance
Corporation ("FDIC") on a quarterly basis what are commonly known as "Call Reports." A Call
Report contains data about the Bank's financial position and is divided into a number of
schedules. One of the schedules, known as "Schedule RC-N," requires disclosure of the full
value of outstanding loans.

Heine's alleged practice of paying delinquent loans with Bank or other proceeds hid delinquent loans that would have otherwise been included in the "Call Reports" and reported to the Board.

2.  Wire Transfer and Loan to Bank Customer M.K. The Indictment alleges that between July 2010 and September 2010, Yates and Heine "permitted an unsecured draw for Bank customer M.K. to be made and then approved a $1.7 million loan for the benefit of M.K. in order to conceal the unsecured draw and to pay other Bank borrowers' delinquent loans." Dkt. 1 at 5. Yates approved the $675,000 unsecured draw.

3.  Straw Buyer Purchase. The Indictment alleges that from October 2010 through May 2011, Yates and Heine recruited a Bank employee, D.W., "to facilitate a straw buyer purchase of real property located at 952 A Avenue, Lake Oswego, Oregon 97034" (the "A Avenue Property") with the purpose of concealing a loss to the Bank. Dkt. 1 at 7. Yates and Heine gave D.W. two checks totaling $267,727.89 from the Bank's cash account to purchase the A Avenue Property. The Indictment alleges that Yates falsely represented in transactional documents that D.W. funded the purchase personally.

4.  Other Real Estate Owned ("OREO") Properties Sold to Bank Customer R.C. The Indictment alleges that from March 2010 through June 2013, Yates and Heine removed two properties from the Bank's OREO account after the properties were sold to a Bank borrower, R.C., "even though the sales did not meet the requirements to remove the properties from the account." Dkt. 1 at 9. Yates and Heine did not require R.C. to make any down payment and provided R.C. with full financing from the Bank for both properties. As a result of the transactions, the properties were no longer reported on the "Call Reports" as OREO assets. On January 24, 2011, FDIC examiners questioned the validity of the removal of the properties from the Bank's OREO account and advised Yates and Heine that the purchases did not meet the minimum equity requirements needed to remove the properties. Yates advised the FDIC examiners that R.C. was going to make down payments for the two homes, which would then permit the Bank properly to remove the properties from the OREO account. On January 31, 2011, Yates prepared two memos to each of the R.C. loan files that falsely stated R.C. was willing to make a 15 percent down payment on the properties. Yates and Heine represented that R.C. paid down payments for the properties, when in fact no payment was received by the Bank.

5.  Misrepresentation to Shareholders. The Indictment alleges that from September 2009 through September 2014, Yates and Heine caused the Bank to misrepresent to the Bank's shareholders the Bank's Texas Ratio, which is a measure of the Bank's credit troubles, thus misrepresenting the true extent of delinquent loans.

The Indictment further alleges that Yates and Heine knowingly made twenty-six false entries in the books, reports, and statements of the Bank with the intent to injure and defraud the Bank. According to the Indictment, Yates and Heine did so by omitting material information about the true status of loans and assets from the "Call Reports" and reports to the Board.

The jury trial on the charges against both Yates and Heine is scheduled to begin on November 1, 2016. Thus, seven months remain before trial.

**B.  Yates's Theory of the Case**

In her publicly-filed memorandum in opposition to the Bank's motion to quash, Yates describes her theory of the case. *See* Dkt. 169 at 9-10. According to Yates, she left the Bank in March 2012 in the wake of a contentious FDIC investigation that was critical of Bank management. Before resigning, Yates compiled a list of Heine's misconduct as Bank President and presented the information to the Board. Because the Board was not receptive to this information, Yates asserts, she had no choice but to resign. The Bank terminated Walsh two months later and subsequently filed a civil lawsuit against Walsh in Clackamas County Circuit Court. The Bank also submitted a bond claim with its insurer in an attempt to recoup losses allegedly caused by Walsh and Yates (the "Bond Claim").

In June 2012, the FDIC and the FBI began to investigate Walsh and the Bank. While cooperating with authorities, Heine, still the Bank's CEO, asserted that Walsh and Yates were exclusively responsible for any misconduct at the Bank. Heine disclaimed all personal responsibility for any inappropriate lending activities. He contended that Yates was responsible for supervising Walsh and that she had knowledge of Walsh's misconduct. In September 2013, the Bank entered into a settlement with the FDIC and the Oregon Division of Finance and Corporate Securities (the "DFCS"). The Consent Order required the Bank to, among other things, conduct detailed internal studies of management, compensation, and its loan portfolio.

Yates asserts her innocence and that she never knowingly or intentionally acted with a fraudulent purpose. She states that at all times she was a conscientious but overworked employee who was forced to take on responsibilities outside of her expertise. According to Yates, the information sought by the subpoena to the Bank will show that she communicated consistently and honestly with Bank employees, outside auditors, and the Board; that she diligently sought advice and assistance from the Bank's accounting firm, Moss Adams, LLP; that Heine and Walsh together, and without the knowledge of Yates, engaged in unlawful conduct; and that Heine shifted the blame for any misconduct onto Yates after she resigned from the Bank.

## DISCUSSION

Yates's Subpoena to the Bank contains the following nine separate requests:

> Request No. One: All documents generated by the Bank or received from the Bank pertaining to the FDIC and DFCS examinations from 2004 through present, including but not limited to working papers, final reports, correspondence, notes, and memoranda between Bank employees and state and federal examiners.

> Request No. Two: All documents pertaining to internal audits and internal investigations from 2004 through present, including but not limited to internal audits and investigations by Moss Adams, including but not limited to working papers, final reports, correspondence, notes, and memoranda between Bank employees and auditors, including any reports, minutes, or communications pertaining to any internal audit committee.

> Request No. Three: All documents pertaining to *Bank of Oswego v. Geoffrey S. Walsh*, Clackamas County Circuit Court Case No. CV1206-0128, including but not limited to all discovery and depositions provided or received.

> Request No. Four: All documents pertaining to the Bank's Bond Claim with Everest Insurance following Walsh's departure from the Bank, including but not limited to all correspondence with the insurer regarding the Bond Claim.

> Request No. Five: All documents pertaining to litigation between the Bank and current or former employees of the Bank and current

PAGE 14 – OPINION AND ORDER

or former customers of the Bank, who are witnesses to the underlying conduct in this case, including but not limited to all discovery and depositions provided or received, settlement documents, and details of settlements entered into.

Request No. Six: All documents pertaining to *In the Matter of The Bank of Oswego*, FDIC-13-0295b, including but not limited to all documents pertaining to internal investigations, including documents concerning advice the Bank received concerning efforts to shift blame to Yates for conduct for which the Bank or Heine was accused, communications with FDIC and DFCS representatives, any and all documents prepared in anticipation of settlement, either internal or provided to the FDIC or DFCS, and any and all documents pertaining to the September 20, 2013, Consent Order in this matter.

Request No. Seven: All ILC minutes from 2004 through 2013.

Request No. Eight: All minutes of Board meetings, all Board reports, all audit committee minutes, reports, or communications, and any and all communications between the members of the Board and Yates, Walsh, and Heine from 2004 through present.

Request No. Nine: Copies of the Bank's server containing email and calendar information for Heine, Walsh, and Yates in .pst format.

The Bank makes several arguments that pertain to several overlapping categories of documents. First, the Bank argues that many of Yates's requests fall outside the relevant time period as outlined in the Indictment. Second, the Bank argues that many of the requested documents are subject to the "bank examiner's privilege" or are protected by the attorney-client privilege or the work product doctrine and thus cannot be compelled. The Court first addresses the relevant time period. The Court next addresses whether any privilege applies to the requested documents. The Court then separately addresses each of the Subpoena's nine requests.

**A.  Relevant Time Period**

The Bank states that many of Yates's requests, such those seeking documents pertaining to the Bank's civil lawsuit against Walsh, the Bank's Bond Claim, and the FDIC's investigation

and settlement with the Bank, either pre-date or post-date the relevant time period as outlined in the Indictment. The Bank argues that because the entirety of Yates's alleged criminal conduct is limited to November 2009 through March 2012, Yates cannot show the relevance of documents that do not fall within this time period of two years and four months.

The Court finds this argument unavailing. Yates's defense theory is that after her departure from the Bank, Heine was motivated to minimize his own fault and sought to shift the blame to Yates for his own misconduct as well as Walsh's. Thus, documents generated after Yates's resignation in 2012 may reveal exculpatory information. Also, documents generated before the events alleged in the Indictment may be relevant to show Yates's diligent, honest, and conscientious attempts to fulfill her duties at the Bank, and thus aid in establishing her defense. Accordingly, Yates has demonstrated "a 'sufficient likelihood'" that documents that pre-date or post-date the time period of the Indictment, at least within a certain window or timeframe, may be "material to any issue in the case." *Mason*, 2008 WL 1909115, at *1 (D. Or. Apr. 25, 2008) (quoting *Nixon*, 418 U.S. at 700). *Cf. id.* at *2 (finding that the defendant did not meet the relevancy requirement in part where discovery provided by the government was sufficient for the defendant's purposes).

## B. Privileges

### 1. Bank Examiner's Privilege

According to the Bank, the documents that it generated, gathered, and sent to the FDIC and DFCS in response to the regulatory review of the Bank are subject to what is known as the "bank examiner's privilege," and the Bank cannot waive this privilege. The bank examiner's privilege protects agency opinions and recommendations, as well as banks' responses to those opinions and recommendations, from disclosure. *In re Bankers Trust Co.*, 61 F.3d 465, 471 (6th Cir. 1995) (citing *Schreiber v. Soc'y for Sav. Bancorp, Inc.*, 11 F.3d 217, 220 (D.C. Cir. 1993)).

The bank examiner's privilege belongs to the agency and must be asserted by it; "'it can neither be claimed nor waived by a private party.'" *Overby v. U.S. Fid. & Guar. Co.*, 224 F.2d 158, 163 (5th Cir. 1995) (quoting *United States v. Reynolds*, 345 U.S. 1, 7 (1953)). Thus, the Bank cannot assert the privilege on behalf of the relevant agencies.

Yates has already served a Rule 17(c) subpoena on the FDIC (the "FDIC Subpoena"). Dkt. 188-1 at 2. In the FDIC Subpoena, Yates made the following requests:

> 1. Documents pertaining to the FDIC's regulatory examinations of Bank from 2004 through the present, including but not limited to, working papers, final reports, correspondence, notes and memoranda, confidentiality agreements and settlement agreements between the FDIC examiners and the Bank, its employees, agents, or representatives.

> 2. Copies of the email accounts and electronic calendars (in searchable .pst format) for Heine, Walsh, and Yates, which are stored on the Bank's server, a copy of which was provided to the FDIC by the Bank.

> 3. Documents pertaining to FDIC investigations of the Bank, which investigations were undertaken pursuant to its statutory authority under 12 U.S.C. § 1820(c) and 12 C.F.R. § 308.144, *et seq.*

*Id.* at 5. The FDIC has already produced to Yates non-privileged materials responsive to the first and third requests.[3] The FDIC did not refuse to produce responsive documents based on the bank examiner's privilege, although the FDIC did require that its production be subject to a protective order entered by the Court that provides, among other things, that disclosure shall not constitute a waiver of any privileges. Dkt. 187 ¶ 11.

In addition, counsel for the FDIC was present at the March 30, 2016 hearing on the Bank's motion to quash. Counsel for the FDIC did not assert the bank examiner's privilege with

---

[3] The second request of the FDIC Subpoena is virtually identical to Request Number Nine of the Yates Subpoena to the Bank.

regard to any of the Subpoena's requests for production from the Bank. Thus, because the FDIC has not asserted the bank examiner's privilege, and the Bank cannot assert the privilege on behalf of the FDIC, the Court does not reach the question of whether that privilege applies to any of the documents requested by Yates in her Subpoena directed to the Bank.

### 2. Attorney-Client Privilege and Work Product Doctrine

The Bank also asserts that several of Yates's requests seek large amounts of documents that are protected by the attorney-client privilege or the work product doctrine, which the Bank does not waive. Yates responds that with respect to Request Numbers One and Six, the Bank already has waived the attorney-client privilege when it shared its otherwise privileged information with the FDIC and the FBI. Yates also argues that even if the attorney-client privilege applies to the subpoenaed documents, her constitutional right to due process outweighs the Bank's interest in maintaining confidentiality under its attorney-client privilege.

As the party asserting the attorney-client privilege, the Bank bears the burden of proving that the attorney-client privilege applies and has not been waived. *United States v. Ruehle*, 583 F.3d 600, 607-08 (9th Cir. 2009). Yates asserts that as part of its cooperation with the FDIC and the FBI, the Bank commenced an internal investigation, and that the Bank's outside counsel provided interviews to the FBI in which he shared information regarding that investigation. Yates argues that in light of the Bank counsel's direct involvement in providing information to the government, and because of the Bank's efforts to compromise with the FDIC and avoid litigation, the results of the Bank's internal investigation and the documents it prepared to facilitate a settlement of its own case are not protected by the attorney-client privilege.

Yates cites *United States v. Bergonzi*, 216 F.R.D. 487 (N.D. Cal. 2003), in support of her argument that disclosure to government investigators waives the attorney-client privilege. In *Bergonzi*, the defendants, former corporate executives charged with fraud, sought production of a

"Report and Back-up Materials" prepared by their former company's outside counsel. *Id.*

at 490-91. After the company's auditors discovered accounting irregularities, the company hired

outside counsel to provide legal advice and review the accounting. *Id.* at 490. The company and

the Securities and Exchange Commission ("SEC") entered into a confidentiality agreement

stating that the company was conducting an internal investigation, likely culminating in the

preparation of a report, and that the company would provide the report to the SEC when it was

completed. *Id.* at 491. The agreement recited that the parties did not intend to waive either the

attorney-client privilege or protection of work product. *Id.*

    Later that month, the company's outside counsel and the U.S. Attorney's Office

("USAO") entered into a separate, but similar, confidentiality agreement that the USAO would

receive a copy of the Report and Back-up Materials. *Id.* The agreement with the USAO provided

that the USAO could use any document produced in any criminal proceeding. *Id.* The company's

outside counsel prepared the Report and Back-up Materials, presented it to the company, and

provided the Report and Back-up Materials to both the SEC and the USAO. *Id.*

    The *Bergonzi* court considered "whether the attorney-client privilege attaches to the

documents where [the company] agrees, prior to the creation of the documents, to disclose them

to the Government on condition that the Government acknowledge and make efforts to maintain

the confidential nature of the documents unless it determines, in its discretion, that it must

disclose them." *Id.* at 493. The court explained that "communications between client and

attorney for the purpose of relaying communication to a third party is not confidential and not

protected by the attorney-client privilege" and found that "[t]he communication between [outside

counsel] and the Company . . . was made with the intent to relay the communication to the

Government." *Id.* Additionally, the court reasoned that the company's authorization of the SEC

and the USAO to disclose the Report and Back-up Materials in certain circumstances ran

"counter to the Company's assertion the communication was intended to remain confidential."

*Id.* Accordingly, the court held that the company failed to meet its burden of proving that the

attorney-client privilege applied to the documents. *Id.*; *see also Ruehle*, 583 F.3d at 612 (holding

that statements made to counsel for the purpose of outside disclosure were not protected

attorney-client communications).

### a.   The Bank's Disclosures to the FBI or the Grand Jury

The pending case is distinguishable from the facts in *Bergonzi*. Here, the Bank asserts

that it retained outside counsel in order to obtain legal advice regarding the submission of its

Bond Claim to its insurer. Although the Bank contends that some of its communications with its

own counsel regarding the Bond Claim are protected under the attorney-client privilege, the

Bank agrees that the Bond Claim submission itself is not privileged, and the Bank represents that

it has provided a copy of those materials to Yates. The Bank also represents that it has never

produced confidential attorney-client communications or work product related to the Bond Claim

to any third party.

Unlike the voluntary disclosure of the Report and Back-up Materials in *Bergonzi*, the

Bank produced to the FBI, or in response to grand jury subpoenas, only non-privileged

information.[4] Because the information provided to the FBI or the grand jury did not contain the

---

[4] At the March 30, 2016 hearing, Yates submitted, and the Court received, Defendant's
Exhibit 1. Defendant's Exhibit 1 includes several FBI FD-302 reports, or interview summaries,
that report statements made by the Bank's counsel to government investigators. Yates argues that
counsel's statements constitute a subject-matter waiver of the attorney-client privilege. *See Weil
v. Inv./Indicators, Research & Mgmt., Inc.*, 647 F.2d 18, 24 (9th Cir. 1981). The Bank responds
that its counsel did not disclose any privileged information to the government and thus no waiver
occurred. The Court has reviewed Defendant's Exhibit 1, and does not find any subject-matter
waiver of the attorney-client privilege.

Bank's confidential attorney-client communications, the Bank has not waived its attorney-client privilege.

### b.  The Bank's Disclosures to the FDIC

Yates also identifies a deposition of a Bank Board member taken by the FDIC during which the Board member mentioned the Bond Claim and Bank counsel's advice regarding the Bond Claim. Yates argues that the Bank waived its attorney-client privilege with regard to all documents relating to its Bond Claim by disclosing to the FDIC advice that the Bank received from its counsel. *See Weil v. Inv./Indicators, Research & Mgmt., Inc.*, 647 F.2d 18, 24 (9th Cir. 1981) (stating that "it has been widely held that voluntary disclosure of the content of a privileged attorney communication constitutes waiver of the privilege as to all other such communications on the same subject."). The Bank responds that any disclosures made to the FDIC do not waive the attorney-client privilege because such disclosures are statutorily protected. The Court agrees based on 12 U.S.C. § 1828. That statute provides, in relevant part:

> The submission by any person of any information to the Bureau of Consumer Financial Protection, any Federal banking agency, State bank supervisor, or foreign banking authority for any purpose in the course of any supervisory or regulatory process of such Bureau, agency, supervisor, or authority *shall not be construed as waiving, destroying, or otherwise affecting any privilege such person may claim with respect to such information* under Federal or State law as to any person or entity other than such Bureau, agency, supervisor, or authority.

12 U.S.C. § 1828(x)(1) (emphasis added). In addition, the FDIC may share otherwise privileged information with other federal government agencies without waiving any applicable privilege. 12 U.S.C. § 1828(t). Thus, any statements made by the Bank to the FDIC or any documents provided by the Bank to the FDIC cannot constitute a waiver of the Bank's attorney-client privilege.

### c.  Yates's Right to Due Process

Finally, Yates argues that even if the Bank can establish that the documents she requests under her Subpoena are protected under the attorney-client privilege, Yates's constitutional due process rights outweigh the Bank's interest in maintaining confidentiality. Yates relies upon *Pennsylvania v. Ritchie*, 480 U.S. 39 (1987), in support of her argument. In *Pennsylvania*, the Supreme Court considered "whether and to what extent a State's interest in the confidentiality of its investigative files concerning child abuse must yield to a criminal defendant's Sixth and Fourteenth Amendment right to discover favorable evidence." *Id.* at 42-43. Although the Court found that the state's withholding of its investigative files did not violate the defendant's Sixth Amendment rights, the Court held that the defendant was entitled, under due process, to have the files reviewed by the trial court. *Id.* at 56-58. The Court explained that while "the public interest in protecting this type of sensitive information is strong, we do not agree that this interest necessarily prevents disclosure in all circumstances." *Id.* at 57. The Court noted that the state law protecting the confidentiality of such files "provides that the information shall be disclosed in certain circumstances, including when . . . directed to do so by court order." *Id.* at 58. The Court held, however, that defense counsel was not allowed to examine the files, rejecting the argument that "whenever a defendant alleges that protected evidence might be material, the appropriate method of assessing this claim is to grant full access to the disputed information, regardless of the State's interest in confidentiality." *Id.* at 59.

The facts in *Pennsylvania* are distinguishable from the pending case, and *Pennsylvania* does not support Yates's due process argument. *Pennsylvania* concerns the government's obligations to provide a defendant with favorable evidence that is material to guilt or punishment, and not whether a third party can be compelled through a Rule 17(c) subpoena to disclose otherwise privileged material to a defendant on the grounds that the information may

prove exculpatory. The *Pennsylvania* Court did not discuss the interaction between a defendant's

right to due process and a third party's assertion of its own attorney-client privilege. Thus,

Yates's reliance on *Pennsylvania* to argue that her due process right outweighs the Bank's

interest in confidentiality is not well-taken.[5]

## C.  The Subpoena's Requests

### 1.  Request No. One

In Request No. One, Yates seeks production of the following:

> All documents generated by the Bank or received from the Bank
> pertaining to the FDIC and DFCS examinations from 2004 through
> present, including but not limited to working papers, final reports,
> correspondence, notes, and memoranda between Bank employees
> and state and federal examiners.

Yates argues that Request No. One meets *Nixon*'s relevancy requirement because she

needs the requested information in order to demonstrate a consistent pattern and history of

transparent and honest communication with bank examiners about all issues and to demonstrate

that she worked diligently to correct identified problems and concerns. Yates also argues that the

information will provide exculpatory information regarding Heine's mismanagement of the

Bank. Yates asserts that information that post-dates her employment at the Bank is relevant

because it will show that Heine blamed Yates for his own misconduct. Finally, Yates argues that

documents relating to regulatory compliance review are likely admissible under the hearsay

exception for business records.

---

[5] Yates also cites an unpublished case from this District, *United States v. Stringer*, Case No. 3:03-cr-00432-HA (D. Or. Mar. 4, 2005) (Dkt.133), in support of her argument. Relying in part on *Pennsylvania*, the *Stringer* court ordered the production of a prior litigation file because "[a]ccording to the defendant, he made statements during the course of the . . . litigation that show he was unaware of any accounting fraud . . . and will be used as prior consistent statements at trial." Dkt. 133 at 5. Unlike in *Stringer*, Yates has not made a similar showing that *specific* evidence would be favorable to her defense. Additionally, *Stringer* is not binding authority.

Among other arguments, the Bank responds that it cannot waive the regulators' bank examiner's privilege. The Bank assrtes that the request should be propounded to the FDIC and DFCS, consistent with their regulations. The Bank additionally argues that under *Nixon*, Yates may not seek these documents from the Bank when they are available with reasonable diligence from the regulators.

Ruling on Request No. One: The FDIC has not asserted the bank examiner's privilege, and the Bank cannot assert that privilege on behalf of the FDIC. This request, however, as framed, is unreasonably broad and does not satisfy the "specificity" requirement of *Nixon*. It also appears to be an inappropriate "fishing expedition." In addition, to the extent that Yates seeks documents protected under the Bank's attorney-client privilege, the Bank has not waived that privilege. Further, the FDIC has already produced to Yates documents that are responsive to Yates's first and third requests to the FDIC, which appear to cover many of the documents sought by Yates in this request to the Bank. Accordingly, the Bank need not produce any documents in response to Request No. One.

**2.   Request No. Two**

In Request No. Two, Yates seeks production of the following:

> All documents pertaining to internal audits and internal investigations from 2004 through present, including but not limited to internal audits and investigations by Moss Adams, including but not limited to working papers, final reports, correspondence, notes, and memoranda between Bank employees and auditors, including any reports, minutes, or communications pertaining to any internal audit committee.

Yates argues that Request No. Two meets *Nixon*'s relevancy requirement because the requested documents will "show that she conferred regularly with Moss Adams and routinely sought its guidance and advice." Dkt. 169 at 29. Additionally, Yates asserts that the audit records

will reveal the nature and extent of advice that the Bank received regarding appropriate accounting practices and compliance.

The Bank responds that the request is overbroad and that it is not limited by the relevant time frame of the transactions identified in the Indictment. The Bank additionally argues that Yates makes only conclusory arguments regarding relevancy. The Bank asserts that it has satisfied its obligations by producing to Yates responsive records with connections to transactions identified in the Indictment, as well as the audited financial statements for 2009 through 2012—the years coinciding with Yates's alleged misconduct.

Ruling on Request No. Two: This request, as framed, is unreasonably broad and does not satisfy the "specificity" requirement of *Nixon*. It also appears to be an inappropriate "fishing expedition." Notwithstanding these concerns, the Court narrows the request and directs the Bank to provide copies of all audited financial statements of the Bank, including any notes, exhibits, or appendices thereto, as well as all Management Letters to the Bank from its auditors at Moss Adams, LLP, for the period of 2007 through 2013. The Court has selected 2007 in order to provide two years' worth of "baseline" information.

### 3. Request No. Three

In Request No. Three, Yates seeks production of the following:

> All documents pertaining to *Bank of Oswego v. Geoffrey S. Walsh*, Clackamas County Circuit Court Case No. CV1206-0128, including but not limited to all discovery and depositions provided or received.

Yates argues that Request No. Three meets the relevancy requirement because the requested documents will reveal exculpatory evidence and will tend to show that Walsh reported directed directly to Heine, rather than to Yates. Additionally, Yates argues that the requested documents are expected to show the extent to which Heine and Walsh conferred about

delinquent loans without the knowledge of Yates. Yates asserts that she seeks the following specific litigation documents: (1) interrogatories; (2) requests for admissions; (3) depositions; and (4) documents produced in discovery.

The Bank responds that it acknowledges that in the course of the *Walsh* litigation, it took the deposition of Yates that included questions related to transactions identified in the Indictment. The Bank agrees to produce a copy of that deposition and its accompanying exhibits. The Bank argues that the remainder the litigation file is not relevant, admissible, or sufficiently identified, and that the *Walsh* case post-dates both Yates's alleged misconduct as well as her departure from the Bank. The Bank additionally argues that the case file contains principally privileged communications and attorney work product, and that the effort in segregating privileged from non-privileged information is unduly burdensome.

Ruling on Request No. Three: This request, as framed, is unreasonably broad and does not satisfy the "specificity" requirement of *Nixon*. It also appears to be an inappropriate "fishing expedition." Notwithstanding these concerns, the Court narrows the request and directs the Bank to provide copies of all written discovery exchanged and transcripts of all depositions taken, including exhibits, in the referenced civil lawsuit.

### 4.  Request No. Four

In Request No. Four, Yates seeks production of the following:

> All documents pertaining to the Bank's Bond Claim with Everest
> Insurance following Walsh's departure from the Bank, including
> but not limited to all correspondence with the insurer regarding the
> Bond Claim.

Yates argues that Request No. Four meet *Nixon*'s relevancy requirement because, as with Request No. One, the requested information will demonstrate the Bank's pattern of shifting blame away from Heine and the Bank and onto Yates. Yates argues that the Bank's records

regarding the Bond Claim will show the extent to which Heine and the Bank sought to direct responsibility for the losses exclusively at Yates and Walsh. Yates asserts that information that post-dates her employment at the Bank is relevant because it will show that Heine blamed Yates for his own misconduct. Finally, Yates argues that these documents are admissible because they go to Heine's motive, bias, and opportunity to shift blame from his and Walsh's wrongdoing onto Yates. Yates additionally argues that the documents are admissible because they will show that Heine engaged in insurance fraud by presenting false and misleading facts to the insurer with the intent to obtain money for losses caused by his own wrongdoing. The Bank has produced the Bond Claim to Yates. The Bank, however, responds that it need not produce "all documents pertaining" to the Bond Claim as the request is overbroad and would capture attorney-client and attorney work product information.[6]

Ruling on Request No. Four: This request, as framed, is unreasonably broad and does not satisfy the "specificity" requirement of *Nixon*. It also appears to be an inappropriate "fishing expedition." Notwithstanding these concerns, the Court narrows the request and directs the Bank to provide, to the extent not already provided, a complete copy of the entire Bond Claim that the Bank submitted to its insurer, along with all correspondence and other documents relating to the Bond Claim that the Bank or its counsel exchanged with the Bank's insurer or its counsel.

---

[6] Yates replies that the crime-fraud exception to the attorney-client privilege voids the Bank's assertion of privilege as to the Bond Claim documents. The Ninth Circuit instructs that "[u]nder the crime-fraud exception, communications are not privileged when the client 'consults an attorney for advice that will serve him in the commission of a fraud' or crime." *In re Grand Jury Investigation*, 810 F.3d 1110, 1113 (9th Cir. 2016) (quoting *In re Napster, Inc. Copyright Litig.*, 479 F.3d 1078, 1090 (9th Cir. 2007), *abrogated in part on other grounds by Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100 (2009)). Because the Court quashes Request No. Four for lack of specificity, with the exception of the Bond Claim itself, the Court need not reach the question of whether the crime-fraud exception to the attorney-client privilege applies.

### 5. Request No. Five

In Request No. Five, Yates seeks production of the following:

> All documents pertaining to litigation between the Bank and current or former employees of the Bank and current or former customers of the Bank, who are witnesses to the underlying conduct in this case, including but not limited to all discovery and depositions provided or received, settlement documents, and details of settlements entered into.

Yates argues that Request No. Five meets *Nixon*'s relevancy requirement because it relates to the concerns that Yates raised with the Board regarding Heine's misconduct, and will corroborate Yates's allegations of Heine's mismanagement of the Bank. The Bank responds that the request targets entire files that contain principally privileged communications and attorney work product, and that Yates cannot identify the files with any specificity or even state whether they exist. The Bank points out that without specifically identifying the documents, Yates cannot meaningfully address their admissibility. The Bank additionally argues that the effort in segregating privileged from non-privileged information is unduly burdensome.

Ruling on Request No. Five: This request, as framed, is unreasonably broad and does not satisfy the "specificity" requirement of *Nixon*. It also appears to be an inappropriate "fishing expedition." Accordingly, the Bank need not produce any documents in response to Request No. Five.

### 6. Request No. Six

In Request No. Six, Yates seeks production of the following:

> All documents pertaining to *In the Matter of The Bank of Oswego*, FDIC-13-0295b, including but not limited to all documents pertaining to internal investigations, including documents concerning advice the Bank received concerning efforts to shift blame to Yates for conduct for which the Bank or Heine was accused, communications with FDIC and DFCS representatives, any and all documents prepared in anticipation of settlement, either internal or provided to the FDIC or DFCS, and any and all

documents pertaining to the September 20, 2013, Consent Order in
this matter.

Yates argues that Request No. Six meets *Nixon*'s relevancy requirement because the
requested documents will show the extent to which the Bank was able to direct the focus of the
investigation away from Heine and toward Yates. Yates asserts that the Bank and Heine were
highly motivated to minimize their own fault, and that the requested information will provide
Yates with exculpatory evidence regarding this motivation. Finally, Yates argues that documents
relating to regulatory compliance review are likely admissible under the hearsay exception for
business records. The Bank responds that it cannot waive the regulators' bank examiner's
privilege. The Bank argues that the request should be propounded upon the FDIC and DFCS,
consistent with their regulations. The Bank additionally argues that under *Nixon*, Yates may not
seek these documents from the Bank when they are available with reasonable diligence from the
regulators.

Ruling on Request No. Six: The FDIC has not asserted the bank examiner's privilege,
and the Bank cannot assert that privilege on behalf of the FDIC. This request, however, as
framed, is unreasonably broad and does not satisfy the "specificity" requirement of *Nixon*. It also
appears to be an inappropriate "fishing expedition." In addition, to the extent that Yates seeks
documents protected under the Bank's attorney-client privilege, the Bank has not waived that
privilege. Further, the FDIC has already produced to Yates documents that are responsive to
Yates's first and third requests to the FDIC, which appear to cover many of the documents
sought by Yates in this request to the Bank. There are four categories of documents responsive to
Request No. 6 that are not likely to be contained in the FDIC's production to Yates, that may
satisfy *Nixon*, and that might not be privileged. Accordingly, the Bank is directed to provide to
the Court within two weeks for the Court's *in camera* review copies of the following: (1) any

reports, presentations, or correspondence sent or provided to the Bank by Troubled Assets

Solution between 2009 and 2013; (2) any reports, presentations, or correspondence sent or

provided to the Bank by Mr. Richard Tine, relating to any forensic accounting work that he

performed for the Bank, between 2009 and 2013; and (3) any reports, presentations, or

correspondence sent or provided to the Bank that constitute "internal investigations" of any of

the matters alleged in the Indictment, to the extent that such documents were not already

provided to the FDIC and thus already likely included in that agency's response to Yates's

subpoena; and (4) any reports, presentations, or correspondence sent or provided to the Bank

related to the Bank's settlement agreement with the FDIC or the September 20, 2013 Consent

Order, to the extent that such documents would not already be in the possession of the FDIC and

likely included in that agency's response to Yates's subpoena.

### 7.  Request No. Seven

In Request No. Seven, Yates seeks production of the following:

> All ILC minutes from 2004 through 2013.

Yates argues that Request No. Seven meets *Nixon*'s relevancy requirement because the

requested documents will show that Heine was centrally involved in loan-making decisions,

although he now claims that he knew little or nothing about delinquent loans and had minimal

involvement in loan approvals. Thus, Yates argues, the requested information will disprove

Heine's claim of lack of knowledge regarding fraudulent loan reporting. Additionally, Yates

asserts that the requested information will establish that she played a minimal role in the Bank's

lending practices and was more focused on Bank operations. The Bank responds that the

Indictment does not relate to activity prior to 2009, and that thus pre-2009 documents are

irrelevant. The Bank agrees to produce its ILC minutes for 2009 through 2013, subject to

redactions for attorney-client privilege or work product, bank examiner's privilege, and statutorily required non-disclosure of certain Bank activity.

Ruling on Request No. Seven: The Bank has already agreed to produce its ILC minutes from 2009 through 2013. The Bank is directed to begin that production two years earlier, starting with ILC minutes prepared in 2007, in order to provide "baseline" information. The Bank may redact information protected against disclosure under the attorney-client privilege.

### 8.   Request No. Eight

In Request No. Eight, Yates seeks production of the following:

> All minutes of Board meetings, all Board reports, all audit committee minutes, reports, or communications, and any and all communications between the members of the Board and Yates, Walsh, and Heine from 2004 through present.

Yates argues that Request No. Eight meets *Nixon*'s relevancy requirement because the requested documents are necessary to establish that Yates's communicated with the Board from the time of the Bank's founding until her departure with full transparency. The Bank responds that the request is overly broad because the Indictment does not relate to activity prior to 2009. The Bank agrees to produce Board meeting minutes, Board reports, and audit committee minutes for 2009 through 2013, subject to redactions for attorney-client privilege or work product, bank examiner's privilege, and statutorily required non-disclosure of certain Bank activity.

Ruling on Request No. Eight: The Bank has already agreed to produce its Board meeting minutes, Board reports, and audit committee minutes for 2009 through 2013. The Bank is directed to begin that production two years earlier, starting with responsive document prepared in 2007, in order to provide "baseline" information. The Bank may redact information protected against disclosure under the attorney-client privilege.

PAGE 31 – OPINION AND ORDER

### 9. Request No. Nine

In Request No. Nine, Yates seeks production of the following:

> Copies of the Bank's server containing email and calendar information for Heine, Walsh, and Yates in .pst format.[7]

Yates argues that Request No. Nine meets *Nixon*'s relevancy requirement because the requested documents will demonstrate the extent to which Heine and Walsh communicated about the loans and transactions at issue in the Indictment. Additionally, Yates argues that she requires a complete set of her email to demonstrate that she diligently relied on the advice of auditor Moss Adams. Yates asserts that her electronic calendar information is necessary to demonstrate that she was overworked and overextended, and thus had neither the time nor the expertise to be involved in the details of the fraudulent transactions the Indictment describes. The Bank responds that this request is overly broad because it would capture sensitive Bank customer records and a large amount of attorney-client privileged communications, as well as information irrelevant to the charges in the Indictment. The Bank proposes that Yates provide search terms that target the transactions at issue in the Indictment.

<u>Ruling on Request No. Nine</u>: The Bank is directed to provide, in .pst format, a copy of all emails and calendar information from 2007 through 2013 from its server for custodians Dan Heine, Diana Yates, and Geoffrey Walsh, although the Bank may exclude or redact information protected against disclosure by the attorney-client privilege. In order to reduce its burden, the Bank may consider searching for all emails sent to, copied to, or received from a named attorney for the Bank or that contain words or phrases such as "attorney," "legal advice," or "legal counsel," before conducting its privilege review. In addition, the Bank's production may be

---

[7] The FDIC, as well as the Bank, possesses copies of the server in .pst format. The prosecution has provided Yates with some emails it obtained from the FDIC in .pdf format; however, according to Yates, the email set the prosecution provided her with is incomplete.

placed under a suitable protective order that contains, among other provisions, a "claw-back" for inadvertently produced privileged information and a requirement that any recipient of documents produced by the Bank pursuant to this Request No. Nine provide reasonable advance notice to the Bank before submitting any such document under this request not under seal or seeking to introduce any such document under this request as a trial exhibit. In addition, if these procedures prove to be unreasonably burdensome to the Bank, it has leave to seek further assistance from the Court on this issue.

## CONCLUSION

The Bank's Motion to Quash or Modify Defendant Yates's Rule 17(c) Subpoena (Dkt. 124) is GRANTED IN PART and DENIED IN PART as described in this Opinion and Order.

**IT IS SO ORDERED**.

DATED this 31st day of March, 2016.

/s/ Michael H. Simon
Michael H. Simon
United States District Judge

PAGE 33 – OPINION AND ORDER