# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **UNITED STATES OF AMERICA**, | Case No. 3:15-cr-238-SI-1 |
| v. | **OPINION AND ORDER ON DEFENDANT DAN HEINE'S MOTION TO SUPPRESS** |
| **DAN HEINE and DIANA YATES**, | |
| Defendants. | |

Billy J. Williams, United States Attorney, and Claire M. Fay, Michelle Holman Kerin, and Quinn P. Harrington, Assistant United States Attorneys, UNITED STATES ATTORNEY'S OFFICE FOR THE DISTRICT OF OREGON, 1000 S.W. Third Avenue, Suite 600, Portland, OR 97204. Of Attorneys for the United States of America.

Jeffrey Alberts and Mark Weiner, PRYOR CASHMAN, LLP, 7 Times Square, New York, NY 10036; Caroline Harris Crowne and Michael C. Willes, TONKON TORP, LLP, 1600 Pioneer Tower, 888 S.W. Fifth Avenue, Portland, OR 97204. Of Attorneys for Defendant Dan Heine.

Janet Lee Hoffman, Kelsey R. Jones, Andrew T. Weiner, Katherine Feuer, and Douglas J. Stamm, JANET HOFFMAN & ASSOCIATES, LLC, 1000 S.W. Broadway, Suite 1500, Portland OR 97205; Matthew J. Kalmanson, HART WAGNER, LLP, 1000 SW Broadway, Suite 2000, Portland, OR 97205. Of Attorneys for Defendant Diana Yates.

**Michael H. Simon, District Judge.**

Defendants Dan Heine ("Heine") and Diana Yates ("Yates") are charged with conspiring to commit bank fraud and making false bank entries, reports, and transactions during the time when they were the two most senior officers of The Bank of Oswego (the "Bank"). ECF 1.

Before the Court are: (1) Defendant Heine's Motion to Suppress ("Motion"), ECF 315; and

(2) Defendant Heine's Supplemental Motion to Suppress ("Supplemental Motion"). ECF 452.

In his Motion, Heine argues that the Court should suppress all statements that he made under oath during a deposition compelled by the Federal Deposit Insurance Corporation ("FDIC") on the grounds that the government abused parallel civil and criminal proceedings and obtained Heine's deposition testimony in violation of his Fifth Amendment right to due process. Specifically, Heine argues that the government violated his right to due process by: (1) not informing him before taking his deposition that the government "contemplated" his criminal prosecution; (2) failing to warn him that his deposition testimony could be used against him at a criminal trial; and (3) compelling his deposition as a "pretext" to obtain evidence for his criminal prosecution.

Heine also argues in his Motion that the Court should suppress statements that Heine made during two covertly recorded telephone conversations with a government informant because federal prosecutors elicited these statements from Heine without the knowledge or consent of Heine's counsel, in violation of the prohibition against *ex parte* communications by an attorney with a represented person contained in Oregon's Rules of Professional Conduct. Finally, Heine argues that the Court should suppress his post-arrest statements for two independently sufficient reasons under *Miranda v. Arizona*, 384 U.S. 436 (1966). First, Heine argues that he unambiguously invoked his right to remain silent. Second, Heine argues that he unambiguously invoked his right to have counsel present during questioning.

In his Supplemental Motion, Heine moves to suppress unsworn statements that he gave on September 12, 2012 and January 24, 2013 to representatives from the FDIC and the FDIC's

Office of Inspector General ("FDIC-OIG"). Heine argues that those statements were taken in violation of his Fifth Amendment right against compulsory self-incrimination under *Miranda*.

The Court held a joint evidentiary hearing to consider both Heine's Motion and Supplemental Motion and a separate Motion to Suppress filed by Defendant Yates. The first day of the hearing was held on August 22, 2016, and it focused on Heine's Motion. At the request of the parties, the evidentiary hearing resumed on November 7, 2016, and continued day-to-day thereafter until November 10, 2016. During the five-day suppression hearing (including August 22), the Court received numerous exhibits and declarations and also heard testimony from the following twelve witnesses:

1.  Assistant United States Attorney Claire Fay;
2.  FBI Special Agent Matthew Swansinger;
3.  FBI Special Agent Michael Maestas;
4.  FBI Forensic Accountant Glenese Klein;
5.  FDIC-OIG Special Agent Michael Wixted;
6.  FDIC Attorney Lori Honjiyo;
7.  FDIC Field Supervisor Paul Hornberger;
8.  Former FDIC Attorney Lesley Williams;
9.  Former FDIC Investigation Specialist Janie Spaulding;
10. Attorney Michael Seidl (previously representing Mr. Heine);
11. Attorney Jeffrey Edelson (previously representing Ms. Yates); and
12. Attorney Casey Nokes (representing the Bank).

The Court has considered all of the evidence and arguments presented by the parties. For the reasons that follow, the Court grants in part and denies in part Heine's Motion to Suppress. Heine's Motion is granted with respect to his post-arrest statements made while in custody and denied in all other respects. The Court also denies Heine's Supplemental Motion to Suppress.

## BACKGROUND

As alleged in the Indictment (ECF 1), in 2004, Heine and Yates co-founded the Bank, a financial institution engaged in the business of personal and commercial banking and lending.

The Bank is headquartered in Lake Oswego, Oregon.[1] Heine served as the Bank's President and Chief Executive Officer ("CEO"). As President and CEO, Heine supervised and managed the Bank's affairs and operations. Heine also was a member of the Bank's Board of Directors (the "Board"). Heine left the Bank in September 2014. Yates served as the Bank's Executive Vice President and Chief Financial Officer ("CFO"). As CFO, Yates was responsible for ensuring the Bank's compliance with federal and state regulations. Yates also was the Secretary of the Board. Yates resigned from the Bank in March 2012 after disagreements with Heine.

Both Heine and Yates were responsible for ensuring that the Bank operated in a sound and safe manner and for keeping the Board informed about the Bank's financial condition and the adequacy of the Bank's policies, procedures, and internal controls. Additionally, Heine and Yates were members of the Bank's Internal Loan Committee (the "ILC"). The duties of the ILC included approving loans that were outside the authority of individual Bank loan officers, ensuring the quality of the Bank's loan portfolio and minimizing risks in that portfolio.

The Bank is subject to regular monitoring and examinations by the FDIC. For example, federal regulations require the Bank to file with the FDIC what are commonly known as "Call Reports" on a regular basis. A Call Report contains data about the Bank's financial position and is divided into a number of schedules. One of these schedules, known as "Schedule RC-N," requires disclosure of the correct value of outstanding loans.

On June 23, 2015, a federal grand jury returned a 27-count Indictment against both Heine and Yates, alleging misconduct related to their activities with the Bank. The Indictment charges Heine and Yates with one count of conspiring to commit bank fraud, in violation of 18 U.S.C.

---

[1] On August 12, 2016, the Bank sold loans and other assets to HomeStreet Bank. The Bank of Oswego continues to exist as a corporate entity, but has relinquished its banking charter and now operates as Oswego Resolution. ECF 481 at ¶¶ 3-4 (Decl. of Stephen G. Andrews).

§ 1349, and 26 counts of making false bank entries, reports, and transactions, in violation of

18 U.S.C. § 1005. The Indictment alleges that beginning in about September 2009 and

continuing through at least September 2014, Heine and Yates conspired to defraud the Bank

through materially false representations and promises. The Indictment further alleges that one of

the purposes of the conspiracy was to conceal the true financial condition of the Bank from the

Board, the Bank's shareholders, the Bank's regulators (including the FDIC), and the public.

According to the Indictment, Heine and Yates reported false and misleading information about

loan performance, concealed information about the status of foreclosed properties, made

unauthorized transfers of Bank proceeds, and failed to disclose material facts about loans to the

Board, shareholders, and regulators, all in an effort to conceal the Bank's financial condition.

The Indictment against Heine and Yates alleges the following five schemes that

purportedly advanced the alleged conspiracy's purpose of falsely creating a healthier appearance

of the Bank's finances than actually existed:

1.  Payments Made on Delinquent Loans. Heine and Yates made payments, using
    Bank proceeds, on behalf of Bank customers who were delinquent on their loans.
    The payments sometimes were made without the knowledge or consent of the
    Bank's customer. The payments were made so that the delinquent loans would not
    appear in the Call Reports. On March 31, 2011, Yates transferred funds from a
    Bank customer's business checking account to the customer's personal loan
    account, which was delinquent, without the customer's consent. Heine and
    Yates's alleged practice of paying delinquent loans with Bank or other proceeds
    hid delinquent loans that otherwise would have been included in the Call Reports
    and reported to the Board.

2.  Wire Transfer and Loan to Bank Customer M.K. Between July 2010 and
    September 2010, Heine and Yates permitted to be made an unsecured draw in the
    amount of $675,000 for Bank customer M.K. and then approved a $1.7 million
    loan for the benefit of M.K. in order to conceal the unsecured draw and to pay
    other Bank borrowers' delinquent loans. Yates approved the unsecured draw.

3.  Straw Buyer Purchase. From October 2010 through May 2011, Heine and Yates
    recruited a Bank employee, Daniel Williams ("Williams"), to facilitate a straw
    buyer purchase of real property located at 952 A Avenue, Lake Oswego, Oregon

97034 (the "A Avenue Property") for the purpose of concealing a loss to the Bank. Heine and Yates gave Williams two checks totaling $267,727.89 from the Bank's cash account to purchase the A Avenue Property. Yates falsely represented in transactional documents that Williams funded the purchase personally.

4. <u>Other Real Estate Owned ("OREO") Properties Sold to Bank Customer R.C.</u> From March 2010 through June 2013, Heine and Yates removed two properties from the Bank's OREO account after the properties were sold to a Bank borrower, R.C., even though the sales did not meet the requirements to remove the properties from the account. Heine and Yates did not require R.C. to make any down payment and provided R.C. with full financing from the Bank for both properties. As a result of the transactions, the properties were no longer reported on the Call Reports as OREO assets. On January 24, 2011, FDIC examiners questioned the validity of the removal of the properties from the Bank's OREO account and advised Heine and Yates that the purchases did not meet the minimum equity requirements needed to remove the properties. Yates advised the FDIC examiners that R.C. was going to make down payments for the two homes, which would then permit the Bank properly to remove the properties from the OREO account. On January 31, 2011, Yates prepared two memos to each of the R.C. loan files that falsely stated R.C. was willing to make a 15 percent down payment on the properties. Heine and Yates represented that R.C. paid down payments for the properties, when in fact no payment was received by the Bank.

5. <u>Misrepresentations to Shareholders.</u> From September 2009 through September 2014, Heine and Yates caused the Bank to misrepresent to the Bank's shareholders the Bank's "Texas Ratio," which is a measure of the Bank's credit troubles and potential for bank failure, thus misrepresenting the true extent of the Bank's delinquent loans.

ECF 1 at 4-11, ¶¶ 13-26. The Indictment further alleges that Heine and Yates knowingly made 26 false entries in the books, reports, and statements of the Bank with the intent to injure and defraud the Bank. Heine and Yates allegedly did so by omitting material information about the true status and condition of loans and assets from the Call Reports and reports to the Board. *Id.* at 12-14.

The Indictment also names Geoffrey Walsh ("Walsh") as a person who played a role in the alleged conspiracy. Walsh was the former Senior Vice President of Lending at the Bank. In May 2012, the Bank, acting through Heine, terminated the employment of Walsh for cause, in

part based on Walsh's alleged misconduct concerning lending practices. In July 2013, Walsh was indicted and charged in a separate case for conspiracy to commit wire fraud, wire fraud, and conspiracy to make false entries in bank records, among other charges. *United States v. Walsh*, Case No. 3:13-cr-00332-SI-1 (D. Or. 2013). On July 22, 2015, Walsh pleaded guilty to certain charges alleged in a superseding indictment and a second superseding information. In Walsh's plea agreement, he accepted responsibility for acts related to those described in the Indictment against Heine and Yates. Walsh is awaiting sentencing.

## FINDINGS OF FACT

The Court finds the following facts by a preponderance of the evidence:

### A.  Parallel Proceedings

On December 15, 2009, the FDIC issued a Safety and Soundness Examination Report, finding "less than satisfactory conditions" at the Bank. Gov't Ex. AA, at 2. The following month, Heine complained to Yates about the "very adversarial" nature of the recent FDIC examination of the Bank and that the FDIC seemed "to overstate the distressed nature of both [the Bank's] loan customers and the safety and soundness of [the] bank." Gov't Ex. QQ.

On June 1, 2010, the Bank and the FDIC entered into a Memorandum of Understanding ("MOU"). Gov't Ex. AA, at 1-5. Under the MOU, the Bank agreed to provide additional reporting to the FDIC and to meet certain financial benchmarks. *Id.* An MOU is "a common informal agreement used by the FDIC to obtain a commitment from a bank's board of directors to implement corrective measures." FDIC RISK MANAGEMENT MANUAL OF EXAMINATION POLICIES § 13.1. Although an MOU is an informal action that is not legally enforceable, a bank's failure to implement the corrective measures described in an MOU may lead to formal proceedings. *Id.*

On January 24, 2011, the FDIC and the Oregon Division of Finance and Corporate Securities began a joint examination of the Bank. Alberts Decl., Ex. J, at 1-2. The examination report describes violations of banking laws and regulations, including a failure properly to appraise OREO (Other Real Estate Owned) property. *Id.* at 2.

In March 2012, the FDIC "downgraded" the Bank. Jones Decl., Ex. 35, at 15. The FDIC examiners told Heine that if the Bank did not make improvements, the FDIC's next step would be to bring a civil enforcement action. *Id.* Approximately one month later, Yates resigned from the Bank after disagreements with Heine. *Id.*

On June 11, 2012, Heine called the FBI to report alleged criminal activity by Walsh. Gov't Ex. BB. Heine reported that Walsh improperly used customer funds to make loans to other customers that the Bank ordinarily would not have approved. *Id.* Heine also told the FBI that Yates may have been involved with Walsh's allegedly improper activities and that she approved many of the loans at issue. *Id.* This was the beginning of the FBI's investigation into activities at the Bank.[2]

On June 14, 2012, FBI Special Agent Swansinger interviewed Heine about Walsh and Yates. Alberts Decl., Ex. B. Later that month, Assistant U.S. Attorney Claire Fay at the U.S. Attorney's Office in the District of Oregon opened a criminal investigation into Walsh's conduct at the Bank. FBI Special Agent Swansinger and FBI Special Agent Michael Maestas were assigned to the case. In July 2012, the U.S. Attorney's Office convened a grand jury to investigate Walsh's activities at the Bank. Alberts Decl. Ex. C.

---

[2] On May 29, 2012, Heine filed a Suspicious Activity Report ("SAR") with the United States Department of the Treasury's Financial Crimes Enforcement Network, naming Yates. Jones Decl. Ex. 6. The SAR stated that Yates contacted Bank customers and third parties regarding customers' confidential information after her departure from the Bank in March 2012. The SAR also described improper lending practices on the part of Walsh. According to the SAR, Yates knew of and signed off on many of Walsh's allegedly improper loans.

On July 27, 2012, FBI agents met with individuals from the FDIC to discuss their respective investigations into alleged misconduct at the Bank. Jones Decl. Ex. 8. The following people attended the meeting: FBI Special Agents Swansinger and Maestas; FBI Forensic Accountant Glenese Klein; FDIC Investigation Specialist Janie Spaulding; FDIC Portland Office Field Supervisor Paul Hornberger; FDIC-OIG Special Agent Michael Wixted[3]; and FDIC representatives Bonn Phillips and Shirley Huang. *Id.* The FBI advised the FDIC that the FBI was investigating "the theft of bank records conducted by Walsh along with an alleged hard money lending scheme,[4] which also involved Walsh." *Id.* The FDIC advised the FBI that the FDIC "will continue their investigation regarding Walsh's loans and report any information that may support the criminal investigation." *Id.* After the meeting, Spaulding emailed to Phillips and Huang the contact information for the FBI agents. Jones Decl., Ex. 48.

By August 2012, Heine was aware that both the FBI and the FDIC were investigating Walsh. On August 11, 2012, Heine emailed FDIC representative Phillips, stating: "Regarding the Walsh/Yates/[M.K.] situation, I have been working closely with Ms. Janie Spaulding, FDIC Investigative Specialist. As you may know, there is also a Federal Investigation going on while our Civil Law Suit [against Walsh] is on hold."[5] Jones Decl., Ex. 9. In addition, during the time

---

[3] The mission of the FDIC's OIG is to investigate fraud, waste, and mismanagement, with a focus on fraudulent transactions. The FDIC's OIG can be characterized as the "law enforcement" arm of the FDIC and is separate from the civil enforcement and bank examination activities of the FDIC. The FDIC's bank examiners may refer matters to the FDIC-OIG.

[4] "Hard money loans" can be defined as "loans too risky to meet the criteria of a bank or other conventional lender, typically involving loan fees and interest rates substantially higher than those charged by conventional lenders." *In re Mastro*, 465 B.R. 576, 585 (W.D. Wash 2011).

[5] In June 2012, the Bank commenced a civil lawsuit against Walsh for misappropriation of the Bank's trade secrets and breach of the duty of loyalty. *The Bank of Oswego v. Geoffrey S. Walsh*, Case No. CV12060128, Clackamas County Circuit Court (the "*Walsh* Lawsuit"). Jones Decl., Ex. 19 (Complaint in *Walsh* Lawsuit).

that Heine was President and CEO, the Bank shared information with both the FBI and the FDIC. *See, e.g.*, Jones Decl., Ex. 49 (September 19, 2012 email from the Bank's consultant, copying FBI Special Agent Swansinger and FDIC-OIG Special Agent Wixted, among others). Further, on November 26, 2012, FBI Forensic Accountant Klein spoke with Heine in connection with the receipt of documents from the Bank pursuant to a grand jury subpoena. Gov't Ex. TT. Heine confirmed that he understood that Walsh's activities at the Bank were the subject of three continuing inquiries: an FDIC investigation, an FBI investigation, and the *Walsh* Lawsuit brought by the Bank. *Id.*

On September 10, 2012, FDIC examiners began an on-premises examination that focused on loans originated by Walsh. Alberts Decl., Ex. K, at 7. Two days later, FDIC Investigator Spaulding and FDIC-OIG Special Agent Wixted interviewed Heine. Alberts Decl., Ex. L. During the interview, Heine described improper conduct by both Walsh and Yates. *Id.* Spaulding and Wixted spoke with Heine again on January 24, 2013. Alberts Decl., Ex. M.

After conducting these interviews of Heine, Investigation Specialist Spaulding and FDIC-OIG Special Agent Wixted regularly discussed and exchanged information regarding the FDIC's investigation into the Bank. Alberts Supp. Decl., Ex. A (emails dated January 2013 through May 2015). For example, after the January 24, 2013 interview, Wixted emailed Spaulding: "I was thinking, remember Dan's [Heine's] statement about how employee loans were processed, do you think you could ask him for the policy and the reports he indicated were provided at the Board meetings." Alberts Supp. Decl., Ex. A, at 1. Additionally, Spaulding informed Wixted about statements that Heine made to Spaulding from time to time. *See, e.g.*, *id.* at 2, 4, 6, 8, 10-11.

On February 4, 2013, the FDIC issued a formal Order of Investigation, finding that "former executives of The Bank of Oswego . . . may have violated laws and/or regulations, engaged in unsafe and unsound banking practices, and/or breached their fiduciary duty to the Bank. Alberts Supp. Decl., Ex. D. This Order authorized the FDIC to issue third-party subpoenas for documents and for taking sworn statements (or depositions).

On April 29, 2013, the FDIC served a Subpoena for Personal Attendance (the "Subpoena") upon Heine. Alberts Decl., Ex. N. The Subpoena's cover letter stated: "The FDIC is conducting a confidential investigation into activities concerning The Bank of Oswego" and advised "You have the right to be accompanied, advised, and represented by counsel." *Id.* at 1. The Subpoena itself also advised Heine that "You the right to be accompanied, advised, and represented by counsel" and that Heine's testimony would be kept confidential under Section 308.147 of the FDIC Rules of Practice and Procedure. *Id.* at 2. [6] The Subpoena further

---

[6] Section 308.147 of the FDIC Rules of Practice and Procedure, 12 C.F.R. § 308.147, states: "Investigations shall be confidential. Information and documents obtained by the FDIC in the course of such investigations shall not be disclosed, except as provided in part 309 of this chapter and as otherwise required by law." Part 309 provides, in relevant part, 12 C.F.R. § 309.6(b)(4)(i): "Reports of Apparent Crime pertaining to suspected violations of law, which may contain customer financial records, may be disclosed to federal or state prosecuting or investigating authorities without giving notice to the customer, as permitted in the relevant exceptions of the [Right to Financial Privacy Act of 1978, 12 U.S.C. § 3401, *et seq.*]." Further, 12 C.F.R. § 310(b)(7) provides that the FDIC may make disclosures:

> To another agency or to an instrumentality of any governmental jurisdiction within or under the control of the United States for a civil *or criminal law enforcement activity* if the activity is authorized by law, and if the head of the agency or instrumentality has made a written request to the [FDIC] specifying the particular portion desired and the law enforcement activity for which the record is sought.

(Emphasis added.)

stated that failure to comply with the Subpoena is a misdemeanor offense punishable by a penalty of $1,000 and up to a year of imprisonment. *Id.* at 3.

At about this time, Assistant U.S. Attorney Fay learned that the FDIC was conducting a civil enforcement investigation into alleged misconduct at the Bank. On June 5 and 10, 2013, FDIC attorneys Lori Honjiyo and Lesley Williams contacted Assistant U.S. Attorney Fay to notify Fay that the FDIC's civil enforcement side planned to depose current and former Bank employees, including Heine. The FDIC attorneys wanted to "de-conflict" and ensure that their depositions would not interfere with the criminal investigation. Assistant U.S. Attorney Fay did not provide the FDIC attorneys with any information about the criminal investigation and did not direct the FDIC's civil enforcement proceeding in any manner, such as by requesting that FDIC counsel depose particular people, ask specific questions, or cover certain topics.

Although FDIC-OIG Special Agent Wixted had some contact with FBI agents throughout 2012 and the first half of 2013, he was not yet considered by the U.S. Attorney's Office (or by himself) to be part of the "prosecution team" in this case. On May 23, 2013, FDIC Investigator Spaulding emailed Wixted to notify him that the FDIC had issued subpoenas to Daniel Williams and Heine, among other current and former Bank employees. Alberts Supp. Decl., Ex. A, at 26. Spaulding also wrote: "Hopefully if the [Assistant U.S. Attorney] wants to request that we not do some of the interviews, she will do that soon." *Id.* at 26. Neither Special Agent Wixted nor FBI Special Agent Swansinger requested that the FDIC ask any particular questions or cover any specific topics during Heine's deposition taken by the FDIC. The FBI, however, did ask Yates on June 6, 2013, whether she would be willing to wear a "wire" to secretly record conversations with Heine. Yates considered the request, but ultimately declined.

Heine's deposition (or "sworn statement," as the FDIC refers to it) was taken by the FDIC on June 13, 2013. Alberts Decl. Ex. O. The Bank retained Portland attorney Michael R. Seidl ("Seidl") to represent Heine personally during the deposition. (Seidl Decl. ¶¶ 2, 4.) In addition to Heine and Seidl, the following people attended the deposition: FDIC Investigation Specialist Spaulding, FDIC attorneys Honjiyo and Williams, and Judith Auten with the FDIC's Division of Risk Management Supervision. Alberts Decl. Ex. O at 2-3.

At the beginning of the deposition, FDIC attorney Williams told Heine and Seidl: "I should state on the record that this is a confidential investigation. . . . However, *we would be obligated to provide the transcript if requested by a law enforcement agency*, but we would only do that pursuant to our Part 309 of our rules and regulations." *Id.* at 9-10 (emphasis added). Attorney Williams then clarified: "And the other thing is . . . not only law enforcement but other federal or regulatory agencies that may show a need pursuant to 309 for the transcript, we would make it available, though, we would give you notice." *Id.* at 10.

During the deposition, the FDIC attorneys questioned Heine about a range of topics, including: the Bank's internal investigation into Walsh's alleged misconduct as the Bank's Senior Vice President of Lending; the termination of Bank employee Williams; the 2011 resignation of John Harnish, a former chairman of the Bank; Williams's involvement in the possible straw buyer purchase of the A Avenue Property; the Bank's Call Reports; the wire transfer to Bank customer M.K.; and transactions with Bank customer R.C. *See generally id.* During his deposition, Heine generally denied any personal involvement in or knowledge of any wrongdoing at the Bank. *See id.*

After the deposition, the FDIC requested additional documents from Heine through his attorney, Seidl. Alberts Decl., Ex. P. Seidl subsequently had follow-up conversations with Heine

PAGE 13 – OPINION AND ORDER

about the FDIC civil investigation. Seidl Decl. ¶ 14. Seidl remained Heine's personal attorney for matters related to the deposition. *Id.*

On August 9, 2013, Assistant U.S. Attorney Fay requested that the FDIC civil attorneys postpone indefinitely taking sworn statements from Yates and Walsh. Alberts Supp. Decl., Ex. B, at 2. Assistant U.S. Attorney Fay was concerned that these depositions may affect the ongoing criminal investigation. On August 29, 2013, the FDIC provided Assistant U.S. Attorney Fay with copies of the transcripts from the depositions previously taken of individuals currently or formerly employed by at the Bank, including Heine and Williams, pursuant to Fay's request. Gov't Ex. DD, at 2.

The grand jury returned an indictment against Walsh on July 16, 2013. The FBI had several interviews with Walsh in August and September of 2013, during which Walsh described misconduct by Heine at the Bank. Based on the interviews with Walsh, FBI Special Agent Swansinger began to seriously consider that Heine may have personal criminal liability in the matters under investigation by the FBI.[7] The grand jury investigation into fraud at the Bank continued after Walsh's indictment. *See* Alberts Decl., Ex. D, at 5; Alberts Decl. Ex. F. At about this point in time, FDIC-OIG Special Agent Wixted began to work more closely with the FBI agents on the criminal investigation. It was not until almost one year later in mid-2014, however, when Assistant U.S. Attorney Fay formally considered or designated Heine as a "target" of the criminal investigation.

On July 22, 2014, FDIC Investigation Specialist Spaulding, FDIC attorney Honjiyo, FDIC-OIG Special Agent Wixted, and several FBI Special Agents met, pursuant to a formal agreement that allowed them to share information. Alberts Supp. Decl., Ex. C. The FDIC

---

[7] The Court notes that this was approximately three months after June 6, 2013, when the FBI asked Yates secretly to record her conversations with Heine.

reported to the FBI that it had finished its investigation into Yates and Walsh in fall of 2013. *Id.* at 1-2. During the meeting, FDIC representatives provided the FBI with information about several topics, including the alleged straw buyer purchase of the A Avenue Property, the $1.7 million loan and related $675,000 wire transfer to bank customer M.K., and the Bank loans to R.C. *Id.* at 2-5.

The FDIC's civil enforcement investigation resulted in a Consent Order being entered into between the FDIC and the Bank on September 20, 2013. Gov't Ex. UU. It also resulted in a Notice of Intention to Prohibit from Further Participation and a Notice of Assessment of Civil Monetary Penalties being issued by the FDIC against Yates on June 8, 2015. Gov't Ex. VV.

On June 23, 2015, FBI Forensic Accountant Klein testified before the grand jury and explained: "We've been working with the FDIC on this, and so there were some transactions that they—that they touched upon. And so they would tell us about it, and then I would dig into that. And that's when we started our interviews and stuff." Alberts Decl. Ex. G.

**B.  Recorded Telephone Conversations**

Daniel Williams was formerly employed by the Bank as a credit analyst. Alberts Decl., Ex. H. While at the Bank, Williams was involved in the alleged straw buyer purchase of the A Avenue Property. *Id.* On May 7, 2013, Special Agents Swansinger and Maestas interviewed Williams. *Id.* During the interview, the agents learned from Williams that Heine may also have played an active role in the straw buyer scheme.

On August 28, 2013, the U.S. Attorney's Office in the District of Oregon received from the FDIC a copy of the transcript from the FDIC's deposition of Heine taken on June 13, 2013. Gov't Ex. DD, at 2. The transcript shows that Heine was represented at that deposition by Portland attorney Michael Seidl. Alberts Decl., Ex. O, at 3. During the deposition, the FDIC's attorney asked Heine questions relating to Williams and the A Avenue Property transaction,

among other topics. Thus, by approximately August 28, 2013, if not earlier, the U.S. Attorney's Office had knowledge that Heine was represented by legal counsel, at least with regard to the issues that were the subject of the FDIC's deposition.

On September 11, 2013, the FBI interviewed Williams again. Alberts Decl., Ex. Q, at 1. Williams agreed to assist the FBI with "monitored telephone calls," including calls with Heine. *Id.* On September 12, 2013, Williams, at the direction of the FBI, spoke on the telephone with Heine. Alberts Decl., Ex. R. Also at the direction of the government, this call was recorded, a fact known to Williams, but not disclosed to Heine. Heine's counsel also was not informed about the call before it occurred. Seidl Decl., ¶ 18. During the September 12 telephone conversation, Williams told Heine that several FBI agents left their business cards at his door and asked Heine if he knew "what was going on." Alberts Decl., Ex. R. Heine told Williams that Heine could not comment on a federal investigation. *Id.*

On September 16, 2013, Williams, again at the direction of the FBI, spoke on the telephone with Heine. *Id.* Williams and Heine called each other several times that evening, and at the direction of the government, these calls also were recorded, a fact known to Williams, but not disclosed to Heine or his counsel. Williams told Heine that Williams had talked to the FBI agents and that the FBI agents wanted to discuss the A Avenue Property with Williams. Alberts Decl., Ex. R. Heine told Williams to "tell the truth" to the FBI agents. *Id.* Heine also told Williams that Heine never knew anything about the transaction. *Id.* Heine recommended to Williams that Williams not speak with Yates or Walsh and that Williams be careful about being "too supportive" of Yates or Walsh. *Id.*

## C. Post-Arrest Interrogation

A grand jury indicted both Heine and Yates on June 24, 2015. ECF 1. On June 26, 2015, at about 10:00 a.m., FBI Supervisory Senior Resident Agent James Rankine and FBI Special

Agent Kevin McCormick arrested Heine near his home in Naples, Florida. Alberts Decl., Ex. S, at 1. While being transported by the FBI and before being advised of his rights, Heine asked the FBI agents if he could use his telephone to call his lawyer. *Id.* at 2. The agents asked Heine if he was represented in the criminal case, and Heine replied that he was not. *Id.* Heine explained that he wanted to call the civil attorney who helped him with his employment exit package with the Bank. *Id.* Heine then called Portland attorney Charles Markley and told Markley that Heine had been arrested.[8] *Id.* Markley advised Heine not to speak with the government. Alberts Decl. Ex. T, Disc 1, at 16:26. Heine then told the FBI agents that Markley was not representing him in the criminal case because Heine could not afford to pay for Markley's services. Alberts Decl., Ex. S, at 2.

The FBI agents brought Heine to its offices at the Fort Myers Resident Agency, arriving at 10:43 a.m. *Id.* Heine was taken to a conference room, where his property was taken and inventoried. *Id.* At 11:10 a.m., FDIC-OIG Special Agent Wixted escorted Heine to an interview room. *Id.* Special Agent Rankine advised Heine of his *Miranda* rights. *Id.* Heine stated that he understood his rights and was willing to answer questions without a lawyer present. *Id.* Heine signed a form acknowledging his *Miranda* waiver. *Id.* at 5. The interrogation began at 11:15 a.m. and was both audio and video recorded. *Id.* at 2. The interview ended at 12:40 p.m., after about one hour and twenty-five minutes. (*Id.*) Both Rankine and Wixted participated in Heine's interrogation. (*See generally* Alberts Decl., Ex. T.)

At the beginning of the interview, both before Rankine informed Heine of his rights and as part of informing Heine of his rights, Rankine told Heine that Heine had the right to stop the

---

[8] The FBI's FD-302 form contains a typographical error in the spelling of Attorney Markley's last name. *Compare* Alberts Decl., Ex. S, at 2 (FD-302) *with* Markley Decl.

interrogation "at any time." (*Id.*, Disc 1, at 1:53.) At just before ten minutes into Heine's

interview, the following exchange occurred:

> HEINE:        I really don't want to say anymore. I'm broke. I
>               don't have any means to pay for an attorney other
>               than a public defender [interrupted].
>
> RANKINE:      So you don't have to answer questions if you don't
>               want to. But what I will tell you is if there are things
>               that you can clarify for [Special Agent Wixted]
>               now, then that's up to you.
>
> HEINE:        You're not going to change your point of view,
>               you're not going to release the indictment . . . . Fifty
>               years, I would never do anything that I knew was
>               illegal.
>
> WIXTED:       Well let me ask you this—we'll just start on that
>               point then. Nothing to do with anything that's
>               alleged in the indictment at all. I've seen emails,
>               Dan, that there was a daughter of a director of the
>               bank had a loan that she's delinquent on.

(*Id.* at 9:58.)

During the interview, which lasted almost one and one-half hours, Heine made several

other statements that he argues were sufficient to invoke either his right to remain silent or his

right to have counsel present during questioning, including the following:

- "I'll need a public defender. I'll need some help. What's the next step I gotta go through?" (*Id.* at 14:50.)

- "The attorney I talked to back in Portland said don't say anything, take the information and turn it over. I don't know what else I can say to you, Mike [Wixted], you were there and you did the investigation and your people were there for two and a half years, I knew nothing about this [interrupted]." (*Id.* at 16:25.)

- "I'm not going to go any further." (*Id.* at 20:00.)

- "I need to have an attorney. I'm sitting here talking to you, the attorney said don't say a thing . . . I just need to get an attorney. I am not guilty [interrupted]." (*Id.* at 27:23.)

- "I don't want to talk." (*Id.* at 57:37.)

- "I can't say anymore. I'm feeling pressured to talk, I don't want to talk anymore." (*Id.* at 62:05.)

The agents continued to interrogate Heine after he made each of the above statements.

## D.  Heine's Interviews with the FDIC on September 12, 2012 and January 24, 2013

As discussed earlier, on May 29, 2012, Heine filed a SAR with the Treasury Department's Financial Crimes Enforcement Network, discussing among other things, certain activities allegedly committed by Yates. On June 11, 2012, Heine called the FBI to report alleged criminal activities by Walsh and added that Yates may have been involved with those activities. Three days later, on June 14, 2012, Heine was interviewed by FBI Special Agent Swansinger. On July 27, 2012, FBI agents met with individuals from the FDIC to discuss their respective investigations into alleged misconduct at the Bank, and the FDIC advised the FBI that the FDIC will continue its investigation regarding Walsh's loans and report any information that may support the FBI's criminal investigation.

Also as discussed earlier, on August 11, 2012, Heine emailed FDIC representative Phillips, stating that he had been "working closely with Ms. Janie Spaulding, FDIC Investigative Specialist. As you may know, there is also a Federal Investigation going on while our Civil Law Suit [the *Walsh* Lawsuit] is on hold." Jones Decl., Ex. 9; *see also* Jones Decl., Ex. 49 (September 19, 2012 email from the Bank's consultant, copying FBI Special Agent Swansinger and FDIC-OIG Special Agent Wixted, among others).

On September 12, 2012, FDIC Investigative Specialist Spaulding and FDIC-OIG Special Agent Wixted interviewed Heine at his office regarding allegations of improprieties by former employees of the Bank. ECF 453-1 (Memorandum of Interview). Although Heine had previously spoken with Spaulding, this was his first meeting with Agent Wixted. Wixted introduced himself

to Heine and explained that he was a Special Agent with the FDIC-OIG. Wixted also identified

himself as a law enforcement officer. He was armed, and Heine noticed Wixted's gun.

Agent Wixted had some discussion with Heine about how the FDIC's OIG is different

from the FDIC's examination office. As Agent Wixted testified on August 22, 2016: "I think I

told him something to [the] effect of, 'You may have to talk to Janie [Spaulding], but you don't

have to talk with me. It is only voluntary to talk with me.'" The interview lasted about three

hours. Aug. 22, 2016 Hearing ("Hearing") Tr. 213:25-214:22 (not yet entered in ECF).

A second interview of Heine took place on January 24, 2013. Again, it was conducted by

Spaulding and Wixted. ECF 453-2 (Memorandum of Interview). Agent Wixted did not repeat his

comment from the September interview that Heine "may have to talk to [Spaulding], but you

don't have to talk with me;" nor did he retract or otherwise explain that comment.

## CONCLUSIONS OF LAW

### A.  Heine's Motion to Suppress His FDIC Deposition Testimony

Heine moves to suppress from his criminal trial the deposition testimony that he gave to

the FDIC on June 13, 2013, pursuant to the FDIC's subpoena. Heine argues that his testimony

was obtained in violation of his Fifth Amendment right to due process for three independently

sufficient reasons: (1) Heine was not informed that the government "contemplated" his

prosecution; (2) Heine was not informed that his statements could be used against him at a

criminal trial; and (3) the FDIC's deposition in its civil investigation was a "pretext" for

obtaining evidence to be used in Heine's criminal prosecution. The Court first describes the law

governing parallel civil and criminal proceedings. The Court then separately addresses each of

Heine's three arguments for suppression of his deposition testimony.

### 1.  The Law Governing Parallel Civil and Criminal Proceedings

Generally, "the government may conduct parallel civil and criminal investigations without violating the due process clause, so long as it does not act in bad faith." *United States v. Stringer*, 535 F.3d 929, 936 (9th Cir. 2008) (citing *United States v. Kordel*, 397 U.S. 1, 11 (1970)). In *United States v. Kordel*, the Supreme Court held, in part, that the government did not violate the Fifth Amendment rights of corporate executives by using evidence obtained from a Food and Drug Administration ("FDA") civil proceeding in a related criminal prosecution against the executives. *Kordel*, 397 U.S. at 11. The Court explained that the FDA did not act in bad faith in requesting information from the executives by way of interrogatories because the agency regularly does so in its civil investigations. *Id.* at 6. The Court further found that the corporate executive who answered the interrogatories waived his Fifth Amendment right against self-incrimination when he failed to assert that right before the trial court. *Id.* at 10.

In *dicta*, the *Kordel* Court described possible circumstances that might establish a Fifth Amendment due process violation:

> We do not deal here with a case where the Government has brought a civil action solely to obtain evidence for its criminal prosecution *or has failed to advise the defendant in its civil proceeding that it contemplates his criminal prosecution*; nor with a case where the defendant is without counsel or reasonably fears prejudice from adverse pretrial publicity or other unfair injury; nor with any other special circumstances that might suggest the unconstitutionality or even the impropriety of this criminal prosecution.

*Id.* at 11-12 (footnotes omitted) (emphasis added).

In *Kordel*, the Supreme Court considered Section 305 of the Food, Drug, and Cosmetic Act, 21 U.S.C. § 335. Under that statute, before any violation of federal food and drug law is reported by the FDA to any U.S. Attorney for institution of a criminal proceeding, the person

against whom such a proceeding is "contemplated" must be given appropriate notice and an opportunity to present his views with regard to that contemplated proceeding.[9] *Id.* at 4.

In *Stringer*, the Ninth Circuit considered a civil investigation by the U.S. Securities and Exchange Commission ("SEC") and a parallel criminal investigation being conducted by the U.S. Attorney's Office. In its decision, the Ninth Circuit quoted from *Kordel* and held that the government's use in the defendants' criminal prosecution for alleged securities violations of statements that the defendants made to the SEC during a civil investigation did not violate the defendants' rights under either the Fourth or Fifth Amendment. *Stringer*, 535 F.3d at 933. Accordingly, the Ninth Circuit reversed the district court's dismissal of the indictments. *Id.*

The Ninth Circuit explained:

> We vacate the dismissal of the indictments because in a standard form [SEC Form 1662] it sent to the defendants, the government fully disclosed the possibility that information received in the course of the civil investigation could be used for criminal proceedings. There was no deceit; rather, at most, there was a government decision not to conduct the criminal investigation openly, a decision we hold the government was free to make. ***There is nothing improper about the government undertaking simultaneous criminal and civil investigations, and nothing in the government's actual conduct of those investigations amounted to deceit or an affirmative misrepresentation justifying the rare sanction of dismissal of criminal charges or suppression of evidence received in the course of the investigations***.

---

[9] Section 305 of the Food, Drug, and Cosmetic Act provides in relevant part that:

> "Before any violation of (the Act) * * * is reported by the Secretary (of the Department of Health, Education, and Welfare) to any United States attorney for institution of a criminal proceeding, the person ***against whom such proceeding is contemplated*** shall be given appropriate notice and an opportunity to present his views, either orally or in writing, with ***regard to such contemplated proceeding***."

*Kordel*, 397 U.S. at 4 n.5 (alterations in original) (emphasis added) (quoting 21 U.S.C. § 335).

*Id.* (emphasis added). SEC Form 1662 states that the SEC "often makes its files available to other governmental agencies, particularly the United States Attorneys and state prosecutors. There is a likelihood that information supplied by you will be made available to such agencies where appropriate." *Id.* at 934 (quotation marks omitted). SEC Form 1662 also advises individuals of their Fifth Amendment right against self-incrimination:

> Information you give may be used against you in any federal . . . civil or criminal proceeding brought by the Commission of [*sic*] any other agency. You may refuse, in accordance with the rights guaranteed to you by the Fifth Amendment of the Constitution of the United States, to give any information that may tend to incriminate you or subject you to fine, penalty, or forfeiture.

*Id.* at 934-35.

With regard to the *Stringer* defendants' Fifth Amendment due process claims, the Ninth Circuit considered their argument, which had been accepted by the district court, that the government used the civil investigation as a "pretext" to obtain evidence for their subsequent criminal prosecution. *Id.* at 938. The Ninth Circuit rejected that argument and held that the government did not violate the defendants' due process rights. The Ninth Circuit explained:

> It is significant to our analysis that the SEC began its civil investigation first and brought in the U.S. Attorney later. This tends to negate any likelihood that the government began the civil investigation in bad faith, as, for example, in order to obtain evidence for a criminal prosecution.

*Id.* at 939. The Ninth Circuit further stated that Congress expressly authorized the SEC to share information with federal law enforcement in order to facilitate the investigation and prosecution of crimes. *Id.* The Ninth Circuit also found no Fifth Amendment due process violation, even though the SEC did not advise the defendants about the active criminal investigation into their conduct by the U.S. Attorney's Office.

PAGE 23 – OPINION AND ORDER

Finally, in *Stringer*, the Ninth Circuit considered the defendants' argument, also accepted by the district court, that dismissal of the indictments was warranted because the government obtained evidence from defendants through trickery or deceit. *Stringer*, 535 F.3d at 939. The district court had concluded that dismissal of the charges was appropriate on this basis because at one of the defendants' depositions, an SEC staff attorney instructed the court reporter to refrain from mentioning the involvement of the U.S. Attorney's Office in the civil investigation and because the SEC gave evasive answers to defense counsel's questions about the involvement of the U.S. Attorney's Office in the civil investigation. *Id.* The Ninth Circuit discussed previous cases applying the Fourth Amendment's prohibition of unreasonable searches and seizures to dual, or parallel, investigations by the civil and criminal branches of the Internal Revenue Service ("IRS"). *Id.*

In particular, the Ninth Circuit discussed its earlier opinion in *United States v. Robson*, 477 F.2d 13 (9th Cir. 1973):

> A government official must not "affirmatively mislead" the subject of parallel civil and criminal investigations "into believing that the investigation is exclusively civil in nature and will not lead to criminal charges." *Robson*, 477 F.2d at 18. However, "we have consistently held that the failure of an IRS agent . . . to warn a taxpayer that an audit may have potential criminal ramifications does not render the search unreasonable." *Id.* at 18-19 (denying suppression where an IRS agent did not expressly advise a taxpayer that the evidence the agent was gathering for a civil audit would be used to support a criminal investigation).
>
> Other circuits have agreed that Fourth Amendment ***and possible due process limitations*** may be implicated in a dual investigation. *See United States v. Peters*, 153 F.3d 445, 451 (7th Cir. 1998) ("A consensual search is unreasonable under the Fourth Amendment or violated of due process under the Fifth Amendment if the consent was induced by fraud, deceit, trickery or misrepresentation."). ***Almost every other circuit has denied suppression, even when government agents did not disclose the possibility or existence of a criminal investigation, so long as they made no affirmative misrepresentations***.

*Stringer*, 535 F.3d at 940 (emphasis added) (citations omitted). Accordingly, the Ninth Circuit

held in *Stringer* that the parallel civil and criminal investigations did not implicate the

defendants' constitutional rights because the SEC did not make any affirmative

misrepresentations to the defendants, adding that SEC Form 1662 also explicitly warned the

defendants that the civil investigation could lead to criminal charges. *Id.* at 940-41.

### 2.  Heine's Three Arguments for Suppression of His Deposition Testimony

#### a.  Failure to Warn of Contemplated Prosecution Before FDIC Deposition

Heine argues that his testimony from his FDIC civil deposition must be suppressed from

his criminal trial because the government failed to warn him that it "contemplated" his criminal

prosecution. In support of this argument Heine relies upon the Supreme Court's *dicta* in *Kordel*:

"We do not deal here with a case where the Government . . . has failed to advise the defendant in

its civil proceeding that it contemplates his criminal prosecution . . . ."[10] *Kordel*, 397 U.S.

at 11-12. As described above, however, in *Kordel* the FDA was required by statute to advise a

defendant that the FDA "contemplated" a criminal proceeding before reporting that defendant's

conduct to a U.S. Attorney for possible criminal prosecution. *Id.* at 4 n.5. Here, Heine fails to

provide the Court with any legal authority for the proposition that a similar requirement exists

outside of a situation where a federal statute expressly places an obligation on a federal agency to

notify an individual that a criminal proceeding is "contemplated" before referring that individual

to a U.S. Attorney's Office for potential criminal prosecution.

In addition, the Court makes the factual finding that at the time of Heine's FDIC

deposition on June 13, 2013, the government did not "contemplate" Heine's criminal

---

[10] In *Stringer*, the Ninth Circuit quoted this portion of *Kordel* with approval. 535 F.3d
at 937. The Ninth Circuit, however, did not discuss what it means to "contemplate" a criminal
prosecution or how that might be relevant outside the context of 21 U.S.C. § 335.

prosecution. Although Daniel Williams told FBI agents and Assistant U.S. Attorney Fay on May 7, 2013 that Heine, as well as Yates and Walsh, directed the straw buyer purchase of the A Avenue Property and although the FBI on June 6, 2013 asked Yates to consider secretly recording her conversations with Heine, the focus of the criminal investigation at that time was on Walsh and securing his indictment. Assistant U.S. Attorney Fay and Special Agent Swansinger testified that they did not yet consider Heine to be a "target" of the criminal investigation at the time of Heine's FDIC deposition. Swansinger also testified that he did not give serious consideration to Heine's possible personal criminal liability until Walsh later provided several interviews in August and September of 2013 corroborating Williams's statements about Heine. Thus, on June 13, 2013, when Heine's deposition was taken by the FDIC, neither the U.S. Attorney's Office nor the FBI in fact "contemplated" Heine's criminal prosecution. Thus, due process did not require that the government inform Heine that the government "contemplated" Heine's prosecution before the FDIC compelled and took his deposition in the FDIC's civil investigation,

### b.  Failure to Give *Miranda*-Type Warning Before FDIC Deposition

Heine also argues that his testimony from his FDIC civil deposition must be suppressed from his criminal trial because the government failed to warn Heine that his deposition testimony could be used against him at a criminal trial. Heine asserts that the government violated his Fifth Amendment right to due process by failing to provide him with an explicit advisement of his rights, similar to what is contained in SEC Form 1662, before compelling and taking his deposition testimony in the FDIC civil investigation.

In *Stringer*, however, the Ninth Circuit did not hold that *Miranda*-type warnings are required in every civil investigation in order to comply with the Fifth Amendment's due process protections where testimony is compelled by a federal agency in a parallel civil investigation and

the government also is conducting a criminal investigation. Rather, the Ninth Circuit held in *Stringer* only that the defendants waived their claims that the government violated their Fifth Amendment rights against self-incrimination because SEC Form 1662 sufficiently advised the defendants that information provided to the SEC could be used in a criminal proceeding. *Stringer*, 535 F.3d at 938. Thus, the Ninth Circuit's discussion of SEC Form 1662 was in the context of the defendants' assertion of their right against self-incrimination, *see id.* at 937-38, but Heine does not argue that the government's conduct violated that right. Instead, Heine argues that the government violated Heine's right to due process.

In *Robson*, the Ninth Circuit rejected a similar argument that an IRS agent was required to inform an individual of his *Miranda* rights and, specifically, that the IRS investigation potentially could have criminal consequences before examining the individual's records. *Robson*, 477 F.2d at 16. In a section of the decision entitled "FIFTH AND SIXTH AMENDMENTS *MIRANDA-TYPE WARNING*," the Ninth Circuit observed:

> This court has repeatedly refused to extend the *Miranda* rule beyond its stated limits. *Simon v. United States*, 421 F.2d 677 (9th Cir. 1970). As we stated in *Simon*: "Absent custody in the conventional sense, we have declined to fault a government agent and reverse a conviction for failure to give a *Miranda* type warning unless the facts clearly demonstrated that the appellant was 'deprived of his freedom by the authorities in any significant way.'" *Id.* at 668.

*Robson*, 477 F.2d at 16 (footnote omitted). Heine was not in custody during the FDIC deposition, and Heine does not argue that he was deprived of his freedom by the government. In the absence of any legal authority to the contrary, the Court declines to expand the reach of *Miranda* to hold that the Fifth Amendment's due process clause required the FDIC, before compelling Heine's deposition in the FDIC's civil investigation, to warn Heine that any statement he made could be used against him in a criminal proceeding.

PAGE 27 – OPINION AND ORDER

In addition, the Subpoena in this case notified Heine that his deposition testimony could be shared with federal and state law enforcement. The Subpoena stated that "the proceeding described herein, including your testimony, is confidential pursuant to section 308.147 of the FDIC Rules of Practice and Procedure, 12 C.F.R. § 308.147." Alberts Decl., Ex. N, at 2. As discussed earlier, Section 308.147 provides: "Investigations shall be confidential. Information and documents obtained by the FDIC in the course of such investigations shall not be disclosed, *except as provided in part 309 of this chapter and as otherwise required by law*." 12 C.F.R. § 308.147 (emphasis added).

Under part 309, the FDIC is authorized to

> disclose to the proper federal or state prosecuting or investigatory
> authorities . . . copies of exempt records pertaining to irregularities
> discovered in depository institutions which are believed to
> constitute violations of any federal or state civil or criminal law, or
> unsafe or unsound banking practices . . . .

12 C.F.R. § 309.6(b)(4)(ii). Further, notice to the individual to whom the record pertains is not required before the disclosure of records to "another agency or instrumentality of any governmental jurisdiction within or under the control of the United States for a civil or criminal law enforcement activity if the activity is authorized by law . . . ." 12 C.F.R. § 310.10(b)(7).

Moreover, at the FDIC civil deposition, Heine was represented by his attorney, Michael Seidl. At the beginning of Heine's deposition, FDIC attorney Williams stated: "I should state on the record that this is a confidential investigation. . . . However, *we would be obligated to provide the transcript if requested by a law enforcement agency*, but we would only do that pursuant to our Part 309 of our rules and regulations."[11] Alberts Decl., Ex. O, at 9-10 (emphasis

---

[11] FDIC counsel further stated that "not only law enforcement but other federal or regulatory agencies that may show a need pursuant to 309 for the transcript, we would make it available, though, we would give you notice." Alberts Decl., Ex. O, at 10.

added). Thus, Heine was aware, before answering any substantive questions at his deposition, that the FDIC would be obligated to provide a copy of the transcript to a law enforcement agency if the agency made such a request. Heine also was aware at the time of his deposition that the FBI was actively investigating the activities at the Bank. In addition, Heine's personal attorney at the deposition, Mr. Seidl, testified that he was aware during the deposition that Heine could invoke his Fifth Amendment right against self-incrimination. Thus, due process did not require that the government provide any further warning to Heine that his statements might be used against him before the FDIC took his deposition as part of its civil investigation, when Heine was not in custody, was represented by counsel at the deposition, was informed that a copy of the transcript of the deposition might be provided to federal law enforcement, and was aware that the FBI was investigating the activities at the Bank that were the subject of the FDIC's investigation. Indeed, it was Heine himself who initiated the criminal investigation when he called the FBI almost exactly one year earlier on June 11, 2012.

### c.   Heine's Argument that the FDIC Deposition Was a Pretext

Finally, Heine argues that his FDIC deposition testimony taken on June 13, 2013 must be suppressed from trial because the FDIC's deposition in its civil investigation was a "pretext" for obtaining evidence to be used in Heine's criminal prosecution. The Court notes, as an initial matter, that Heine and the government disagree as to whether the commencement of the FDIC civil enforcement investigation preceded the criminal investigation into activities at the Bank. The government asserts:

> As noted in *Stringer*, it is particularly determinative whether the civil investigation preceded the criminal investigation. In this case, as part of its routine supervisory role, the FDIC was monitoring the Bank of Oswego. Further, the FDIC supervision became more extensive with the Memorandum of Understanding in mid-2010. All of this oversight began before the criminal investigation was

initiated. *In short, the FDIC's investigation preceded the
criminal investigation and was not a pretext*.

ECF 354 at 20 (Government's Response to Heine's Motion to Suppress) (emphasis added).

Heine responds that the FDIC routinely examines every bank that it supervises and that the FDIC's oversight has no bearing on whether the agency actually has initiated a civil enforcement investigation. According to Heine, the FDIC did not formally commence its civil investigation until the General Counsel of the FDIC's Division of Risk Management Supervision issued its Order of Investigation on February 4, 2013—nearly eight months *after* Heine contacted the FBI to report alleged criminal activity conducted by Walsh at the Bank.

The Court need not resolve the question of when the FDIC's civil enforcement action into activities at the Bank began. In 2010, 2011, and early 2012, the FDIC's civil side was actively reviewing the Bank's activities. Heine himself noted the examiners' increased level of scrutiny as far back as January 11, 2010. In March 2012, well after the Bank signed the MOU with the FDIC in 2010, the FDIC downgraded the Bank's rating because of a poor examination. The FDIC's examiners then warned Heine that if the Bank did not make ameliorative changes, the FDIC would bring a civil enforcement action as its next step. Several months later, in June 2012, Heine first contacted the FBI. The evidence does not show that the FDIC's civil enforcement proceeding was initiated at the request of the prosecution.

Additionally, the FDIC did not just interview or depose Heine and then cease any further investigative activities. Instead, the FDIC took several sworn statements from other individuals and conducted extensive additional investigative work. The FDIC's civil investigation resulted in a Consent Decree being entered into between the FDIC and the Bank on September 20, 2013. It also resulted in the FDIC issuing a Notice of Intention to Prohibit from Further Participation and a Notice of Assessment of Civil Money Penalties against Diana Yates on June 8, 2015. These

PAGE 30 – OPINION AND ORDER

regulatory outcomes further support the conclusion that the FDIC did not take Heine's civil deposition as a pretext to assist the government in its criminal prosecution.

Further, the FDIC's deposition of Heine as part of its civil investigation was taken on June 13, 2013, which was more than *two years* before the grand jury returned its indictment against Heine and Yates on June 24, 2015. This also supports the conclusion that the civil deposition was not a pretext for collecting evidence for Heine's criminal prosecution. *See United States v. Unruh*, 855 F.2d 1363, 1374 (9th Cir. 1987) (finding no bad faith on the part of the government where the Comptroller of the Currency conducted the defendant's deposition more than 14 months before a grand jury returned the defendant's criminal indictment).

Heine also argues that the government misrepresented the extent to which the FDIC participated in the criminal investigation. Heine identifies earlier representations the government made when litigating Heine and Yates's Motions for Discovery in this criminal action:

- "Significantly, the FDIC did not participate in the criminal investigation. Instead, the government and the FDIC operated independently of one another and only in some limited circumstances did the FDIC provide information to the government to aid in its investigation."

- "The FDIC did not participate, lend resources to or direct the criminal investigation in any meaningful way. In fact, the FDIC conducted its own independent investigation, brought its own independent administrative action and was only nominally involved in this investigation, primarily by providing some information to the government."

- "During the course of this investigation, the OIG-FDIC and the FBI obtained some limited information from the FDIC. In doing so, the FDIC required the government to prepare written requests in which the government made specific assurances to the FDIC that the information was for the criminal investigation and used for a limited purpose."

- "Because of its mission, [the FDIC-OIG] acts independently from the FDIC."

ECF 133 at 9-10 (Government's Response to Defendant's Motions for Discovery).

Heine argues that the government's earlier representations are inconsistent with the evidence in this case, including the following:

- FDIC-OIG Special Agent Wixted's January 25, 2013 email to FDIC Investigator Spaulding: "I was thinking, remember Dan's statement about how employee loans were processed, do you think you could ask him for the policy and the reports he indicated were provided at the Board meetings." (Alberts Supp. Decl., Ex. A, at 1.)

- Spaulding's May 23, 2013 email to Wixted in which she informs Wixted that the FDIC had subpoenas out to Williams and Heine, among others involved with the Bank. Spaulding also writes: "Hopefully if the AUSA wants to request that we not do some of the interviews, she will do that soon." (*Id.* at 26.)

- Assistant U.S. Attorney Fay's August 9, 2013 request that the FDIC not take the sworn deposition statements of Walsh and Yates.

- On August 29, 2013, the FDIC provided Assistant U.S. Attorney Fay with the deposition transcripts from individuals formerly employed by at the Bank including Heine and Williams.

- FBI Forensic Accountant Klein's June 23, 2015 testimony before the grand jury that: "We've been working with the FDIC on this, and so there were some transactions that they—that they touched upon. And so they would tell us about it, and then I would dig into that. . . . So they also have been involved in this . . . ." (Alberts Decl., Ex. G, at 2.)

According to Heine, these and other, similar interactions "show that the FDIC was feeding information to the purported 'prosecution team' and *vice versa*; guiding its own investigation around the prosecutors' directives; and otherwise working with members of the purported 'prosecution team' to build a case against Mr. Heine." ECF 366 at 14 (Heine's Reply in Support of Motion to Suppress).

This evidence, however, does not show that the government conducted the FDIC's civil deposition as a pretext to gather information for Heine's criminal prosecution. Less than a month before Heine's deposition, the FDIC's Spaulding told Wixted: "Hopefully if the AUSA wants to request that we not do some of the interviews, she will do that soon." This is not the sort of communication that indicates that the FDIC is conducting the Heine deposition at the request of the criminal investigation team. In fact, it shows the contrary. It shows that the FDIC wanted to take Heine's deposition for its own civil investigation, but also did not want to interfere with the criminal investigation if the criminal team would have preferred that the FDIC's deposition not be taken.

In addition, a copy of the transcript from Heine's deposition was not provided to the criminal investigation team until more than two months after the deposition was taken. If the FDIC's deposition would have been a pretext, one might have expected a more prompt delivery of the transcript.

Further, former FDIC Investigation Specialist Spaulding, FDIC attorney Honjiyo, and former FDIC attorney Williams all testified that no one from the U.S. Attorney's Office, the FBI, or the FDIC-OIG asked that Heine's deposition be taken by the FDIC, requested that any specific questions be asked of Heine during his FDIC deposition, or even suggested that the FDIC's deposition of Heine cover any particular topics or issues. Assistant U.S. Attorney Fay, FBI Special Agent Swansinger, and FDIC-OIG Special Agent Wixted also testified that they did not direct or attempt to influence the FDIC's deposition of Heine in any way.

Finally, in *Stringer*, the Ninth Circuit found no bad faith even where the SEC and U.S. Attorney's Office worked closely together to coordinate their respective investigations:

> The SEC facilitated the criminal investigation in a number of
> ways. The SEC offered to conduct the interviews of defendants so

> as to create "the best record possible" in support of "false statement cases" against them, and the AUSA instructed the SEC Staff Attorney on how best to do that. The AUSA asked the relevant SEC office, located in Los Angeles, to take the depositions in Oregon so that the Portland Office of the USAO would have venue over any false statements case that might arise from the depositions, and the SEC did so. Both the SEC and USAO wanted the existence of the criminal investigation kept confidential.

535 F.3d at 934. As in *Stringer*, the FDIC here notified Heine that anything he said during his deposition could be shared with law enforcement. Further, federal regulations expressly authorize the FDIC to share information with law enforcement to facilitate investigations into criminal conduct. *See, e.g.*, 12 C.F.R. § 310.10(b)(7).

The Court concludes that the FDIC compelled Heine's deposition to advance a *bona fide* civil investigation into alleged misconduct at the Bank and that the FDIC did not conduct its civil investigation as a pretext to obtain evidence for the government's criminal prosecution. This is not a case where the government "has brought a civil action solely to obtain evidence for its criminal prosecution." *Kordel*, 397 U.S. at 11-12. The FDIC civil investigation was conducted pursuant to the FDIC's civil enforcement jurisdiction, which led to civil sanctions being entered against Yates and a Consent Order being reached between the FDIC and the Bank. Further, the evidence does not show that the civil enforcement proceeding was opened or directed at the behest of the prosecution. *Cf. Stringer*, 535 F.3d at 949. Moreover, Heine presented no evidence that any governmental conduct "amounted to deceit or an affirmative misrepresentation justifying the rare sanction of dismissal of criminal charges or suppression of evidence received in the course of the investigations." *Stringer*, 535 F.3d at 933.

Instead, Heine argues that *Kordel* supports the conclusion that due process demands an inquiry into whether a defendant was treated fairly by ensuring that he made a fully informed decision about whether to assert his Fifth Amendment right to remain silent. Neither *Kordel* nor

PAGE 34 – OPINION AND ORDER

any other case law that has been presented to the Court supports such a broad reading of the Due Process Clause. The Court concludes that the government did not abuse parallel civil and criminal investigations and did not act in bad faith. Thus, the government did not violate Heine's Fifth Amendment right to due process. Heine's motion to suppress the FDIC's civil deposition of Heine taken on June 13, 2013 is denied.

## B.  Heine's Motion to Suppress His Covertly Recorded Statements

Heine also moves to suppress from trial the secretly recorded statements that he made over the telephone to Daniel Williams on September 12 and 16, 2013. Heine argues that the U.S. Attorney's Office obtained the statements in violation of Oregon's ethical rule against *ex parte* communication with a represented party. Rule 4.2 of the Oregon Rules of Professional Conduct provides:

> In representing a client or the lawyer's own interests, a lawyer shall not communicate or cause another to communicate on the subject of the representation with a person the lawyer knows to be represented by a lawyer on that subject unless:
>
> (a) the lawyer has the prior consent of a lawyer representing such other person;
>
> (b) the lawyer is authorized by law or by court order to do so; or
>
> (c) a written agreement requires a written notice or demand to be sent to such other person, in which case a copy of such notice or demand shall also be sent to such other person's lawyer.

The attorneys in the U.S. Attorney's Office for the District of Oregon are subject to the Oregon Rules of Professional Conduct. 28 U.S.C. § 530B(a) ("An attorney for the Government shall be subject to State laws and rules, and local Federal court rules, governing attorneys in each State where such attorney engages in that attorney's duties, to the same extent and in the same manner as other attorneys in that State."). Ethical rules, such as Rule 4.2, apply to pre-indictment, noncustodial communications between Assistant U.S. Attorneys and represented parties. *United*

*States v. Talao*, 222 F.3d 1133, 1139 (9th Cir. 2000). A district court may suppress evidence

obtained in violation of ethical rules. *See United States v. Powe*, 9 F.3d 68, 69 (9th Cir. 1993).

 Heine argues that the U.S. Attorney's Office violated Rule 4.2 because Seidl, the attorney

that the Bank hired to represent Heine personally at the June 13, 2013 FDIC deposition,

continued to represent Heine for purposes of the federal government's investigation into any

matters discussed at the deposition, including the A Avenue Property transaction.

 The government responds that even if the Court assumes that the U.S. Attorney's Office

knew that Heine was represented by Seidl with regard to the issues that were the subject of the

FDIC's deposition at the time of the recorded telephone calls with Williams, the U.S. Attorney's

Office did not violate Rule 4.2. The Court agrees.

 Courts in the Ninth Circuit repeatedly have held that a prosecutor's duty to avoid *ex parte*

contacts with represented individuals generally does not apply to pre-indictment, noncustodial

communications conducted by an undercover agent or informant. *See, e.g.*, *Powe*, 9 F.3d at 69;

*United States v. Kenny*, 645 F.2d 1323, 1339 (9th Cir. 1981); *United States v. Mohr*, 2007 WL

2344875, at *5 (D. Or. Aug. 13, 2007). For example, in *United States v. Kenny*, the defendant

argued that the prosecutor, acting through a government informant, made a prohibited direct

contact with the defendant. 645 F.2d at 1339. The government informant in *Kenny*, like Williams

in this case, recorded a telephone conversation with the defendant without the defendant's

knowledge. *Id.* at 1337. The Ninth Circuit held that this practice did not violate the ethical rule

against *ex parte* communications with a known represented party, emphasizing that the telephone

recording took place in a noncustodial environment and prior to the defendant's charge, arrest, or

indictment. *Id.* at 1339. The Ninth Circuit explained: "In our view, the Government's use of such

investigative techniques does not implicate the sorts of ethical problems addressed by the Code."

*Id.* Twelve years later, in *United States v. Powe*, the Ninth Circuit followed *Kenny* and held that

a tape recording was properly admitted against a defendant, even where the U.S. Attorney's

Office promised the defendant's attorney that the prosecution would not talk to the defendant

without his counsel present. 9 F.3d at 69-70.

Heine replies that the Ninth Circuit's subsequent decision in *United States v. Talao*

clarifies that the Ninth Circuit has declined to announce a categorical rule permitting all pre-

indictment, noncustodial communications by federal prosecutors and government informants

with represented parties.[12] 222 F.3d at 1138-39. In *Talao*, the court adopted the Second Circuit's

approach, described in the decision *United States v. Hammad*, 858 F.2d 834 (2d Cir. 1988):

> Rather than announcing a bright-line rule, the [*Hammad*] court
> preferred to apply the ethical rule through "case-by-case
> adjudication," policing clear misconduct while keeping in mind
> that prosecutors are "authorized by law" to employ legitimate
> investigative techniques in conducting or supervising criminal
> investigations.

*Talao*, 222 F.3d at 1139 (footnotes omitted). The prosecution in *Hammad* issued a sham

subpoena for a government informant in order "to create a pretense that might help the informant

elicit admissions from a represented suspect." 858 F.2d at 840. Because the informant thus

became the "alter ego" of the prosecution, the Second Circuit agreed with the district court that

an ethical violation occurred. *Id.*

Heine also attempts to distinguish both *Kenny* and *Powe*. Heine states that in *Kenny*, the

Ninth Circuit interpreted the ABA Code of Professional Responsibility, which proscribed

communication with a "party" who is represented, rather than a "person" who is represented.

*Kenny*, 645 F.2d at 1339. Similarly, according to Heine, in *Powe*, the Ninth Circuit interpreted

---

[12] As the government correctly observes, *United States v. Talao* did not involve the use of undercover agents or informants as part of a criminal investigation.

the California Rules of Professional Conduct, which also proscribed communication with a
"party," rather than with a "person." *Powe*, 9 F.3d at 69. Heine correctly notes that Oregon's
Rule 4.2 is entitled "Communication with Person Represented by Counsel" and does not refer to
communication with a "party."

Heine argues that the distinction between "party" and "person" is a meaningful
distinction. The Court disagrees. Based on a Formal Ethics Opinion from the Oregon State Bar
Interpreting Oregon's Rule 4.2, the precise conduct of the U.S. Attorney's Office that Heine
challenges is permitted under the Oregon Rules of Professional Responsibility. Oregon Formal
Ethics Opinion No. 2005-126 provides in relevant part as follows:

> Prosecuting Attorney is also considering filing criminal charges
> against C and, to that end, has caused C to be called to testify
> before a grand jury. Prosecuting Attorney knows that C is
> represented by counsel in connection with the potential criminal
> charges. Before deciding whether to institute formal criminal
> proceedings against C, Prosecuting Attorney would like to use
> undercover agents or informants to obtain certain information from
> C for use by Prosecuting Attorney.

> **Questions:**

> 3.      May Prosecuting Attorney use undercover agents or
> informants in connection with the investigation of C?

> **Conclusions:**

> *    *    *

> 3.      Yes, qualified.

> **Discussion:**

> *    *    *

> In light of the "authorized by law" exception in Oregon
> RPC 4.2(b), most courts have held, and we agree, that prosecutors
> may engage in preindictment, prearrest, and other investigative
> contacts with suspects even though those suspects are known to be

> represented by counsel. *See, e.g.*, *U.S. v. Ryans*, 903 F.2d 731, 735-736 (10th Cir. 1990); *U.S. v. Hammad*, 902 F.2d 1062, 1063 n.1 (2d Cir. 1990); *U.S. v. Kenny*, 645 F.2d 1323, 1339 (9th Cir. 1981). In contrast, prosecutors cannot use go-betweens to circumvent defense counsel in discussing or negotiating a plea bargain.

Oregon Formal Ethics Opinion No. 2005-126, *available at*

https://www.osbar.org/_docs/ethics/2005-126.pdf (last visited August 21, 2016).

The circumstances in this case do not suggest that the government's use of Williams as an informant was anything other than a legitimate investigative technique, "authorized by law." Williams's covertly recorded telephone conversations with Heine occurred in the pre-arrest, pre-indictment, noncustodial context. The U.S. Attorney's Office did not take any additional actions such that Williams became the "alter ego" of the prosecution. *Cf. Hammad*, 858 F.2d at 840. Heine provides no persuasive argument as to how this factual setting can be distinguished from that of the *Powe* and *Kenny* cases. Moreover, Oregon's Formal Ethics Opinion No. 2005-126 clarifies that the recorded statements made by Heine over the telephone to Daniel Williams on September 12 and 16, 2013, as directed by attorneys from the U.S. Attorney's Office in the District of Oregon with knowledge that Heine was represented by counsel and without Heine having knowledge that they were being recorded and directed by the U.S. Attorney's Office, were not obtained in violation of the Oregon Rules of Professional Conduct. Heine's motion to suppress the recordings of telephone conversations between Heine and Daniel Williams on September 12 and 16, 2013 is denied.

## C.  Heine's Motion to Suppress His Post-Arrest Statements

Heine moves to suppress from trial all statements that he made during his post-arrest interrogation for two independently sufficient reasons: (1) Heine invoked his right to remain silent; and (2) Heine invoked his right to have counsel present during questioning. Heine argues that his request to call his attorney Charles Markley before his interrogation was an unambiguous

invocation of his right to counsel. Heine additionally argues that several statements he made after waiving his *Miranda* rights were sufficient to invoke either his right to counsel or right to silence, including: "I really don't want to say anymore"; "I'll need a public defender"; "I'm not going to go any further"; "I need to have an attorney"; "I don't want to talk"; "I can't say anymore. I'm feeling pressured to talk, I don't want to talk anymore." The FBI agents continued to interrogate Heine after he made each of these statements.

The Self-Incrimination Clause of the Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. CONST., AMEND. V. In *Miranda v. Arizona*, the Supreme Court held that the Fifth Amendment's prohibition on self-incrimination requires that any custodial interrogation must be preceded by advice that the individual has the right to the presence of an attorney and the right to remain silent. 384 U.S. at 479. The Court instructed as follows:

> Once warnings have been given, the subsequent procedure is clear. ***If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease***. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked.

*Id.* at 473-74 (emphasis added). The government cannot use an individual's post-invocation statements "to cast retrospective doubt on the clarity of the initial request itself." *Smith v. Illinois*, 469 U.S. 91, 100 (1984).

The government bears the burden of establishing that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to counsel. *Miranda*, 384 U.S. at 475. "Doubts must be resolved in favor of protecting the constitutional claim."

*Robinson v. Borg*, 918 F.2d 1387, 1391 (9th Cir. 1990) (quoting *Michigan v. Jackson*, 475 U.S. 625, 633 (1986)). If the government obtains the defendant's statement by violation of his *Miranda* rights, the government may not introduce the statement into evidence in the state's case-in-chief. *See Miranda*, 384 U.S. at 479. The government may, however, use statements obtained in violation of *Miranda* for impeachment purposes if the defendant testifies at his trial. *Harris v. New York*, 401 U.S. 222, 225-26 (1971); *Pollard v. Galaza*, 290 F.3d 1030, 1033 (9th Cir. 2002).

At the beginning of Heine's interrogation, both before the FBI informed Heine of his *Miranda* rights and as part of informing Heine of his rights, FBI Special Agent Rankin told Heine that if he began to answer questions, he also had the right "to stop anytime." At just before ten minutes into his interview, Heine said: "***I really don't want to say anymore***. I'm broke. I don't have any means to pay for an attorney other than a public defender." The government argues that promptly after Heine said "I really don't want to say anymore," the special agents conducting the interview reaffirmed that Heine could remain silent, but that it may be helpful to continue to speak with them. According to the government, Heine chose to continue talking.

The government's position, however, supports the conclusion that the agents violated *Miranda* by continuing to attempt to obtain information from Heine after he unambiguously invoked his right to remain silent by stating "I really don't want to talk anymore." Indeed, as Heine points out, his case is virtually identical to the Ninth Circuit's decision in *Jones v. Harrington*, 829 F.3d 1128 (9th Cir. 2016). In *Jones*, after hours of questioning, Jones told the officers: "I don't want to talk no more." *Id.* at 1132. The officers continued to question Jones, responding: "I understand that, but—." *Id.* at 1137.

The California Court of Appeals held that Jones's statement that he "don't want to talk no more" was made ambiguous by statements that Jones made later on in the interrogation. On habeas review, the Ninth Circuit reversed, holding that the California Court of Appeals's decision is both contrary to and an unreasonable application of clearly established Supreme Court law. The Ninth Circuit explained:

> Here, there is no doubt officers violated *Miranda*. Certainly, Jones saying he "did not want to talk no more" qualifies as "indicat[ing] *in any manner* that he does not wish to be interrogated." *Miranda*, 384 U.S. at 445, 86 S.Ct. 1602 (emphasis added). And there is no real dispute that officers continued interrogating Jones. Officers knew well that he was invoking his right, but continued to push him for more answers: "I understand that but—." No fairminded jurist could reasonably interpret this statement to be "ceasing" the interrogation. *Id.*

*Jones*, 829 F.3d at 1137. With regard to the California Court of Appeals's finding that Jones's subsequent statements made his initial invocation of the right to silence equivocal, the Ninth Circuit stated:

> By continuing to interrogate Jones after he had invoked his right to remain silent, officers violated *Miranda*—which means the government cannot use against Jones anything he said after his invocation. This includes using Jones's subsequent statements to police to "cast retrospective doubt on the clarity of the initial request itself." *Smith*. 469 U.S. at 100, 105 S.Ct. 490. "To permit the continuation of custodial interrogation" after Jones's invocation "would clearly frustrate the purposes of *Miranda*." *Michigan v. Mosley*, 423 U.S. 96, 102, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975).

*Id.* at 1136.

The Ninth Circuit's decision *Jones* shows that Heine's statement "I really don't want to say anymore" was an unambiguous invocation of his right to silence and that all questioning should have stopped after Heine made that statement. *Id.* at 1139 (finding Jones's nearly identical statement to be "unambiguous on its face"). As in *Jones*, the special agents continued to push Heine for more answers after he stated that he wanted to remain silent, responding: "So you

PAGE 42 – OPINION AND ORDER

don't have to answer questions if you don't want to. But what I will tell you is if there are things that you can clarify for [Special Agent Wixted] now, then that's up to you." By continuing to interrogate Heine after he had invoked his right to remain silent at minute 9:58 of the interview, the special agents violated *Miranda*. Accordingly, all subsequent statements that Heine made during the interrogation must be suppressed. The government may not introduce these statements into evidence in its case-in-chief. *See Miranda*, 384 U.S. at 479.

In addition, the government has agreed not to introduce in evidence during the government's case-in-chief any of Heine's pre-invocation statements made during his custodial interrogation. *See* ECF 405. Thus, there is no need for the Court to address Heine's alternative argument that the interrogation also must be suppressed based on Heine's invocation of his right to counsel, either before the interrogation began or at any time during his interrogation.[13] Heine's motion to suppress the statements that he made during his post-arrest interrogation on June 26, 2015 is granted.

**D.  Heine's Supplemental Motion to Suppress**

In his Supplemental Motion, Heine moves to suppress unsworn statements that he gave on September 12, 2012 and January 24, 2013. Heine argues that those statements were taken in violation of his right against compulsory self-incrimination under *Miranda*. Heine bases his argument on the statement made by FDIC-OIG Special Agent Wixted on September 12, 2012 that "You may have to talk to Janie [Spaulding], but you don't have to talk with me. It is only voluntary to talk with me." According to Heine, Agent Wixted "falsely told Mr. Heine that he

---

[13] For the same reason, the Court need not reach Heine's argument that his post-arrest interrogation be suppressed because federal prosecutors at the U.S. Attorney's Office in the District of Oregon violated Oregon Rule of Professional Conduct 4.2 when, without attorney Seidl's consent, they authorized FBI Special Agent Rankine and FDIC-OIG Special Agent Wixted to interrogate Heine while he was in custody.

*must* speak with Ms. Spaulding, thereby rendering the interviews involuntary and violative of Mr. Heine's Fifth Amendment rights." ECF 452 at 2 (emphasis in original).

Heine argues that the Constitution demands that confessions be made voluntarily, citing *United States v. Haswood*, 350 F.3d 1024, 1027 (9th Cir. 2003). Heine adds that statements are involuntary "if coerced either by physical intimidation or psychological pressure,." *id*. (citing *United States v. Tingle*, 658 F.2d 1332, 1332 (9th Cir. 1981), and that the government bears the burden of proving that any statements "were voluntary and must do so by a preponderance of the evidence." *Haswood*, 350 F.3d at 1027 (citing *Lego v. Twomey*, 404 U.S. 477, 485-85 (1972)).

Heine further argues that "[t]he issue at hand does not require the typical fact-based voluntariness analysis regarding whether Mr. Heine's 'will was overborne.' *See, e.g.*, *Dickerson v. United States*, 530 U.S. 428, 434 (2000)." ECF 452 at 6. Heine argues, in essence, that because Agent Wixted, a law enforcement officer, told Heine that he "may have to talk to" Spaulding, yet Wixted remained present for the entire interview and even asked some questions, the entire interview became "involuntary" as a matter of law. Heine adds that under FDIC regulations when an examiner "accompanies law enforcement agents onto the bank's premises for the purpose of gathering records, bank management must be apprised that the examiner is assisting the law enforcement authority in an investigation and does not represent the FDIC in any supervisory or regulatory capacity." ECF 452 at 7.

Heine overstates the facts when he argues that Agent Wixted "falsely told Mr. Heine that he must speak with Ms. Spaulding." First, Wixted used the word "may," not "must." Second, the voluntariness analysis is not resolved by looking only at a single word or even a single sentence. Instead, it requires an examination of the totality of the circumstances.

The Self-Incrimination Clause of the Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. CONST., AMEND. V. To effectuate this right, the government may not use a defendant's statements against her at trial if the defendant gave the statements involuntarily. *See United States v. Preston*, 751 F.3d 1008, 1010, 1015 (9th Cir. 2014). A statement is involuntary for purposes of the Fifth Amendment if it is the product of physical or psychological coercion. *Arizona v. Fulminante*, 499 U.S. 279, 287 (1991). The government has the burden of proving, by a preponderance of the evidence, that a defendant gave a challenged statement voluntarily. *United States v. Bautista*, 362 F.3d 584, 589 (9th Cir. 2004).

An inquiry into the voluntariness of a confession "takes into consideration the totality of all the surrounding circumstances—***both*** the characteristics of the accused ***and*** the details of the interrogation." *Preston*, 751 F.3d at 1016 (emphasis in original) (quoting *Dickerson v. United States*, 530 U.S. 428, 434 (2000)). Some of the factors that courts consider include the defendant's age, education, intelligence, and knowledge of her rights; the duration and nature of the detention or questioning; and whether physical punishment was used or threatened. *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973). "Ultimately, the voluntariness determination 'depend[s] upon a weighing of the circumstances of pressure against the power of resistance of the person confessing.'" *Preston*, 751 F.3d at 1016 (alteration in original) (quoting *Dickerson*, 530 U.S. at 434).

Addressing both the characteristics of the accused and the details of the interview, the Court notes that Heine is a highly-educated banker. At the time of his noncustodial interview, which took place in the Bank's offices, Heine was the president and chairman of the Bank. Moreover, he initiated the communications when he sent a SAR to the Treasury Department and

called the FBI. Also, before ever meeting FDIC-OIG Agent Wixted, Heine voluntarily spoke with FDIC Investigation Specialist Spaulding, as well as with several Special Agents of the FBI. He was well aware that the FDIC was conducting a civil investigation, that the Bank was involved in a civil lawsuit with Walsh, and that the FBI was conducting a criminal investigation.

Agent Wixted told Heine, "You may have to talk to Janie [Spaulding], but you don't have to talk with me. It is only voluntary to talk with me." Wixted did not threaten Heine (or the Bank) with any regulatory or other consequences if Heine declined to speak, and Wixted expressly told Heine that he was strictly voluntary on Heine's part whether he spoke with or in the presence of Wixted. Moreover, given the background of Heine's voluntary communications with both the FDIC and the FBI during the preceding four months, the Court concludes that the government has met its burden of showing the voluntariness of Heine's statements made on September 12, 2012. Further, if Heine's statements on September 12, 2012 were voluntarily made, there is no question raised about his statements made to Spaulding and Wixted in their second interview, conducted on January 24, 2013. Thus, Heine's Supplemental Motion to Suppress is denied.

## CONCLUSION

Heine's Motion to Suppress (ECF 315) is GRANTED IN PART and DENIED IN PART. Heine's Motion is GRANTED with respect to all of his post-arrest statements made during his custodial interrogation. Heine's Motion is DENIED in all other respects. Heine's Supplemental Motion to Suppress (ECF 452) is DENIED.

**IT IS SO ORDERED**.

DATED this 17th day of November, 2016.

/s/ Michael H. Simon
Michael H. Simon
United States District Judge

PAGE 46 – OPINION AND ORDER