# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **UNITED STATES OF AMERICA**, | Case No. 3:15-cr-238-SI |
| v. | **OPINION AND ORDER ON POST-TRIAL MOTIONS** |
| **DAN HEINE** and **DIANA YATES**, | |
| Defendants. | |

Billy J. Williams, United States Attorney, and Claire M. Fay, Michelle Holman Kerin, and Quinn P. Harrington, Assistant United States Attorneys, UNITED STATES ATTORNEY'S OFFICE FOR THE DISTRICT OF OREGON, 1000 SW Third Avenue, Suite 600, Portland, OR 97204. Of Attorneys for the United States of America.

Jeffrey Alberts and Mark Weiner, PRYOR CASHMAN, LLP, 7 Times Square, New York, NY 10036; Caroline Harris Crowne and Michael Willes, TONKON TORP, LLP, 1600 Pioneer Tower, 888 SW Fifth Avenue, Portland, OR 97204. Of Attorneys for Defendant Dan Heine.

Janet Lee Hoffman, Andrew T. Weiner, Katherine Feuer, and Douglas J. Stamm, JANET HOFFMAN & ASSOCIATES, LLC, 1000 SW Broadway, Suite 1500, Portland OR 97205; Matthew J. Kalmanson, HART WAGNER, LLP, 1000 SW Broadway, Suite 2000, Portland, OR 97205. Of Attorneys for Defendant Diana Yates.

**Michael H. Simon, District Judge.**

Defendant Dan Heine ("Heine") was the President and Chief Executive Officer of The Bank of Oswego (the "Bank"). Defendant Diana Yates ("Yates") was the Executive Vice President and Chief Financial Officer of the Bank. Beginning October 10, 2017, and ending November 28, 2017, a federal jury in Portland, Oregon heard testimony from 43 witnesses,

received 584 exhibits admitted in evidence, and deliberated for four days. The 12-person jury then returned its unanimous verdict, finding both Heine and Yates guilty on the same 13 out of 19 charges alleged. The jury found both Defendants guilty on one count of conspiracy to commit bank fraud and 12 counts of making a false bank entry. The jury also found both Defendants not guilty on six counts of making a false bank entry. Pending before the Court are Defendant Heine's post-trial motion for judgment of acquittal or new trial, joined by Defendant Yates, and Defendant Yates's separate amended post-trial motion for judgment of acquittal or new trial. For the reasons that follow, Defendants' motions are denied.

## BACKGROUND

In 2004, Heine founded the Bank. Until August 2016, the Bank was a financial institution engaged in the business of personal and commercial banking and lending, headquartered in Lake Oswego, Oregon.[1] The Bank is insured by the Federal Deposit Insurance Corporation ("FDIC"). In addition to serving as the Bank's President and Chief Executive Officer, Heine also was a member of the Bank's Board of Directors ("Board"). Heine left the Bank in September 2014. In addition to serving as the Bank's Executive Vice President and Chief Financial Officer, Yates also was the Secretary of the Board. Yates resigned from the Bank on March 22, 2012.

On June 24, 2015, a federal grand jury indicted Heine and Yates for conduct related to their time with the Bank. On March 9, 2017, a federal grand jury returned a Superseding Indictment (the "Indictment"), charging Heine and Yates with one count of conspiring to commit bank fraud, in violation of 18 U.S.C. § 1349, and 18 counts of making false bank entries, reports,

---

[1] On August 12, 2016, the Bank sold its loans and other assets to HomeStreet Bank ("HomeStreet"). The Bank of Oswego continues to exist as a corporate entity, but has relinquished its banking charter and now operates as Oswego Resolution.

or transactions, in violation of 18 U.S.C. §§ 2 and 1005.[2] As alleged in the Indictment, between September 2009 and September 2014, Heine and Yates conspired to defraud the Bank through materially false representations and promises. The Indictment further alleges that one of the purposes of the conspiracy was to conceal the true financial condition of the Bank from the Bank's Board, shareholders, and regulators, including the FDIC. According to the Indictment, Heine and Yates reported false and misleading information about loan performance, concealed information about the status of foreclosed properties, made unauthorized transfers of Bank proceeds, and failed to disclose material facts about loans to the Bank's Board, shareholders, and regulators, all in an effort to conceal the Bank's true financial condition.

## DISCUSSION

Defendants Heine and Yates ask the Court to set aside their convictions and enter judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure. That rule provides, in relevant part: "If the jury has returned a guilty verdict, the court may set aside the verdict and enter an acquittal." Fed. R. Crim. P. 29(c)(2). Defendants Heine and Yates also ask the Court, in the alternative, for a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure. That rule provides, in relevant part: "Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a).

---

[2] Under § 1005, it is a crime for any person to make "any false entry in any book, report, or statement of [any insured] bank, . . . with intent . . . to deceive . . . the Federal Deposit Insurance Corporation, or any agent or examiner appointed to examine the affairs of such bank." 18 U.S.C. § 1005.

**A. Defendant Heine's Motion for Judgment of Acquittal or New Trial**

    **1. Heine's Argument that He Did Not Take "Something of Value" from the Bank**

In Count One of the Indictment, both Defendants are charged with conspiracy to commit bank fraud, in violation of 18 U.S.C. § 1349.[3] The underlying crime of bank fraud, although not separately charged, is a violation of 18 U.S.C. § 1344(1). That subsection provides that it is a crime to "knowingly execute, or attempt[] to execute, a scheme or artifice . . . to defraud a financial institution." 18 U.S.C. § 1344(1). At trial, the Court instructed the jury that the three elements of the crime of bank fraud are: (1) a defendant knowingly executed a scheme to defraud a bank as to a material matter; (2) the defendant did so with the intent to defraud a bank; and (3) the bank was insured by the FDIC. ECF 999 (Instr. No. 25).

The Court next instructed the jury about the meaning of the phrase "scheme to defraud a bank." The Court stated:

> The phrase "scheme to defraud a bank" means any deliberate plan of action or course of conduct by which someone intends to (a) deceive or cheat (b) a bank *out of something of value*. In this context, the words "deceive" and "cheat" are different ways of saying the same thing. Both require dishonesty or misleading conduct. For there to be a scheme to defraud a bank, it is not necessary for the government to prove that the bank was the only or sole victim of that scheme. Also, for there to be a scheme to defraud a bank, it is not necessary for the government to prove that a defendant actually was successful in defrauding the bank or that the bank actually lost any money or property as a result of the scheme.

ECF 999 (Instr. No. 26) (emphasis added). After that, the Court instructed the jury about the meaning of the phrase "intent to defraud a bank," explaining:

---

[3] Section 1349 provides: "Any person who attempts or conspires to commit any offense under this chapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy." 18 U.S.C. § 1349. Bank fraud is prohibited under 18 U.S.C. § 1344 and is an offense under the chapter referenced in § 1349.

> A person acts with intent to defraud a bank if he or she (a) acts knowingly (b) with the intent either to deceive or to cheat a bank (c) *out of something of value*. In this context, the words "deceive" and "cheat" are different ways of saying the same thing. Both require dishonesty or misleading conduct.

ECF 999 (Instr. No. 27) (emphasis added). The Court did not instruct the jury on the meaning of "something of value."

The government presented evidence at trial to show that Defendants acted with the intent to deceive or cheat the Bank out of something of value. During the government's closing argument, the government told the jury:

> But right now I want to talk to you about the element in bank fraud of depriving the bank of something of value. This is the kind of reason why the defendant sought to deceive the bank, and *they sought to deprive the Bank of Oswego and the board of directors first, accurate financial information in the bank's books and records.*
>
> *They sought to ensure that the defendants' salaries and bonuses and that they maintain the use of bank's lending services and throughout the course of the conspiracy they misled the bank and the board of directors for the use of bank funds to continue their conspiracy.*
>
> Mr. Walsh told you that one of the primary reasons that he made the payment as well was because he needed to keep his job.
>
> With respect to the accurate financial information of the bank's books and records, Ms. Yates, Mr. Heine, and Mr. Walsh sought to make the bank's books and records look better throughout the course of the conspiracy.
>
> What you heard from Shepanek, from Mr. Harnish, and even Mr. Kelley, the defendants' own expert, was that the board of directors relies on the accuracy of the information in the financial records to perform their duties, particularly records about delinquencies and OREO [Other Real Estate Owned].
>
> You heard from Ms. Comer and from Mr. Walsh and Mr. Kelley that having accurate information about the status of past due loans permits the bank to analyze the risks posed by the various borrowers who are late. Not having that information does not give

the bank and the board of directors that information so it can properly make the analysis of that risk.

I want you to think about -- during the course of my argument and in the course of the arguments throughout the day -- I predict you will hear a lot about Geoff Walsh today when I sit down. And I want you to think between Geoff Walsh, between Dan Heine, and between Diana Yates, which of those individuals had control over the information to the board of directors? It was Mr. Heine and Ms. Yates.

And between those three individuals, who had the ability to make entries in financial records? To direct the entries in financial records? It was Mr. Heine and Ms. Yates.

Who can control -- between those three – what goes on the call reports to the FDIC? Mr. Heine and Ms. Yates.

Who sat through the examination about the financial conditions and the regulators expressing their concerns about the asset quality? It was Mr. Heine and Ms. Yates.

*The defendants sought to deprive the bank of their significant salaries and bonuses, their use of bank lending service, and they desired that their stock go up.*

ECF 1016-5 (Gov't. Closing, Nov. 20, 2017) (emphasis added).

In his post-trial motions, Heine argues that the government advanced three distinct theories of "something of value," namely: (1) the Bank's accurate financial information; (2) Defendants' salaries and bonuses paid by the Bank and Defendants' access to the Bank's lending services for their personal benefit; and (3) the value of Defendants' stock in the Bank. Heine further argues that these are three separate legal theories, and if any is legally insufficient, the jury's verdict must be overturned because it is impossible to tell which theory formed the basis for conviction. Heine then challenges the legal sufficiency of all three "theories."

In response, the government argues that Heine and Yates were charged with a single conspiracy involving a single objective, namely, to defraud the Bank out of something of value. The jury was instructed that for a defendant to be found guilty of conspiracy, the government

must prove that there was an agreement between two or more persons to commit the crime of

bank fraud and that the defendant became a member of that conspiracy knowing of its objective

and intending the help accomplish it. The jury was further instructed that the elements of bank

fraud required the government to prove that a defendant knowingly executed a scheme to defraud

a bank as to a material matter, that the defendant did so with the intent to defraud the bank, and

that the bank was insured by the FDIC. Finally, the jury was instructed that "a scheme to defraud

a bank" means any deliberate plan of action or course of conduct by which someone intends to

deceive or cheat a bank out of something of value.

In this context, the "something of value" is analogous to particular facts that may be used

to satisfy the overt act element of a conspiracy charge, when such an overt act is required to be

shown. In such a circumstance, the Ninth Circuit has explained, "[w]hile jurors need not

unanimously agree on the particular facts satisfying the overt act element of a conspiracy charge,

jurors must still unanimously agree that the defendant is guilty of participating in a particular

conspiracy—*i.e.*, of forming an agreement with at least one other particular individual to pursue

a particular criminal goal." *United States v. Lapier*, 796 F.3d 1090, 1096 (9th Cir. 2015) (citation

omitted). The jurors were instructed that, in order to find a defendant guilty, they must

unanimously agree that the defendant is guilty of forming an agreement with at least one other

particular individual to pursue the particular criminal goal of executing a scheme to defraud the

Bank as to a material matter, and did so with the intent to defraud the Bank. Thus, the jury was

properly instructed. Further, there is sufficient evidence to support the jury's verdict.

In addition, the government's articulation of "something of value," which is a necessary

part of a scheme to defraud, is not legally insufficient. When Defendants failed to provide the

Bank's Board of Directors with accurate information about the Bank's past due loans,

Defendants created a risk that the Bank would be prevented from collecting debts that were due to the Bank or that the Bank would credit borrowers with payments they did not make. In *United States v. Ely*, 142 F.3d 1113 (9th Cir. 1997), the Ninth Circuit recognized these actions as a deprivation of a bank's property.

> To deprive a bank of property you do not have to move cash out of its vaults. *You deprive a bank of property if you prevent its collection of debts that are due or if you arrange for the bank to credit you with a payment you have not made.* That is what these defendants are alleged to have done, to have prevented Statebank from collecting loans and interest that were due and to have arranged for Statebank to create further credit in their favor which would pay the interest due. As § 1344 specifies, it is a crime to obtain bank credits by false pretenses.

142 F.3d at 1119 (emphasis added). In the pending case, the government argued and the jury found that Defendants arranged for the Bank to credit certain borrowers with payments that those particular borrowers did not make, thereby placing the Bank at risk of being unable to collect debts owed to the Bank by those borrowers. That arrangement is sufficient evidence of depriving (or attempting to deprive) a bank of something of value.

In addition, Defendants misrepresented to both the Bank's Board of Directors and the FDIC the true condition of the Bank's past due loans and the facts relating to Defendants' deceptive bank entries. The Bank's former Chairman of the Board, Chris Shepanek, testified that the Board considered both the financial performance of the Bank and how well Defendants were performing their responsibilities, including their responsibilities to provide accurate information to the Bank's Board of Directors and the FDIC, in determining Defendants' compensation levels. Further, a witness from the FDIC testified that a bank that fails to comply with FDIC enforcement directions could be placed under receivership. Thus, had either the Bank's Board or the FDIC been accurately informed about the past due loans or the Defendants' role in these misrepresentations, this likely would have affected Defendants' salary, bonuses, continued

access to the Bank's lending services, and even their continued employment by the Bank. By continuing to misrepresent information about the Bank's handling of certain past due loans to the Bank's Board of Directors and the FDIC, Defendants were able to continue to receive their salaries, bonuses, and favorable access to the Bank's lending services. This is all property of the Bank and, thus, something of value, which is a necessary part of a scheme to defraud.

Heine, however, argues that his salary, bonuses, and favorable access to the Bank's lending services should not be considered to be "something of value." He asserts that the Bank would have needed to pay that compensation to someone to be chief executive officer and that he, therefore, did not cause the Bank to part with any property with which it otherwise would not have parted. In support, Heine cites several public corruption cases, including *United States v. Thompson*, 484 F.3d 877 (7th Cir. 2007); *United States v. Turner*, 465 F.3d 667 (6th Cir. 2006); and *Ingber v. Enzor*, 664 F. Supp. 814 (S.D.N.Y. 1987). In each of these cases, a public official or public employee was convicted of mail fraud based on corrupt activities committed during the performance of official duties. In each of these cases, the court rejected the prosecution's case as inconsistent with the Supreme Court's earlier decision in *McNally v. United States*, 483 U.S. 350 (1987) (rejecting the intangible-rights doctrine in public corruption cases). Public corruption cases, however, are distinguishable from the pending case.

In 2016, the Supreme Court noted that "fraud targeting the Government [is] an area of the law with its own special rules and protections. We have found no relevant authority in the area of mail fraud, wire fraud, financial frauds, or the like supporting Shaw's view." *Shaw v. United States*, 137 S. Ct. 462, 468 (2016). Thus, the Court finds that the decisions in the public corruption cases of *Thompson*, *Turner*, and *Ingber*, cited by Heine, are distinguishable. Moreover, all of these cases precede *Shaw*, and the Supreme Court in *Shaw* gave a broad reading

to the bank fraud statute, 18 U.S.C. § 1344(1), which is the statute in Count One that Heine and

Yates are alleged to have violated. In *Shaw*, the Supreme Court confirmed that to be liable for

bank fraud in violation of § 1344(1), a defendant who fraudulently sought to obtain the funds of

a bank's customer thereby sought to deprive a bank of certain bank property rights as well. *Id.*

at 466. In addition, the Supreme Court in *Shaw* held that the government need not prove that the

defendant intended to cause financial harm to the bank, *id.*, or even make any showing of intent

to cause financial loss. *Id.* at 467.

The Supreme Court's reading of the bank fraud statute in *Shaw* supports the conclusion

that evidence that Heine misrepresented to the Bank's Board of Directors how he and others

under his supervision were handling the Bank's past due loans to show that the Bank was

performing better than it actually was, and thereby hoped to continue to receive his salary, pay

increases, bonuses, and favorable access to the Bank's lending services, is sufficient to show a

course of conduct to deceive the Bank out of something of value. *See also United States v.*

*Bonallo*, 858 F.2d 1427, 1433 (9th Cir. 1988) (observing in the context of the bank fraud statute,

18 U.S.C. § 1344, that it is "clear that Congress sought to apply to bank fraud cases the same

broad standard used in determining whether a scheme to defraud is covered by the mail fraud

statute").

Heine also relies upon *Skilling v. United States*, 561 U.S. 358 (2010). In that case,

Enron's Chief Executive Officer Jeffrey Skilling was charged by the government with the crime

of conspiracy to commit "honest-services" wire fraud, in violation of 18 U.S.C. § 1346. With

that statute, Congress sought to overturn the Supreme Court's 1987 decision in *McNally* and

restore the intangible-rights doctrine.[4] *Skilling*, 561 U.S. at 401-02. Skilling argued that § 1346 was unconstitutionally vague. To avoid striking down a federal statute as impermissibly vague, the Supreme Court gave it a limiting construction, *id.* at 403-06, and held that § 1346 encompassed only bribery and kickback schemes, *id.* at 408-09. In the pending case, neither Heine nor Yates is charged with violating § 1346, and neither argues that the statutes under which they have been charged are unconstitutionally vague. Thus, *Skilling* has no application here.

Finally, Heine argues that, even if he had sought to increase the value of his shares of the Bank's stock, that cannot constitute attempting to deceive the Bank out of "something of value" because the stock already belonged to Heine. The government does not disagree. Instead, the government responds that Heine has misunderstood the use to which the government presented this particular evidence. In the government's closing argument, including the slides shown to the jury during that argument, the government told the jury that Defendants sought to deprive the Bank and its Board of Directors of "something of value" in the form of (1) accurate financial information in the Bank's books and records; (2) the Defendants' salaries, bonuses, and use of the Bank's lending services; and (3) the use of Bank funds.[5]

As the government explains, because both Defendants were struggling financially during the time of the alleged conspiracy and their most significant assets were their stock in the Bank, Defendants had substantial financial motivation not to disclose the Bank's true financial

---

[4] Section 1346 provides: "For the purposes of this chapter, the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the *intangible right* of honest services." 18 U.S.C. § 1346 (emphasis added).

[5] *See* ECF 1016-16 (Ex. P), at p. 10 (government slide titled, "Something of Value," not listing Defendants' stock); *but see* ECF 1016-16 (Ex. P), at p. 13 (government slide, titled "Something of Value," reciting "Stock in Bank most valuable assets").

condition and Defendants' own misconduct to the Bank's Board of Directors, in order to avoid

the risk of losing Defendants' salaries, bonuses, and access to favorable credit. The Court agrees

with the government and finds no grounds in Heine's argument on this point that are sufficient to

warrant a new trial.

## 2. Heine's Argument that the Government Misstated Facts in Closing Argument

"While the government may not suggest that information not in evidence supports its

case, prosecutorial misconduct violates due process only if evidence is presented which taken as

a whole gives a jury a false impression." *Downs v. Hoyt*, 232 F.3d 1031, 1038 (9th Cir. 2000)

(quotation marks and citations omitted). Further, a court should grant "a new trial for

prosecutorial misconduct only where, considered in the context of the entire trial, the

prosecutor's conduct seems likely to have affected the jury's discharge of its duty to judge the

evidence fairly." *United States v. Sanchez*, 944 F.2d 497, 499 (9th Cir. 1991).

### a. A Avenue Property Transaction

Several of the charges against Heine and Yates relate to the purchase by the Bank of

residential real property known as the "A Avenue Property." The government presented

evidence, and the jury found, that Heine and Yates enlisted a bank officer and employee (Danny

Williams) to serve as a straw buyer to purchase that property from the Federal National

Mortgage Association (commonly known as "Fannie Mae"). The A Avenue Property previously

served as collateral for a second, or junior, loan issued by the Bank. After the borrower defaulted

on both the first loan and the second, the property was foreclosed upon and taken over by Fannie

Mae. The Bank was legally unable to purchase the A Avenue Property directly from Fannie Mae

at the time that the property became available for sale to owner-occupiers, so the Bank asked its

employee Danny Williams to serve as a straw buyer to purchase the property. Using the Bank's

money, Williams purchased the property in his own name from Fannie Mae and falsely

represented to Fannie Mae that Williams would be using the property as his personal residence. After Williams purchased the property from Fannie Mae, the Bank bought it from Williams, and then sold it to a third-party to reduce the Bank's loss. Through these maneuvers and deceptions, the Bank avoided having to show on its books the loss that would have resulted from the defaulted second loan.

### i. Testimony by Kelly Francis

In closing argument, the government stated:

> You heard evidence from Mr. Walsh, from Mr. Williams, and from Ms. Francis that Dan Heine, Diana Yates, Geoff Walsh and Danny Williams met; that they met and that they agreed that Danny Williams was the only person at The Bank of Oswego who could purchase the property, because he was young and didn't have a house.

Trial Tr., Nov. 20, 2017 (Gov't. Closing). Heine argues that this statement was false to the extent that it implies that testimony from Ms. Kelly Francis implicated Heine in the deception by Williams concerning the A Avenue Property transaction. Heine cites the following testimony from witness Kelly Francis:

> Q:     So I want to go back just for a second. You said earlier that you heard something from Danny Williams about the A Avenue property?
>
> A:     Correct.
>
> Q:     What did you hear?
>
> A:     He [Danny Williams] asked me if I should – I'm sorry – he told me that Geoff [Walsh] and Diana [Yates] wanted him to buy a house for the bank, and he asked me if he should do it.

Trial Tr., Nov. 1, 2017 (K. Francis). According to Heine, Francis was the only person of these three witnesses who was not criminally implicated in the A Avenue Property transaction, and she never testified that Heine met with Walsh or Williams to discuss the A Avenue Property. Heine

adds that Francis also did not testify that Williams was "the only person at the Bank" who could purchase the A Avenue Property. Instead, according to Heine, Francis's testimony corroborated Heine's defense that Walsh and Yates put Williams up to this scheme without Heine's knowledge.

The government makes two points in response. First, the government states that Defendants did not object to this comment during the government's closing argument. Second, the government states that evidence from multiple people corroborated the government's theory that a meeting of Walsh, Williams, Heine, and Yates occurred during which they all agreed that Williams would act as the Bank's straw buyer to purchase the A Avenue Property. The government acknowledges that although Francis did not include Heine in this portion of her testimony, she did corroborate that a meeting took place with Walsh and Yates during which there were discussions about Williams purchasing the A Avenue Property as a straw buyer. The government also states that Francis testified that she expressed concern over Williams using his "first-time homeowners' credit" on this transaction. In addition, the government, during its closing argument, displayed to the jury a slide that correctly recited Francis's testimony on this issue as follows: "Kelly Francis – Williams told her Walsh and Yates wanted him to buy A Avenue." ECF 1016-17 at 20 (Ex. Q., p. 20).

During Heine's closing argument, which came next, Heine's counsel told the jury that the government had misstated Francis's testimony in its closing, and Heine's counsel displayed to the jury an excerpt from the transcript of Francis's trial testimony. In the government's rebuttal closing, the government clarified this issue and told the jury:

> Let's take A Avenue, for example. Now, to be clear, I'm not going
> to parse the words and read to you what I think each witness said
> or read a bunch of my own questions. You've been in the same
> courtroom as I have. And as the judge has instructed you on

> numerous occasions, your memory controls. But I want you to
> keep in mind a few things while you are deliberating.
>
> Remember that Danny Williams told you about a meeting with
> Geoff Walsh, Dan Heine, and Diana Yates. It will be up to you to
> decide whether you believe what he told you about that. In making
> that decision, think about all the other evidence in this case and the
> other witnesses whom you've heard from.
>
> Remember that Kelly Francis told you that Danny Williams told
> her about the A Avenue transaction. *She said that Danny Williams
> told her that Diana Yates and Geoff Walsh wanted him to buy A
> Avenue.*

Trial Tr., Nov. 21, 2017 (Rebuttal Closing) (emphasis added).

The Court concludes that the government's statement in closing that Heine now

challenges did not unambiguously and expressly tell the jury that Francis testified in a manner

that would impute knowledge to Heine of Williams's serving as a straw buyer for the Bank in

buying the A Avenue Property. Nevertheless, the Court recognizes that the government's

statement might have been interpreted by the jury in that manner and, if it were, such a

conclusion would have been incorrect. Any such incorrect interpretation, however, was corrected

by the government both in its slide shown during closing argument and in the government's

rebuttal argument after this issue was called to the jury's (and the government's) attention by

Heine's counsel during Heine's closing argument. Further, the government presented sufficient

evidence at trial in the form of testimony from both Williams and Walsh that Heine was aware of

and approved Williams's deception concerning the A Avenue Property transaction.

### ii. Testimony by Danny Williams

In closing argument, the government stated:

> You heard that during the meeting with Mr. Heine or possibly Ms.
> Yates that there was an issue about the owner-occupied certificate
> and that he [Danny Williams] would be required to sign something
> that indicated that he could be subject to a $10,000 fine.

> Mr. Williams did not waver in his testimony that either Mr. Heine,
> Ms. Yates or both told him that the bank would cover that fine.

Trial Tr., Nov. 20, 2017 (Gov't. Closing). Heine argues that this statement was false based on the

following testimony by Danny Williams:

> Q:      Did Mr. Heine say anything during this meeting?
>
> A:      I remember being concerned about an owner-occupied
> form that had a dollar value of, you know, if you get – if you don't
> actually occupy it, then you can be required to pay a certain
> amount of money, and I said that I didn't want to pay that.
>
> Q:      And what did Mr. Heine say in response?
>
> A:      I don't recall if it was Mr. Heine or Mr. Walsh or Ms. Yates
> but it was discussed at that meeting. Basically they said if that
> happened, they would cover that money.

Trial Tr., Oct. 11, 2017 (D. Williams).

> Q:      Did Mr. Heine say something to you about whether or not
> what might happen if that penalty was imposed?
>
> A:      I don't recall if it was Mr. Heine, Mr. Walsh, or Mrs. Yates.
> In the meeting in the office, it was conveyed that penalty would be
> covered by the bank if it was ever imposed.
>
> THE COURT:  And it was conveyed by one of those people?
>
> A:      Correct.

Trial Tr., Oct. 11, 2017 (D. Williams). Heine adds that the government compounded this

purported misstatement in the government's slide that read: "Either Heine or Yates said that

Williams would not have to pay the FNMA [Fannie Mae] penalty under the owner-occupant

certificate."

The government makes two points in response. First, the government states that

Defendants did not object to this comment during the government's closing argument. Second,

the government states that although Williams initially testified that Heine, Walsh, or Yates told

Williams that he would not have to pay the fine if one were assessed, Williams later testified at

trial that his prior statements to law enforcement and the FDIC included Heine or Yates. Trial Tr., Oct. 11, 2017 (D. Williams). According to the government, Williams "held strong" that it was Heine or Yates who told him that, and he told that to the FDIC in his sworn testimony. Trial Tr., Oct. 13, 2017 (D. Williams).

The Court concludes that the government's statement in closing was supported by the evidence. Although Williams testified at first that he could not recall whether it was Heine, Walsh, or Yates who made the statement that is at issue, Williams later testified at trial that his earlier statements to law enforcement and to the FDIC in sworn testimony was to the effect that either Heine or Yates told him that statement. This supports the government's slide and also the government's assertion in closing argument that that Williams "did not waver in his testimony that either Mr. Heine, Ms. Yates or both told him that the bank would cover that fine." At most, whether Williams did or not "waver" is a fair subject for closing argument based on this evidence.

### b. Using Kehoe Loan Proceeds to Pay Loans of Delinquent Borrowers

In the fall of 2010, the Bank loaned Marty Kehoe $1.7 million, much of which was used to make loan payments on behalf of other borrowers from the Bank whose loans had become delinquent. Walsh testified that this use of the Kehoe loan proceeds was discussed at a meeting of the Bank's Internal Loan Committee ("ILC") when Heine and Yates were present. Walsh's assistant, Nancy Griesenauer, also a Bank employee, largely corroborated Walsh's testimony. In an effort to undermine this testimony, Defendants elicited testimony from other Bank employees who also attended meetings of the Bank's ILC, and they testified that they had never heard at those meetings that the Kehoe loan proceeds were being used to make payments on delinquent loans of other borrowers.

At trial, the government asked Danny Williams whether this use of Kehoe loan proceeds was discussed in meetings of the ILC. Williams testified that it was common knowledge that Kehoe was a "hard money lender" and that Williams had spoken with both Walsh and Kelly Francis about the use of Kehoe's loan proceeds to pay delinquent loans. Williams could not recall, however, whether that topic had ever been discussed in front of Heine in Williams's presence. Williams added that it did not appear to him that either Walsh or Francis were trying to hide or keep secret the information that Kehoe loan proceeds were being used to pay the loans of delinquent customers.

During closing argument, the government told the jury:

> Ms. Griesenauer testified that when the Kehoe loan was being discussed in the internal loan committee, there was discussion about using proceeds of that loan to make payment on delinquent customer accounts. She told you that Mr. Heine was present and Ms. Yates was present. Mr. Williams also testified to the same facts.

Trial Tr., Nov. 20, 2017 (Gov't. Closing). Heine does not challenge the portion of this statement in which the government told the jury that Griesenhauer testified that Heine and Yates were present during discussions about Kehoe loan proceeds being used to make payments on delinquent loan accounts for other customers. Instead, Heine challenges only the government's statement that "Mr. Williams also testified to the same facts."

The government concedes that its comment made in closing that "Mr. Williams also testified to the same facts" was a misstatement because Williams was not present when any such statements were made in the presence of Heine and Yates. Further, the Court sustained Defendants' hearsay objections during the government's examination of Williams and appropriately instructed the jury. The government notes, however, that Defendants did not object

to this portion of the government's closing argument, and that Defendants brought this point to the jury's attention in their own closing arguments.

The Court agrees with Heine's argument and the government's concession that the government erred by stating that "Mr. Williams also testified to the same facts." Had either Defendant made a timely objection during the government's closing, the government could have promptly corrected its misstatement or the Court could have sustained the objection or both. Instead, Defendant Heine waited until his closing argument to recite for the jury the actual trial testimony and argue that the government's statement on this matter during its closing argument was inaccurate.

In addition, Williams testified that he did discuss the use of the Kehoe loan proceeds to pay delinquent loans to other Bank customers with Francis and Walsh, and that they did not appear to make any effort to keep this information hidden or secret within the Bank's management. Finally, both Griesenauer and Walsh testified that they were present when the use of Kehoe loan proceeds to pay off delinquent loans of other borrowers was discussed in the presence of both Heine and Yates. For all of these reasons, the Court concludes that the government's misstatement on this point is insufficient to warrant a new trial.

### c. The Mesick Property

Certain property known as the "Mesick Property" was obtained by the Bank after foreclosure, based on a nonperforming loan. This requires the property to be listed on the Bank's books and records and reported on the Bank's Call Reports to the FDIC as OREO assets (Other Real Estate Owned).[6] The government presented evidence, and the jury found, that Heine and

---

[6] OREO, or Other Real Estate Owned, is a term used in the banking industry. It refers to real property owned by a bank that is not directly related to the bank's business and is a nonperforming asset for the bank. OREO is generally acquired by a bank as a result of foreclosure on property after a loan default by a borrower who had used the property as collateral

Yates falsely omitted (or removed) the Mesick Property from the Bank's list of OREO assets after Randall Coleman purchased the Mesick Property with money loaned by the Bank because the Bank did not receive any down payment. Instead, the Mesick Property was then shown on the Bank's books as a "performing loan" made to Coleman. According to the evidence presented at trial, selling OREO property with loaned money and without receiving a down payment does not support removing that property from a bank's schedule of OREO assets.

Heine argues that the following statements made by the government in closing argument are false in two respects:

> This is March 26, 2010. On March 29th, Mr. Heine signs an agreement with Mr. Coleman. It is the sale agreement for the purchase of the Mesick property. It clearly states that there is no down payment. Ms. Griesenauer told you that she brought these documents in for Mr. Heine to sign, and this is significant, because [Heine's expert witness Brian] Kelley told you that, as a bank CEO, you need to be familiar with OREO, and he would know that a down payment was required in order to move property from – off of OREO.

Trial Tr., Nov. 20, 2017 (Gov't. Closing). Heine first argues that Griesenauer was describing different documents that she had brought to Heine. Heine also argues that his expert witness Brian Kelley was merely describing his own practices and experiences.

The government begins its response by noting that Defendants did not object to this portion of the government's closing. In specific response to Heine's first point, the government identifies the substantial testimonial and documentary evidence linking Heine with the sale and negotiation of the Mesick Property. Greissenauer testified that Heine was the original loan

---

for the loan. The presence of OREO assets on the books of a bank may raise concerns about the financial health of the bank or its lending decisions. A bank must report OREO assets to the FDIC on the bank's call reports. Trial Tr., Oct. 30, 2017 (P. Worthing). The government's evidence at trial showed that Defendants deceptively moved OREO assets off of the books of the Bank and did not disclose them to the FDIC.

officer on that matter, Heine stated in writing that the relator for the Mesick Property should

offer Bank financing with favorable terms or even no money down, Heine signed the

March 29, 2010 sale agreement with Coleman that explicitly showed no money down, and Heine

often pushed both Walsh and Yates to get OREO assets off the Bank's books and records. In

specific response to Heine's second point, the government notes that Heine called Kelley as an

expert witness, including on the subject of what a chief executive officer of a community bank

generally does and knows. Thus, when Kelley described his own understanding, based on his

experience as a former chief executive officer of a community bank, about what is required to

move property from OREO to performing loan status, it is a fair inference that he was presenting

what chief executive officers of a community bank generally do or know and are expected to do

or know. In any event, the slight errors made by the government in closing argument on this

point are insufficient to warrant a new trial.

### d.  Minutes of the Internal Loan Committee

During the government's closing argument, the government told the jury:

> The appearance is that these ILC [Internal Loan Committee]
> minutes; that the discussions are documented somehow in the
> minutes. And you heard from multiple witnesses that Mr. Heine
> and Ms. Yates edited key discussions from the minutes. You heard
> that from Mr. Williams. You heard that from Mr. Sweet. You
> heard that from Mr. Walsh. And you heard that from Ms. Francis.

Trial Tr., Nov. 20, 2017 (Gov't. Closing). Both Heine and Yates argue that this was a false

statement by the government.

The government makes two points in response. First, the government states that

Defendants did not object to this comment during the government's closing argument. Second,

the government contends that its statement is true. As explained by the government, the

witnesses testified that Heine and Yates edited the ILC minutes and that although Kelly Francis

also was involved in the process, Heine and Yates had the final say. Williams, who took the minutes for a significant portion of the relevant time period, testified that Heine expressly asked Williams to reduce the information contained in the minutes. Williams added that he "pushed back on it and said that were—I believe there were statutory technicalities that we had to keep all that stuff in there." In response, Heine "got upset" and told Williams it was "Heine's Bank." Williams also testified that information about borrower discussions and information about Heine's concerns about information being in the Call Reports were edited out of the minutes by Yates and then later by Kelly Francis. As a result, Williams explained, he eventually just stopped putting that sort of information in the ILC minutes.

In addition, Walsh testified that Heine edited the ILC minutes and that when the prior meeting's minutes were presented at an ILC meeting, bickering often occurred because the minutes were inaccurate, and Heine would ultimately edit them. Walsh also testified about an email in which Heine stated that the minutes should not reflect that Kelly Francis disagreed with a credit decision. Francis also testified to this effect and about Heine's comment to remove dissent from the minutes. Ryan Sweet also corroborated that the ILC minutes were not accurate, stating that Yates edited the minutes of the ILC meetings, that they were "light on dialogue," and that they failed to capture the discussions that went into decisions. The Court finds that the government's characterization of the evidence in closing argument is fair.

### e.  Customer Names

During the government's closing argument, the government told the jury:

> Dan Heine falsely told customers in his collection email that if
> they failed to pay, their names would go to the federal regulators
> and they would be on the bad list. That's Exhibits 358, 361 through
> 363, 365 through 368 and 370. Mr. Kelley, his own expert, told
> you that he would not send those emails. And Mr. Worthing told
> you that names don't go to regulators.

Trial Tr., Nov. 20, 2017 (Gov't. Closing). Heine argues the government misstated the testimony

of the government's FDIC witness Paul Worthing. Concerning the closing argument issues

raised in Heine's post-trial motion, this is the *only* time when Heine objected during the

government's closing. Heine objected that the government had misstated Worthing's testimony.

In response to Heine's objection, the Court told the jury:

> Members of the jury, from time to time in closing arguments, you
> are going to hear the lawyers tell you what they recall the
> testimony was. As I have instructed you previously, the lawyers'
> statements are not evidence. Use your own recollection of the
> testimony. [To the government:] You may proceed.

The government contends that its statement is true. As explained by the government, the

exhibits received in evidence at trial showed that Heine stated or at least implied to delinquent

Bank borrowers that their names would go to federal regulators on a quarterly basis, referring to

the Call Reports. The FDIC witness Paul Worthing testified that delinquent borrower names do

not go from banks to regulators on the Call Reports. Names of delinquent customers are never

sent to the regulators, *i.e.*, they "don't go to regulators." Supporting documents for the Call

Reports, which include reports with delinquent borrower names, are generally available to

regulators during an examination for review, but that is a different matter. Even Heine's expert

witness Brian Kelley confirmed this process. The Court finds that the government's

characterization of the evidence in closing argument is fair.

### f.  Persons Having Critical Information

During the government's closing argument, the government told the jury:

> Mr. Heine and Ms. Yates were the only people at the Bank who
> have all of the information about the expectations of the
> examiners, about the criticisms and the concerns of the examiners.
> They were the only ones who presented information to the Board
> of Directors about delinquent loans and OREO. They were the
> only ones who knew about the entries on call reports.

Trial Tr., Nov. 20, 2017 (Gov't. Closing). Heine argues that these statements are false. Among

other things, Heine argues that the Bank's Controller Brandy Comer knew about the entries on

the Call Reports and that the entire Board of Directors reviewed the Call Reports as part of a

presentation at the monthly Board meetings.

The government makes two points in response. First, the government states that

Defendants did not object to this comment during the government's closing argument. Second,

the government contends that its statement is true. The Court has reviewed the government's

argument and the evidence presented at trial and finds that the government's characterization of

the evidence in closing argument is fair.

### g. What the Board of Directors Was Told about the A Avenue Property

During the government's closing argument, the government told the jury:

> Exhibit 24, page 7 relates to Count 19, and this is the board of
> directors report that was presented in June 2011. In it Yates and
> Heine described for the Board of Directors that the Brock property
> [the A Avenue property] – that the Brock OREO property was sold
> during May, reducing foreclosed assets by $366,000. That was not
> true.

Trial Tr., Nov. 20, 2017 (Gov't. Closing). Heine argues that these statements are false, asserting

that at trial Board Chairman Chris Shepanek testified that it was Yates, and not Heine, who

presented the referenced information to the Board. Heine adds that this is confirmed by Board

minutes.

The government makes two points in response. First, the government states that

Defendants did not object to this comment during the government's closing argument. Second,

the government contends that Heine was present during the presentation to the Board, even if he

was not the individual who directly made these statements or actually wrote them in the reports.

The government adds that a person is liable for a false entry if he or she "caused" the entry to be

made, and that the overwhelming evidence at trial demonstrated that by the time this statement was presented to the Board, Heine knew about the deception concerning the A Avenue Property transaction, including that Danny Williams acted as a straw buyer. The evidence also showed that Heine noted in an email that the Bank had "dodged some bullets" on the A Avenue Property such that the Bank's books and records would not reflect a loss. The government concludes that even if Heine's co-conspirator actually made the statement, Defendants were acting together in presenting this information to the Board. The Court finds that the government's characterization of the evidence in closing argument is fair.

### h. Witness Ryan Sweet

During the government's closing argument, the government told the jury:

> You remember Ryan Sweet, Dan Heine fired him too. Ryan Sweet described it as he wasn't rowing in sync with Dan Heine, who was the captain of the ship. That's what Ryan Sweet told you. And you heard how Ryan Sweet was rowing. He objected to loans, Diana Yates called him names, and then he was fired.

Trial Tr., Nov. 20, 2017 (Gov't. Closing). Heine argues that these statements are false because Sweet testified that he was fired for "several reasons," including engaging in a sexual relationship with his supervisor and going through a divorce that distracted him from his duties at work.

The government makes two points in response. First, the government states that Defendants did not object to this comment during the government's closing argument. Second, the government contends that Sweet only testified about what he "believed" were the reasons why he was fired and that the government's statement is a fair inference from the record. The Court concludes that the government's statements regarding Sweet during closing argument are fair inferences from the trial evidence and Heine's contention is insufficient to warrant a new trial.

### i. Purported Additional Misstatements of Fact

After separately presenting the alleged misstatements that the Court discusses above, Heine states in his post-trial motion that there is "not space enough to address in-depth" other misstatements by the prosecution in its closing argument. ECF 1015 at 43. The government responds in a separate appendix. ECF 1026-1. The Court has reviewed the items described by Heine, the government's responses, and the evidence presented at trial. Heine's contentions, either individually or collectively, are insufficient to warrant a new trial.

### j. Characterizing Defendant Heine's Defense and Expert Testimony

### i. Defendant Heine's Defense

During the government's closing argument, the government told the jury:

> Now, the defendants would have you believe that the concealment
> of these loans, that not reporting them to the board of directors or
> the FDIC was not a big deal; that these were not material.

Trial Tr., Nov. 20, 2017 (Gov't. Closing). Heine argues that this statement mischaracterizes his defense and warrants a new trial under *United States v. Preston*, 873 F.3d 829 (9th Cir. 2017). In response, the government argues that the Ninth Circuit has upheld references to the seriousness of charges or the effects of crimes. *See People of Territory of Guam v. Ignacio*, 852 F.2d 459, 461-61 (9th Cir. 1988) (upholding reference to embezzlement of public funds taking money away from battle against heroin); *United States v. Drebin*, 557 F.2d 1316, 1332 (9th Cir. 1977) (upholding reference that movie industry was losing hundreds of thousands of dollars in revenue in case involving the sale of eight sales of numerous films).

In addition, the government explains that the evidence in this case from FDIC witnesses and the Bank's Board of Directors establishes that truthfulness in reporting to the FDIC and a bank's board is important. The government further argues that it did not "mischaracterize" the defense. The government notes that both Heine and Yates challenged materiality throughout the

trial, including in their closing arguments. Heine said in closing that the delinquencies were

"insignificant" and that "in terms of the overall portfolio of the [B]ank, that's just a blip," "less

than 2 percent of the overall portfolio," and represented a "very minor change in the overall

financials." Yates presented a similar argument. Heine's contention is insufficient to warrant a

new trial.

### ii. Defendant Heine's Expert Testimony

During the government's closing argument, the government told the jury:

> Now the defendants offered expert testimony on the claim that A
> Avenue – that it was properly accounted for OREO. The
> government has the burden at all times. But Mr. Kelley who was
> paid approximately a hundred thousand dollars for his testimony
> told you that he would not ask an employee to act as a straw
> purchaser and if the employee purchased property for the bank, he
> would expect a written agreement to which Mr. Riley whose
> family unit was paid $350,000 for work on their agreed case
> agreed that most agencies are in written contract – are in the form
> of a written contract.

Trial Tr., Nov. 20, 2017 (Gov't. Closing). Heine argues that this statement mischaracterizes his

expert's testimony. The government makes two points in response. First, the government states

that Defendants did not object to this comment during the government's closing argument.

Second, the government contends that its statements are accurate. The Court finds that the

government's characterization of the evidence is fair.

### k. Purported Misstatements of Law

### i. Conspiracy Law

During the government's closing argument, the government told the jury:

> When I was a young prosecutor the crime of conspiracy seemed
> illusive to me and a mentor of mine described it to me like this:
> Conspiracy is like a party. You can stay late, you can leave early.
> You don't even have to be invited by the host. But if you show up
> and you party, you are responsible for the cleanup. And you can
> see from the instructions that the coconspirators do not have to

have a formal agreement. They don't even have to agree on every detail. But if you join the conspiracy willfully, you are as responsible as the originators. If you are in for a penny, you are in for a pound.

Trial Tr., Nov. 20, 2017 (Gov't. Closing). Heine argues that this statement mischaracterizes the law of conspiracy, especially in light of the Court's *Pinkerton* instruction.

The government makes two points in response. First, the government states that Defendants did not object to this comment during the government's closing argument. Second, the government contends that it did not misstate the law of conspiracy. The Court agrees and finds that Heine's argument is without merit. Further, the Court properly instructed the jury regarding the law of conspiracy. *See* ECF 999 (Instr. Nos. 21-23). Heine's argument does not warrant a new trial.

### ii. Direct Liability

During the government's closing argument, the government told the jury:

You can find that the defendants are directly liable for the false entry counts in many instances – in all instances Ms. Yates was responsible for preparing the call report and signed the call report. In some of the cases, Mr. Heine also signed the call report.

Trial Tr., Nov. 20, 2017 (Gov't. Closing). Heine argues that this statement mischaracterizes the law of direct liability with respect to the charge of making a false bank entry.

The government makes two points in response. First, the government states that Defendants did not object to this comment during the government's closing argument. Second, the government contends that it did not misstate the law of direct liability for making a false bank entry. As the government explains, the government discussed earlier in its closing argument the elements that it had the burden to prove in order for the jury to convict Defendants of the crime of making a false statement. In addition, through its closing argument slides, the government explained that for the jury to find direct liability, the government had to prove that

Defendants made or caused to be made the false statements in addition to the other elements. Further, the government described in its closing argument that the evidence showed that both Defendants were responsible for the false entries under all three theories of liability: co-conspirator (*Pinkerton*) liability, direct liability, and aiding and abetting liability. Finally, the jury was property instructed on these points. *See* ECF 999 (Instr. Nos. 29-32). Heine's argument is without merit and does not warrant a new trial.

### 3. Government's Use of Other Act Evidence

#### a. Witness Stephen Andrews

Before trial, Heine moved *in limine* to exclude evidence relating to: (1) a credit card that Elan Bank issued to him in 2005, subject to a full recourse guarantee by The Bank of Oswego, which was not authorized by The Bank of Oswego; (2) Heine's attempts to secure loans; and (3) Heine's misrepresentations to The Bank of Oswego in 2010 and 2011 in connection with his requests for extensions on his line of credit. ECF 800 at 13-19; ECF 665 at 13-14, 17-19. The Court denied Heine's motions, finding that: (1) the evidence is relevant to Heine's motive, intent, or absence of mistake; (2) Heine's deteriorating financial condition and use of the Bank's financial services is intrinsically intertwined with the alleged illegal conduct; and (3) because the government must show that Defendants sought to deprive the Bank of "something of value," Defendants continued access to and use of the Bank's line of credit and their related misrepresentations to the Bank are all relevant to the government's showing. ECF 926 at 31-33.

The government called as a witness Stephen Andrews, who at the time of trial was the President and Chief Executive Officer of the Bank. Among other things, Andrews testified that as of January 2015, Heine was more than 120 days delinquent on his personal credit card, which was guaranteed by the Bank. Heine objected, and the Court overruled Heine's objections on the same grounds on which the Court previously denied Heine's motions *in limine*. At the end of the

government's direct examination, Andrews was asked whether Heine had ever repaid that credit

card debt. Andrews answered that Heine had not, and then added: "[E]ssentially this money was

stolen from the bank." Heine promptly objected, and the Court immediately sustained the

objection. Out of the presence of the jury, the Court told counsel: "I think it was unfair and

inappropriate for this witness to refer to the money as having been stolen." Because trial had

been recessed for the day, the Court added:

> THE COURT:  I think I have adequately cured it. I will let
> Mr. Alberts [Heine's counsel] sleep on it. If you want me to say
> something more to the jury about just the use of the word stolen, I
> think I have adequately addressed it. If you want me to say
> something more that they shouldn't draw an inference about intent
> from that testimony and I have instructed them to disregard the
> word stolen, write something out for me and I'll look at it in the
> morning but I do think that's the point that concerned me in his
> answer and that's why I jumped in on my own to address that. But
> if you can think I need to address it, let me know.
>
> *     *     *
>
> THE COURT:  If there is more curative instruction you want me to
> do on that word, write something out and share it with counsel and
> I'll take a look at it tomorrow morning. Secondly if you want to
> point out in closing argument what you just said to me. There is
> enough material here. He said he has been a witness more. He used
> the word stolen. You can remind the jury what the judge said about
> the use of that word.

Trial Tr., Nov. 2, 2017 (colloquy with counsel after testimony of S. Andrews). The next

morning, also outside the presence of the jury, the Court repeated its offer to give a further

curative instruction. Heine declined. The testimony of Stephen Andrews is insufficient to warrant

a new trial.

### b.  Letters to Shareholders

Before trial, Heine moved *in limine* to exclude evidence relating to letters signed by

Heine and sent to the Bank's shareholders that failed to disclose the problems the Bank was

experiencing, and specifically failed to disclose the existence of the Memorandum of

Understanding ("MOU") reached between the Bank and the FDIC. ECF 800 at 20; ECF 665

at 15. The Court denied Heine's motion, finding that: (1) the evidence is relevant to Heine's

motive, intent, or absence of mistake; and (2) Heine's deteriorating financial condition is

intrinsically intertwined with the alleged illegal conduct. ECF 926 at 33.

At trial, the government offered and the Court received without objection by Heine

copies of the letters to shareholders signed by Heine. The government used the letters as

additional evidence that Heine misrepresented the Bank's financial condition to the Bank's

shareholders. During the government's closing argument, the government told the jury:

> Appearance versus reality. When you go back to deliberate as a
> jury, I want you to review the communications by Mr. Heine and
> Ms. Yates and compare them to the communications they received
> in the report of findings from the regulators. You will see in
> Exhibits 250 and 488 that there is significant criticism of the asset
> quality, the credit administration, that the loan portfolio continues
> to deteriorate. And if you look at Exhibits 55, 56, 57 and 60, 61,
> you will see that Mr. Heine and Ms. Yates say something different
> to their shareholders.
>
> And with respect to the 2010 examination, the FDIC examination
> report indicated that the overall condition of the bank was less than
> satisfactory and that the loan portfolio continued to deteriorate at a
> pronounced rate. But again, if you look at Exhibits 57, 62, 63, and
> 64, you will see that they are saying something different to their
> shareholders.

Trial Tr., Nov. 20, 2017 (Gov't. Closing).

Heine objects on several grounds, but primarily argues:

> [T]he use the government made of the shareholder letters only
> underscored the absence of probative value to weigh against the
> unfair prejudice of suggesting Mr. Heine lied to individual
> shareholders, including employees and individual shareholder
> witnesses who testified at trial. The only testimony at trial about
> these letters demonstrated that they were reviewed and approved
> by a number of other parties – including the alleged victim, the
> Board of Directors, who also were fully aware of the FDIC reports.

> Thus, they had no probative value on the question of whether Mr. Heine intended to defraud the Board of Directors, who had received both the shareholder letters and the FDIC reports that the government suggests demonstrates the falsity of those letters.

ECF 1015 at 72. The Court concludes that the government's statements in closing argument on this point are fair inferences from the evidence, and Heine's contention is insufficient to warrant a new trial.

### 4. Exclusion of Evidence Purporting to Show No Financial Loss to Bank

Heine argues that the Court prohibited him from introducing evidence in his case-in-chief regarding the "overall financial impact" of the various transactions at issue. Whether the victim of an alleged fraud suffered a loss, or even whether a defendant intended to cause a loss, is not relevant. *See generally Shaw v. United States*, 137 S. Ct. at 467 (holding that scheme to defraud "demands neither a showing of ultimate financial loss nor a showing of intent to cause a financial loss"); *United States v. Benny*, 786 F.2d 1410, 1417 (9th Cir. 1986) ("While an honest, good-faith belief in the truth of the misrepresentations may negate intent to defraud, a good-faith belief that the victim will be repaid and will sustain no loss is no defense at all.").

Nevertheless, the Court gave Defendants wide leeway at trial and the opportunity to present evidence and make their arguments to the jury. As the government observes, the only exhibit on this issue that the Court excluded was Trial Ex. 4801, which the Court excluded under Rule 403 of the Federal Rules of Evidence. Regarding all of the other evidence that Heine sought to present, the government correctly notes that the Court allowed that evidence in Heine's cross-examinations of the government's witnesses (*see, e.g.*, Heine's cross-examinations of John Hisatomi, Chris Dudley, and Chris Shepanek). In addition, although the Court excluded Trial Ex. 4801 under Rule 403, the Court allowed Trial Ex. 4800 as a demonstrative exhibit during Heine's examination of his expert witness Brian Kelley, who described in detail the "overall

financial impact" of the various transactions and the "net transaction effects." Heine's objection on this issue is insufficient to warrant a new trial.

**B. Defendant Yates's Amended Motion for Judgment of Acquittal or New Trial**

### 1. Purported Insufficient Evidence for Counts Seven, Eight, and Nine

Yates separately argues that the government failed to present sufficient evidence to support the guilty verdicts on Counts Seven, Eight, and Nine. ECF 1031. These counts allege that Defendants made false bank entries on November 10, 2010, by omitting from the Call Report submitted to the FDIC for the third quarter of 2010 the delinquency of the following loans made by the Bank: (1) delinquent loan made to H. Abrams (Count Seven); (2) delinquent loan made to E. Duffy (Count Eight); and (3) delinquent loan made to R. Goodman (Count Nine). ECF 623 (Superseding Indictment); ECF 1010 (Verdict Regarding Defendant Diana Yates). In essence, Yates argues that these entries were not false because the loan payments had been made, albeit not by the debtors themselves.

When considering whether evidence is sufficient to sustain a verdict, the Court must view the evidence in the light most favorable to the prosecution. *United States v. Nevils*, 598 F.3d 1158, 1163-64 (9th Cir. 2010) (en banc) (asking whether "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt"); *accord United States v. Grovo*, 826 F.3d 1207, 1213-14 (9th Cir. 2016). From this perspective, there was more than sufficient evidence presented at trial to allow the jury to conclude that the payments relating to the loans at issue in Counts Seven, Eight, and Nine came from the $1.7 million loan from the Bank to Martin Kehoe. Further, the evidence presented at trial was more than sufficient to allow the jury to conclude that the internal bank documentation for the $1.7 million Kehoe loan failed to disclose that portions of the loan were being used for two improper purposes: (1) repayment of an out-of-

balance wire transfer to Kehoe in the amount of $675,000; and (2) to pay the loans of severely delinquent Bank loan customers, including H. Abrams, E. Duffy, and R. Goodman. In fact, the Chairman of the Bank's Board of Directors, Chris Shepanek, testified that the Kehoe loan was one of the most contentious loans that the Bank's Board had ever approved, that the omitted information should have been included, and its omission was material to the Board. Further, Walsh and Greisenauer testified the use of the proceeds for delinquent borrowers was discussed in the meetings of the ILC, of which both Defendants were members. Thus, it is a reasonable conclusion that the delinquent loan payments made with the proceeds of the $1.7 million Kehoe loan, being made on the final day of the quarter in an effort to keep these delinquent loans from being reported on the Bank's Call Report to the FDIC (and to the Bank's Board of Directors), were deceptive and improper. The use of improperly-obtained Bank loan proceeds to hide loan delinquencies is sufficient to make the entries in the Call Reports false and misleading. But there is more.

The government presented sufficient evidence at trial to permit the jury to find that the actual borrowers (H. Abrams, E. Duffy, and R. Goodman) were unaware of these loan payments at the time the payments were being made on their behalf. For example, the government called Duffy as a witness, and he testified that he did not authorize Kehoe to make payments to the Bank on Duffy's delinquent loan. Duffy added that he was in a significantly precarious financial position and that at some point he intentionally stopped making payments to the Bank to try to force Heine and Walsh to negotiate with him. Thus, making unauthorized loan payments on his behalf would frustrate Duffy's objective. Further, the evidence with respect to both Abrams and Goodman was that they too were in cash-strapped positions at the time, were historically very slow payers, and were severely delinquent at the time the payments were made on their behalf

out of the Kehoe loan. There also was evidence presented at trial through the testimony of Walsh that Abrams and Goodman did not authorize the payments being made on their behalf or even know that loan payments were being made for them at the time. Viewing all of this evidence in the light most favorable to the prosecution, these facts are sufficient to show that the entries on the Call Report relevant to Counts Seven, Eight, and Nine were false and misleading.

### 2. Government's Closing Argument

#### a. Defendant Yates's Financial Condition

Yates objects that the government made misstatements in its closing argument regarding Yates's financial condition. The government responds that it did not. Trial Ex. 404 is an email that Yates sent to Heine after her resignation from the Bank. In it, she states that all of her money was tied up in the Bank. In addition, both Chris Shepanek and Geoffrey Walsh testified that Yates had a significant amount of her assets held in the form of Bank stock. Further, Trial Ex. 476 is a summary prepared by the FBI's forensic accountant. It shows that Yates had substantial credit card debt, was close at times to the limit on her credit cards, and paid off her credit cards only after receiving a loan from the Bank. Similarly, Trial Ex. 545 shows that Yates was routinely overdrawn on her checking accounts at the Bank. Thus, the government's comment in closing argument that Yates was in a precarious financial position is not misleading and is supported by evidence admitted at trial.

#### b. Witness Brandy Comer

Yates objects that the government's closing argument mischaracterized Brandy Comer's testimony regarding the A Avenue Property transaction. During its closing argument, the government discussed the A Avenue Property and stated:

> This is important, because as of January 31st, Ms. Yates has issued more than a quarter million of dollars in cashier's checks to buy the house in Mr. William's name. You know that there is no

written contract between Danny Williams and The Bank of Oswego regarding has to funds. You know that there is no written contract between Danny Williams and The Bank of Oswego requiring him to deed this property back to him. And you know that there is no written contract between Danny Williams and Ms. Yates – between Danny Williams and The Bank of Oswego that secures this property for The Bank of Oswego.

Mr. Williams even provides a deposit back to him that's refunded from the title company.

Ms. Comer is concerned about this and inquires. Ms. Yates says that's the way that we had to do it. A warranty deed is signed between Fannie Mae and Danny Williams on February 8th, 2011 and at this point, ladies and gentlemen, Danny Williams owns this property free and clear to everybody else.

Trial Tr., Nov. 20, 2017 (Gov't. Closing).

At trial, Comer testified that she was attempting to reconcile the transactions and the entries in the Bank's general ledger related to the purchase of the A Avenue Property. She was comparing them to items such as requests for cashier's checks—because there was no indication in the general ledger's OREO account or other documentation about the purpose of the $26,000 cashier's check made for the benefit of Bank employee Danny Williams or the check for approximately $241,000. Comer testified that she tried to "get to the bottom" of these general ledger entries relating to the A Avenue Property, and the answer was not readily apparent. After inquiring of others, including Williams, Comer reached out to Yates. Comer asked Yates about the purpose of these entries. Yates responded, "that is the way we had to do it." The Court concludes that the government's statement in closing argument that Comer "was concerned" about the manner in which the transaction occurred is a fair comment on the evidence and Yates's contention is insufficient to warrant a new trial.

### c.   Minutes of the Internal Loan Committee

Yates objects to the comments made by the government in closing argument about Yates's role in editing the minutes of the ILC meetings. The Court has sufficiently addressed this objection above in Section A(2)(d). The Court concludes that the government's statement in closing argument on this issue is a fair comment on the trial testimony presented by Williams, Walsh, and Sweet. Yates's contention is insufficient to warrant a new trial.

### 3.   Purportedly Curtailed Cross-Examination and Presentation of Evidence

### a.   Purported FDIC Investigatory Bias

Yates objects that the Court prevented her from inquiring at trial about "FDIC investigator bias." The only witness from the FDIC who testified at trial was Paul Worthing, an Assistant Regional Director of the FDIC. The Court did not limit either Yates or Heine from examining Worthing regarding any potential bias that this particular witness may have. Yates, however, wanted to go further.

On several occasions before trial, Yates argued that there was FDIC "investigatory bias" against her. She first raised this issue in a motion to suppress. After an evidentiary hearing that spanned several days, the Court denied Yates's motion. ECF 514. Yates later raised this contention in a motion to dismiss and alternative motion for an adverse jury instruction. The Court denied Yates's motion to dismiss and alternative motion. ECF 725. In the government's motions *in limine*, the government asked that Yates not be allowed at trial to present to the jury any evidence or argument of any purported investigatory bias by the FDIC, the prosecution team, or both. The Court granted the government's motion *in limine*, holding:

> There is no relevance to that evidence or argument for the charges
> that will be considered by the jury. Further, whatever minimal
> relevance might exist, if any, is substantially outweighed by the
> risk of confusing the issues, misleading the jury, and wasting time.
> Fed. R. Evid. 403. A defendant's right to present a complete

defense, *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973), does not override these considerations, which are made after a careful review of the proffered evidence.

ECF 926 at 14. The Court has again reviewed Yates's argument on this issue raised in her post-trial motions. Because the Court did not restrict Yates or Heine from inquiring into the potential bias of any witness, including Worthing, the Court again denies Yates's argument.

### b. Yates's Expert Witness Mark Riley

Yates objects that the Court prevented her at trial from asking her expert witness Mark Riley on direct examination to describe the connotation within the banking industry of the term "straw buyer." ECF 1031 at 17. Yates also objects to the manner in which the Court limited Yates in asking other questions of Riley about how Riley disagreed with the testimony of the government's expert witness, Paul Worthing.

During her direct examination of Yates's expert witness Mark Riley, Yates asked: "Now when you hear the word straw buyer versus agent, what is the connotation of straw buyer in the banking business?" The government objected, and the Court sustained the government's objection because that specific question was outside the scope of the witness's disclosed summary of expert opinions. *See* Fed. R. Crim. P. 16(b)(1)(C). Shortly thereafter, the Court held a colloquy with counsel outside the presence of the jury. Yates's counsel argued that she merely wanted to ask Riley whether he agreed or disagreed with testimony that had been provided by the government's expert, Paul Worthing. The government, however, did not ask Worthing what connotation the term "straw buyer" had in the banking business, so the question as phrased was not truly rebuttal of Worthing's testimony.

Moreover, the Court allowed Yates to ask Riley questions to rebut Worthing's testimony about the A Avenue Property transaction. The Court told Yates that she could recite the precise statement that Worthing had made in which he used the term "straw buyer" and then ask Riley

whether he agreed or disagreed with Worthing's testimony and why. The Court imposed this limitation because it had already experienced during trial Yates's expert witness Riley not being responsive to questions asked on direct examination and attempting to inject testimony that the Court had excluded. In light of the Court's experience during trial with this expert witness, this limitation was a reasonable effort by the Court to control the presentation of testimony to ensure that inadmissible evidence would not be injected by an expert witness who had already demonstrated a propensity to do so.

### c. Witness Brandy Comer

Yates objects that the Court did not allow witness Brandy Comer "to testify as to what information the FDIC revealed to her during her FDIC deposition." ECF 1031 at 18. According to Yates, this information would have explained Comer's "ill will" toward Yates." *Id.* at 19. Yates, however, fails to identify any testimony or evidence that indicates that Comer was hostile to or harbored ill will toward Yates. Further, Yates did not ask Comer whether she held any hostility or harbored any ill will toward Yates, let alone the basis for any such feeling. In addition, after the Court sustained the government's objection, Yates did not proffer what the evidence that Yates was seeking to elicit would have been. Thus, the Court cannot conclude at this time that the answer, had it been allowed, would have been admissible or might have affected the outcome of the trial.

### d. Witness Kathy Szedlar

Yates objects that the Court did not allow witness Katherine Szedlar to state her opinion about whether Geoffrey Walsh was "fit" for his job. ECF 1031 at 19. Yates acknowledges that Szedlar was not disclosed as an expert witness, but argues that this question only called for proper lay opinion testimony under Rule 701 of the Federal Rules of Evidence. The Court rejected that argument.

Rule 701 allows a witness not testifying as an expert to express an opinion, provided that the opinion is:

> (a)  rationally based on the witness's perception;
>
> (b)  helpful to clearly understanding the witness's testimony or to determining a fact in issue; and
>
> (c)  not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Fed. R. Evid. 701. Szedlar's opinion about whether Walsh was "fit" for his job at the Bank is not proper lay opinion testimony for two reasons. First, it would not be helpful to the jury to understand any witness's testimony or to determine a fact in issue. Further, and more significantly, Szedlar's opinion on this question is necessarily based on her specialized knowledge within the scope of Rule 702. To have a rational opinion on whether Walsh was fit for his position at the Bank requires specialized knowledge about (1) Walsh's position within the Bank; (2) the duties and expectations required for that position; and (3) an experiential basis in the banking industry sufficient to form an opinion about whether Walsh did or not did have the requisite qualifications to be fit for his position at the Bank. These are matters within the scope of Rule 702 and not the sort of lay opinion allowed under Rule 701.

Finally, the Court did *not* exclude any opinion testimony about Walsh's *character for truthfulness or untruthfulness*, which would be admissible from any witness under Fed. R. Evid. 608(a). Although another witness was questioned on that precise issue concerning Geoffrey Walsh, Yates chose not to ask that question to Szedlar. Had Yates (or Heine) asked that question to Szedlar (or any other witness), it would have been allowed. Asking Szedlar her opinion about whether Walsh was "fit" for his job, however, was too vague to fall within Rule 608(a), did not qualify as lay opinion under Rule 701, and ran the risk of eliciting information about Walsh that the Court previously excluded under Rule 403.

### 4. Whether Admission of Bond Claim (Trial Ex. 471) Required Severance

Yates argues that the admission in evidence of Trial Ex. 471 required severance to avoid violating her confrontation clause rights under the Sixth Amendment. Trial Ex. 471 is a redacted version of a sworn narrative statement that is part of a "proof of loss" form signed by Heine and submitted by the Bank to its insurer as part of an insurance claim. The Court received this redacted document over Yates's objection, ruling it admissible only against Heine and providing a limiting instruction to the jury. All references to Yates's name in this document were redacted, and the jury was instructed on several occasions that the redacted document may only be considered as evidence against Heine. In her post-trial motion, Yates argues that the admission of this document "should have resulted in severance." ECF 1031 at 22.

Early in the life of this case, the Court denied the parties' original motions for severance. ECF 184. Later in the case, the Court denied the parties' renewed motions for severance. ECF 725. The Court has reviewed this issue again and remains of the opinion that severance was not required and indeed would have been inappropriate under applicable precedent. This case took 29 trial days over almost seven weeks, and the jury heard from 43 witnesses. Had each defendant been tried separately, the number of trial days and the number of witnesses needed would have been only slightly lessened. Almost all of the witnesses called by the government would have had to testify in both trials. The need for judicial economy in this case outweighs the minimal risk of unfair prejudice from a joint trial. *See United States v. Polizzi*, 801 F.2d 1543, 1553 (9th Cir. 1986) (holding that the public has a substantial interest in a joint trial). Yates's post-trial argument that the admission of Trial Ex. 471 required severance is without merit.

## CONCLUSION

Defendant Heine's Motion for Judgment of Acquittal or for New Trial (ECF 1015), joined by Defendant Yates (ECF 1019), and Defendant Yates's Amended Motion for Judgment

of Acquittal or for New Trial (ECF 1031) are DENIED. Defendant Yates's Motion for Judgment

of Acquittal or for New Trial (ECF 1017) is DENIED AS MOOT.

**IT IS SO ORDERED**.

DATED this 4th day of June, 2018.

/s/ Michael H. Simon
Michael H. Simon
United States District Judge