# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **UNITED STATES OF AMERICA**, | Case No. 3:15-cr-238-SI |
| v. | **OPINION AND ORDER ON SENTENCING** |
| **DAN HEINE** and **DIANA YATES**, | |
| Defendants. | |

Billy J. Williams, United States Attorney, and Claire M. Fay, Michelle Holman Kerin, and Quinn P. Harrington, Assistant United States Attorneys, UNITED STATES ATTORNEY'S OFFICE FOR THE DISTRICT OF OREGON, 1000 SW Third Avenue, Suite 600, Portland, OR 97204. Of Attorneys for the United States of America.

Jeffrey Alberts and Mark Weiner, PRYOR CASHMAN, LLP, 7 Times Square, New York, NY 10036; Caroline Harris Crowne, TONKON TORP, LLP, 1600 Pioneer Tower, 888 SW Fifth Avenue, Portland, OR 97204. Of Attorneys for Defendant Dan Heine.

Janet Lee Hoffman, Andrew T. Weiner, Katherine Feuer, and Douglas J. Stamm, JANET HOFFMAN & ASSOCIATES, LLC, 1000 SW Broadway, Suite 1500, Portland OR 97205; Matthew J. Kalmanson, HART WAGNER, LLP, 1000 SW Broadway, Suite 2000, Portland, OR 97205. Of Attorneys for Defendant Diana Yates.

**Michael H. Simon, District Judge.**

      Imposing a sentence on a fellow human being is one of the most difficult acts that a judge is required to perform. The judge's decision likely will affect not only the criminal defendant, but also his or her family and the victims of the crime and their families. A sentence also may affect the future safety, security, and sense of well-being of the community. In addition, a

sentence should deter future criminal conduct, not only by the defendant being sentenced but also by others. In white collar cases dealing with economic crimes involving financial institutions, a sentence also may affect the confidence the public holds in those institutions as well as the government's ability effectively to regulate and supervise those institutions. Many complex factual and legal issues must be considered and balanced to find a just and appropriate sentence.

Because we live under the rule of law, judges must make decisions under objective, common, and discernable legal principles. The discretion possessed by a judge at sentencing tests the limits of this principle. Sentencing is constrained by both substantive bounds (such as statutory minimum or maximum terms) and procedural bounds (such as mandated methodology and explanatory requirements). Nevertheless, even within these bounds, there is often more than one lawful solution, which provides both the legal basis for the court's discretion and the tension between this discretion and the rule of law. In recognition of this tension, it is incumbent upon a judge to explain the bases for a criminal sentence. Others may agree or disagree with the sentence imposed, but a judge should leave no doubt about the factors that he or she has considered or the reasons for imposing a particular sentence.

## BACKGROUND

In 2004, Defendant Dan Heine ("Heine") founded The Bank of Oswego (the "Bank") and became its President and Chief Executive Officer. He also served as a member of the Bank's Board of Directors ("Board"). Defendant Diana Yates ("Yates") was the Executive Vice President ("EVP") and Chief Financial Officer ("CFO") of the Bank. In addition to serving in these positions, Yates was the Secretary of the Board. Yates resigned from the Bank on March 22, 2012. Heine left the Bank in September 2014. On June 24, 2015, a federal grand jury indicted Heine and Yates for conduct related to their time with the Bank; the indictment was

unsealed two days later. As alleged in the superseding indictment, Heine and Yates were charged with one count of conspiring to commit bank fraud, in violation of 18 U.S.C. § 1349, and 18 counts of making false bank entries, in violation of 18 U.S.C. §§ 2 and 1005. In essence, Heine and Yates were charged with concealing the true financial condition of the bank to the Board and regulators by falsely reporting that the Bank had title to a property obtained in a "straw buyer" transaction, falsely reporting that delinquent loans were paid, and falsely reporting the sale of bank-owned property received in foreclosure.

Until August 2016, the Bank was a financial institution engaged in the business of personal and commercial banking and lending, headquartered in Lake Oswego, Oregon. The Bank was insured and supervised by the Federal Deposit Insurance Corporation ("FDIC"). On August 12, 2016, the Bank sold its loans and other assets to HomeStreet Bank ("HomeStreet"). The Bank continues to exist as a corporate entity, but has relinquished its banking charter and now operates as Oswego Resolution.

Beginning October 10, 2017, and ending November 28, 2017, a federal jury in Portland, Oregon heard testimony from 43 witnesses, received 584 exhibits admitted in evidence, and deliberated for four days. The 12-person jury then returned a unanimous verdict, finding both Heine and Yates guilty on the same 13 out of 19 charges. The jury found both Defendants guilty on one count of conspiracy to commit bank fraud and 12 counts of making false bank entries. The jury also found both Defendants not guilty on six counts of making false bank entries.

## STANDARDS

### A. Sentencing Considerations and Methodology

Congress has directed that a federal court shall impose a sentence that is "sufficient, but not greater than necessary" to achieve the purposes of sentencing. As explained by Congress, a just and appropriate sentence should reflect the seriousness of the offense, promote respect for

the law, provide just punishment for the offense, afford adequate deterrence to criminal conduct, protect the public from further crimes of the defendant, and provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. 18 U.S.C. § 3553(a)(2). In determining the particular sentence to be imposed, the court shall consider the nature and circumstances of the offense and the history and characteristics of the defendant. 18 U.S.C. § 3553(a)(1). The court must also consider the advisory sentencing guidelines established by the United States Sentencing Commission ("USSC") as well as all relevant policy statements issued by the USSC. 18 U.S.C. § 3553(a)(4)-(5). Further, the court must attempt "to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).

White collar crime is peculiarly amenable to general deterrence. That is because white collar criminals, oftentimes, premeditate their crimes and engage in a cost-benefit analysis. *See, e.g.*, *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) ("Because economic and fraud based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence. Defendants in white collar crimes often calculate the financial gain and risk of loss, and white collar crime therefore can be affected and reduced with serious punishment."). Indeed, the congressional drafters of § 3553(a) recognized the distinction between white collar criminals and other criminals when it comes to deterrence:

> The second purpose of sentencing is to deter others from committing the offense. This is particularly important in the area of white collar crime. Major white collar criminals often are sentenced to small fines and little or no imprisonment. Unfortunately, this creates the impression that certain offenses are punishable only by a small fine that can be written off as the cost of doing business.

S. Rep. No. 98-225, at 76 (1983), as reprinted in 1984 U.S.C.C.A.N. 3182, 3259. White collar criminals may weigh the benefits of creating and maintaining a fraudulent enterprise, including the financial, professional, and social benefits that come with their crimes. Against these benefits, they may weigh the costs, including the likelihood of getting caught, being charged, and being convicted, as well as the degree of punishment they will face. These are all factors to be considered in sentencing the white collar criminal.

Determining a proper sentence begins with a properly calculated advisory sentencing guideline range. *Gall v. United States*, 552 U.S. 38, 39 (2007); *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008). The United States Sentencing Guidelines ("USSG") serve as the initial benchmark in every sentencing proceeding, *Gall*, 552 U.S. at 39, and "reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." *United States v. Rita*, 551 U.S. 338, 350 (2007). The sentencing table in the guidelines presents a defendant's adjusted offense level in the vertical axis and a defendant's criminal history category in the horizontal axis. Both the offense level and the criminal history category must be correctly calculated, and their intersection yields the advisory sentencing guideline range. After correctly calculating the advisory sentencing guideline range, the court then considers that range and all of the other sentencing factors identified in 18 U.S.C. § 3553(a) before arriving at a final sentence.

**B.  Relevant Conduct**

The USSG directs the court to consider all "relevant conduct" when evaluating the nature and circumstances of the offense to determine the correct offense level. USSG § 1B1.3. The USSG defines "relevant conduct," in part, as follows:

> Relevant Conduct (Factors that Determine the Guideline Range)
>
> (a)    CHAPTERS TWO (OFFENSE CONDUCT) AND THREE (ADJUSTMENTS). Unless otherwise specified, (i) the base offense level where the guideline specifies more than one base offense

level, (ii) specific offense characteristics and (iii) cross references in Chapter Two, and (iv) adjustments in Chapter Three, shall be determined on the basis of the following:

> (1)    (A)    all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and
>
> (B)    in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all acts and omissions of others that were—
>
> (i)    within the scope of the jointly undertaken criminal activity,
>
> (ii)    in furtherance of that criminal activity, and
>
> (iii)    reasonably foreseeable in connection with that criminal activity;
>
> that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense;
>
> (2)    solely with respect to offenses of a character for which §3D1.2(d) would require grouping of multiple counts, all acts and omissions described in subdivisions (1)(A) and (1)(B) above that were part of the same course of conduct or common scheme or plan as the offense of conviction;
>
> (3)    all harm that resulted from the acts and omissions specified in subsections (a)(1) and (a)(2) above, and all harm that was the object of such acts and omissions; and
>
> (4)    any other information specified in the applicable guideline.

USSG § 1B1.3(a). In addition, the USSC explains: "Conduct that is not formally charged or is not an element of the offense of conviction may enter into the determination of the applicable guideline sentencing range." USSG §1B1.3, cmt, background.

## C. Standard of Proof

"District courts generally use the preponderance of the evidence standard of proof when finding facts at sentencing, such as the amount of loss caused by a fraud. The higher 'clear and convincing' standard may apply, however, when a sentencing factor has an *extremely* disproportionate effect on the sentence relative to the offense of conviction." *United States v. Hymas*, 780 F.3d 1285, 1289 (9th Cir. 2015) (emphasis added) (citations and quotation marks omitted). Because the advisory sentencing guideline adjustment for loss, which is discussed below, has the potential to exert a substantial upward influence on the ultimate advisory guideline range, the Court will apply a "clear and convincing" standard for that specific factor. The Court will apply the "preponderance of the evidence" standard for all remaining factors.

## D. Evidence that May Be Considered

Federal law provides:

> No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence.

18 U.S.C. § 3661. As explained by the United States Supreme Court, "18 U.S.C. § 3661 . . . codifies the longstanding principle that sentencing courts have broad discretion to consider various kinds of information." *United States v. Watts*, 519 U.S. 148, 151 (1997). Thus, at sentencing, the Court may draw its own conclusions from all of the evidence presented at trial, as well as from all other sources.

The Federal Rules of Evidence do not apply in a sentencing proceeding. Fed. R. Evid. 1101(d)(3) ("These rules—except for those on privilege—do not apply to . . . sentencing"). Unlike the strict evidentiary restrictions applicable at trial, the only evidentiary requirement at sentencing is that the sentence be based on information that has "sufficient indicia of reliability

to support its probable accuracy." USSG § 6A1.3; *see also United States v. Berry*, 258 F.3d 971, 976 (9th Cir. 2001) (holding that for sentencing purposes, hearsay testimony need only "be accompanied by some minimal indicia of reliability") (quotation marks omitted)).

## DISCUSSION

**A. Calculation of Advisory Sentencing Guideline Range**

**1. Adjusted Offense Level**

**a. Base Offense Level; USSG § 2B1.1(a)(1)—Level 7**

Based upon the offenses of conviction, the Base Offense Level is 7. USSG § 2B1.1(a)(1). This applies to both Heine and Yates.

**b. Loss Enhancement; USSG § 2B1.1(b)(1)—Increase by 14 Levels for Heine and by 12 Levels for Yates**

**i. General principles of loss under the USSG**

Under the guidelines, a defendant's offense level shall be increased based on the amount of the economic loss caused by relevant conduct. USSG § 2B1.1(b)(1). Application Note 3 offers the following guidance. It states, in relevant part:

> Loss Under Subsection (b)(1).—This application note applies to the determination of loss under subsection (b)(1).
>
> (A) General Rule.—Subject to the exclusions in subdivision (D), loss is the greater of actual loss or intended loss.
>
> (i) Actual Loss.—"Actual loss" means the reasonably foreseeable pecuniary harm that resulted from the offense.
>
> (ii) Intended Loss.—"Intended loss" (I) means the pecuniary harm that the defendant purposely sought to inflict; and (II) includes intended pecuniary harm that would have been impossible or unlikely to occur (*e.g.*, as in a government sting operation, or an insurance fraud in which the claim exceeded the insured value).
>
> (iii) Pecuniary Harm.—"Pecuniary harm" means harm that is monetary or that otherwise is readily measurable in money. Accordingly, pecuniary harm does not include

emotional distress, harm to reputation, or other non-economic harm.

    (iv)    <u>Reasonably Foreseeable Pecuniary Harm</u>.—For purposes of this guideline, "reasonably foreseeable pecuniary harm" means pecuniary harm that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense.

    \*    \*    \*

(B)    <u>Gain</u>.—The court shall use the gain that resulted from the offense as an alternative measure of loss only if there is a loss but it reasonably cannot be determined.

(C)    <u>Estimation of Loss</u>.—The court need only make a reasonable estimate of the loss. The sentencing judge is in a unique position to assess the evidence and estimate the loss based upon that evidence. For this reason, the court's loss determination is entitled to appropriate deference. *See* 18 U.S.C. § 3742(e) and (f).

The estimate of the loss shall be based on available information, taking into account, as appropriate and practicable under the circumstances, factors such as the following:

    (i)    The fair market value of the property unlawfully taken, copied, or destroyed; or, if the fair market value is impracticable to determine or inadequately measures the harm, the cost to the victim of replacing that property.

    \*    \*    \*

    (v)    The reduction that resulted from the offense in the value of equity securities or other corporate assets.

    \*    \*    \*

(E)    <u>Credits Against Loss</u>.—Loss shall be reduced by the following:

    (i)    The money returned, and the fair market value of the property returned and the services rendered, by the defendant or other persons acting jointly with the defendant, to the victim before the offense was detected. . . .

USSG § 2B1.1, cmt. n. 3.

### ii. Whether there is reasonably foreseeable pecuniary harm

As discussed in Application Note 3, "actual loss" means the reasonably foreseeable pecuniary harm that resulted from the offense. "Reasonably foreseeable pecuniary harm" means pecuniary harm that a defendant knew or, under the circumstances, reasonably should have known, was a *potential* result of the offense. For two independent reasons, the Court finds there was reasonably foreseeable pecuniary harm.

First, Defendants misrepresented to and concealed from the Board and the FDIC the Bank's financial weaknesses, which undermined the Board's and the FDIC's ability fully to assess material risks and tailor managerial and supervisory responses to undisclosed emerging problems. But for the upturn in the national and local economy, many of the problem loans that were hidden from the FDIC and the Board might have gone into default. In fact, notwithstanding the improvement of the economic climate, one of the problem loans in the offenses of conviction (the Duffy loan) actually did result in a loss to the Bank of more than $200,000. Second, after Defendants' misrepresentations and other fraudulent activity became publicly known, the Bank essentially collapsed, causing Bank's shareholders to lose their investments and the Bank's employees to lose their jobs. The Bank's collapse resulted, at least in part, from the charges against its CEO and EVP/CFO (the Bank's two highest officers) becoming publicly known.

Since shortly after the beginning of our nation, the American banking system has served as the foundation of our economy. Our economy requires honest bankers. When the public loses confidence in its bankers, the economy is placed in jeopardy. Further, a bank's ability to survive depends upon its reputation for integrity, honesty, and accuracy. Thus, after the public learned about Heine and Yates's fraudulent activities, the Bank was unable to continue active operations as a bank. The Bank ceased operating and sold its remaining assets to HomeStreet, resulting in the Bank's employees losing their jobs and the Bank's shareholders losing most, if not all, of

their investments. As victims of Heine and Yates's crimes, the Bank, its employees, and its investors all suffered economic loss.

### iii.  Whether the loss can be reasonably determined

The government and Defendants have spent considerable time and effort disputing whether the economic losses in this case can be reasonably determined. Because a guideline enhancement based on economic loss would substantially increase the offense level, the Court applies a "clear and convincing" standard for this factor, and the government has the burden to show the amount of loss.

Even though a reasonable estimate of the loss caused by a defendant is sufficient, the Court concludes in this case that the government has not satisfied its burden. Several factors appear to have contributed to the downfall of the Bank. There appears to have been mismanagement at the Bank even before the onset of criminal activities. In fact, that mismanagement and the resulting problems faced by the Bank, along with the pressures of the severe economic downturn of 2007-2008, appear to have at least in part motivated Heine and Yates's criminal activities. They sought rapidly to grow the Bank's portfolio of loans in order to improve the economic performance and profitability of the Bank and, perhaps, make the Bank a more attractive candidate for a potential takeover. (The Court notes that the bulk of both Heine and Yates's personal assets was their stock in the Bank.) The rapid growth in the Bank's loan portfolio, however, resulted in non-performing loans or other loan-related problems that made the Bank's operations more risky and less attractive. The FDIC took notice and placed the Bank under a Memorandum of Understanding, among other regulatory activities.

Heine and Yates did not deceive others in order to put money *directly* into their own pockets. The fraud in this case was not a Ponzi scheme, or even a scheme that resulted in direct and immediate financial benefit to Defendants. Instead, Heine and Yates deceived the Board and

the FDIC to hide the Bank's problems. This deception allowed Heine and Yates to keep their jobs and avoid more drastic regulatory sanctions by the FDIC.

Nevertheless, the crimes of convictions, even all "relevant conduct" taken together, were not the sole causes of the Bank's ultimate losses. Thus, for purposes of determining a guidelines loss calculation, it is necessary to determine the amount of loss caused by and attributed to Defendants' crimes. A reasonable estimate will do, but there must be an appropriate estimation of the loss caused by Defendants versus the loss caused by other, non-criminal factors.

Economic tools are available to perform this analysis, and they could have been used. For example, an event study or regression analysis might have quantified the loss to the Bank caused by Defendants' relevant conduct, as opposed other factors, but such an analysis was not performed (or at least none was presented to the Court). It is also possible that such a study might not have been fruitful. In any event, from the evidence presented, the amount of the loss caused by the relevant conduct of Defendants cannot be reasonably determined under a clear and convincing standard.

### iv.  Gain that resulted from the offense

If there is loss (which there is in this case) but it cannot be reasonably determined, the Court may proceed to consider the gain to a defendant. The Ninth Circuit has upheld the use of a defendant's salary to measure gain when the district court concludes that a defendant would not have received the salary "but for" the unlawful conduct. *United States v. Shabudin*, 701 F. App'x 599, 601 (9th Cir. 2017).[1] The continued salary and benefits enjoyed by Heine and Yates were their gains from their crimes. They kept their jobs and avoided the FDIC's regulatory sanction of

---

[1] The application notes provide for a credit against loss for "the fair market value of . . . the services rendered." It is unclear, however, whether that provision applies to a calculation of "gain." Gain is used when loss cannot be reasonably determined, which is not the situation in most cases that apply a credit against a loss.

bank takeover or officer removal or prohibition. Based on the evidence presented at trial, Heine's total salary and benefits paid by the Bank from 2010 through 2013 was approximately $1.2 million, and Yates's salary and benefits paid by the Bank from 2010 through 2012 was approximately $459,000. The Court does not find it necessary or appropriate to exclude from Defendants' gains their salaries attributable to the lawful services that they performed for the Bank. Their crimes of conviction were intertwined with their lawful activities at the Bank.

The Court finds by clear and convincing evidence that Defendant Heine's gain from his relevant conduct was more than $550,000 but not more than $1,500,000. Accordingly, the offense level of Defendant Heine will be increased by 14 levels. The Court also finds by clear and convincing evidence that Defendant Yates's gain from her relevant conduct was more than $250,000 but not more than $550,000. Accordingly, the offense level of Defendant Yates will be increased by 12 levels.

### c. Sophisticated Means; USSG § 2B1.1(b)(10)(C)—Increase by 2 Levels

Under the guidelines, a defendant's offense level shall be increased by 2 levels if the offense "involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means." USSG § 2B1.1(b)(10)(C). As explained in Application Note 9(B), "'sophisticated means' means especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." USSG § 2B1.1, cmt. n. 9(B). In *United States v. Tanke*, 743 F.3d 1296, 1307 (9th Cir. 2014), the Ninth Circuit affirmed the imposition of the sophisticated means enhancement where the defendant "created at least six false invoices and falsified carbon copies of checks . . . on at least ten occasions to conceal the payments." *Id*. (citation omitted). The court held that this evidence "as a whole w[as] sufficiently sophisticated to support the district court's decision." *Id.*

The scheme to defraud perpetrated by Heine and Yates involved more than simply entering false numbers on Bank Call Reports provided to the FDIC and the Bank's Board. Among other things, Heine and Yates enlisted a "straw buyer" (Danny Williams) fraudulently to purchase for the Bank the foreclosed A Avenue Property from the Federal National Mortgage Association (commonly known as "Fannie Mae"). They also misrepresented financial information to the Bank's outside auditor, the Moss Adams accounting firm, in order to conceal the Bank's improper accounting of the Coleman loan. The Court finds that the offenses involved sophisticated means and that Defendants intentionally engaged in or caused the conduct constituting sophisticated means. Accordingly, the offense levels of both Defendants will be increased by 2 levels.

### d. Substantially Jeopardizing Safety and Soundness of a Financial Institution; USSG § 2B1.1(b)(16)(B)(i)—Increase by 4 Levels

Under the guidelines, a defendant's offense level shall be increased by 4 levels if the offense "substantially jeopardized the safety and soundness of a financial institution." USSG § 2B1.1(b)(16)(B)(i). As explained in Application Note 13(A), some of the *non-exhaustive* factors that the court should consider in determining whether, as a result of the offense, the safety and soundness of a financial institution was substantially jeopardized, include whether the financial institution became insolvent or was so depleted of its assets as to be forced to merge with another institution in order to continue active operations. USSG § 2B1.1, cmt. n. 13(A).

In this case, the Bank did not become "insolvent" as a direct and immediate result of the offense. Similarly, the offense did not so directly and immediately deplete the Bank of its assets that it was forced to merge with another institution *in order to continue active operations*. Indeed, as discussed above, the Bank did not continue its active operations. Instead, as a result of the offense, the Bank was forced to become inactive and sell its assets to HomeStreet. As the

Application Notes make clear, these factors are part of a non-exhaustive list. *See United States v. Zech*, 553 F.3d 663, 667 (11th Cir. 2009).

The FDIC's Victim Impact Statement, signed by Senior Bank Examiner Martin Muenchau, along with Mr. Muenchau's testimony at the sentencing hearing explain that "Congress established the FDIC to maintain stability and public confidence in the nation's financial system, but the crimes perpetrated by Mr. Heine and Ms. Yates undermine this goal." Mr. Muenchau added that Defendants' "false entries misdirected FDIC examiners, such as myself, away from significant weakness at the Bank." As explained by Mr. Muenchau, "Mr. Heine's and Ms. Yates'[s] misconduct substantially jeopardized the safety and soundness of the Bank of Oswego." Among other things, "[b]oth Mr. Heine and Ms. Yates took active steps to conceal the Bank of Oswego's true financial condition from the FDIC." Mr. Muenchau adds that Defendants "each signed and submitted answers to FDIC questionnaires attesting broadly that there were no financial irregularities at the Bank," they "oversaw submission of Call Reports, which contained materially false information," and they "concealed the Bank's financial weaknesses when meeting with FDIC examiners and investigators onsite at the Bank."

Mr. Muenchau then states: "These actions undermined the FDIC's ability to fully assess material risks and to tailor supervisory responses to undisclosed emerging problems." Based on these facts, Mr. Muenchau concludes:

> Mr. Heine's and Ms. Yates's crimes put the safety and soundness of the Bank of Oswego into substantial jeopardy. The FDIC regards management as perhaps the most critical component in assessing a bank's health. In this case, Mr. Heine's and Ms. Yates's collective actions and dishonesty resulted in regulatory downgrades to the Bank of Oswego's CAMELS rating, ultimately placing the Bank in the category for the highest probability for failure.

Based on Mr. Muenchau's written statement and testimony, the Court finds that the offense substantially jeopardized the safety and soundness of the Bank, a financial institution. Accordingly, the offense levels of both Defendants will be increased by 4 levels.

### e.   Role in Offense; USSG § 3B1.1(a)—Increase by 2 Levels

Under the guidelines, a defendant's offense level may be increased depending on that defendant's role in the offense and the number of participants in the criminal activity. USSG § 3B1.1. If a defendant was an "organizer" or "leader" of a criminal activity that involved five or more participants, the offense level shall be increased by 4 levels. USSG § 3B1.1(a). If the defendant was a "manager" or "supervisor" (but not an organizer or leader) and the criminal activity involved five or more participants, the offense level shall be increased by 3 levels. USSG § 3B1.1(b). If the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than as described above, the offense level shall be increased by 2 levels. USSG § 3B1.1(c). As explained in Application Note 1, "[a] 'participant' is a person who is criminally responsible for the commission of the offense, but need not have been convicted." USSG § 3B1.1, cmt. n. 1.

Based on the evidence presented at trial, the criminal activity involved at least Defendants Heine and Yates, Geoffrey Walsh, and Danny Williams. The government contends that the criminal activity also involved Geoffrey Walsh's administrative assistant at the Bank, Julie Frank. Defendants dispute this conclusion, arguing that Ms. Frank only admitted at trial to participating in Bank-related illicit conduct with Walsh. At trial, Ms. Frank testified:

> Q.    Were there times when Mr. Walsh asked you to help him
> do things that you knew his bosses would not approve of?
>
> A.    Yes.
>
> Q.    Including things that violated bank procedures?

A.    Yes.

The evidence at trial appears to show that Ms. Frank did some things that she knew at the time were wrong and she did them at the direction of both Walsh and Yates. Ms. Frank testified that she knowingly facilitated some transactions designed to conceal the true financial condition of the Bank, including paying some delinquent loans to make them appear current. She also testified that she was glad that she was not required to keep secrets anymore, that she felt better not working for Walsh, Yates, and Heine, and that during her employment with the Bank, she was asked to do things that she now regrets doing.

"[M]ere unknowing facilitators of crimes will not be considered criminally responsible participants" for purposes of an offense level adjustment under USSG § 3B1.1(c). *United States v. Cyphers*, 130 F.3d 1361, 1363 (9th Cir. 1997). If, however, a person is a "knowing participant" in the fraudulent practices, then that person can be considered to be a criminally responsible participant for purposes of this adjustment. *Id*. Whether Ms. Frank was a criminally responsible participant in the relevant conduct for purposes of this guideline adjustment is a close call. The Court declines to make that finding.

The Court, however, does find that both Heine and Yates qualify as an organizer, leader, manager, or supervisor in the relevant criminal activity, even if there were only four participants. Neither Walsh nor Williams would have done what they did in the offenses of conviction had they not had the approval of Heine and Yates. Accordingly, the offense levels of both Defendants will be increased by 2 levels. USSG § 3B1.1(c).

### f.    Abuse of Position of Trust; USSG § 3B1.3—Increase by 2 Levels

Under the guidelines, a defendant's offense level shall be increased by 2 levels if that defendant has abused a position of public or private trust. USSG § 3B1.3. As explained in Application Note 1, a position of public or private trust is "characterized by professional or

managerial discretion (*i.e.*, substantial discretionary judgment that is ordinarily given considerable deference). Persons holding such positions ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature." USSG § 3B1.3, cmt. n. 1. The Court finds that both Heine and Yates abused their positions of trust at the Bank. Accordingly, an increase of 2 levels for abuse of a position of trust is appropriate for both Heine and Yates.

### g.  Obstruction of Justice; USSG § 3C1.1—No Increase Applied

Under the guidelines, the offense level shall be increased by 2 levels if: "(1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation . . . of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense." USSG § 3C1.1. As explained in Application Note 1, "[o]bstructive conduct that occurred prior to the start of the investigation of the instant offense of conviction may be covered by this guideline if the conduct was purposefully calculated, and likely, to thwart the investigation or prosecution of the offense of conviction." USSG § 3C1.1, cmt. n. 1. One example of the type of conduct to which this adjustment applies is "committing . . . perjury, including during the course of a civil proceeding if such perjury pertains to conduct that forms the basis of the offense of conviction. USSG § 3C1.1, cmt. n. 4(B).

The government contends that Heine lied in his deposition under oath before the FDIC, including on matters involving his knowledge and involvement with the crimes for which he was convicted. Many of Heine's answers, however, were in the form of expressing his lack of recollection. The government also contends that Yates lied in her deposition taken in the civil lawsuit brought by the Bank against Geoffrey Walsh. The government asserts that Yates lied

when asked questions about the A Avenue Property and the handling of the Coleman loan, among other topics. As with Heine, many of Yates's responses indicate that she did not recall certain events or matters. The Court concludes that the government has not shown that either Heine or Yates willfully obstructed justice or committed perjury.

### h. Summary

Based on the Court's findings and conclusions described above, Defendants Heine and Yates have the following adjusted offense levels:

|                                    | Heine | Yates |
| ---------------------------------- | :---: | :---: |
| Base Offense Level                 |   7   |   7   |
| Loss Enhancement                   |  14   |  12   |
| Sophisticated Means                |   2   |   2   |
| Jeopardizing Financial Institution |   4   |   4   |
| Role Adjustment                    |   2   |   2   |
| Abuse of Position of Trust         |   2   |   2   |
| Total:                             |  31   |  29   |

### 2. Advisory Sentencing Guideline Range

Both Defendants have a Criminal History Category of I. Based on the adjusted offense levels stated above, Defendant Heine has an advisory sentencing guideline range of 108-135 months, and Defendant Yates has an advisory sentencing guideline range of 87-108 months. The Court also notes that if no offense level enhancement for loss (or gain) were applied, then each Defendant would have an adjusted offense level of 17. In that circumstance, each Defendant would have an advisory sentencing guideline range of 24-30 months.

## B. Consideration of Sentencing Factors under Section 3553(a)

### 1. Defendant Heine

Defendant Dan Heine is 71 years old and has no prior criminal conviction. As discussed previously, Heine did not directly line his pockets as a result of his crimes of conviction in making misrepresentations to the Bank's Board of Directors and to the Bank's regulators,

including the FDIC. Instead, his actions appear primarily intended to hide the Bank's financial problems, keep his job, and improve the Bank's financial attractiveness to potential future investors or acquirers. The bulk of Heine's assets was his stock in the Bank, which is now gone. He is virtually broke. Many people submitted letters to the Court, attesting to Heine's otherwise good character and describing his many charitable and selfless activities over many years. Although a prison sentence is appropriate based on the seriousness of the offense and the need to deter others from committing these types of crimes, 24 months in federal prison (from which there is no early release for parole) is a sufficient but not greater than necessary sentence for Defendant Heine to achieve the purposes of sentencing.

### 2. Defendant Yates

Defendant Diana Yates is 56 years old and has no prior criminal conviction. As discussed previously, Yates did not directly line her pockets as a result of her crimes of conviction in making misrepresentations to the Bank's Board of Directors and to the Bank's regulators, including the FDIC. Instead, her actions appear primarily intended to hide the Bank's financial problems, keep her job, and improve the Bank's financial attractiveness to potential future investors or acquirers. The bulk of Yates's assets was her stock in the Bank, which is now gone. She is virtually broke. In addition, Yates's husband is disabled and cannot work. Other personal medical and family issues relating to Yates were disclosed to the Court and have been considered in determining an appropriate sentence. Although a prison sentence is appropriate based on the seriousness of the offense and the need to deter others from committing these types of crimes, 18 months in federal prison (from which there is no early release for parole) is a sufficient but not greater than necessary sentence for Defendant Yates to achieve the purposes of sentencing.

## CONCLUSION

As to Counts 1, 3, 7-9, 11-13, and 15-19, Defendant Dan Heine is committed to the Bureau of Prisons for confinement for a period of 24 months on each count, with the sentences in all counts to be served concurrently with each other. As to Counts 1, 3, 7-9, 11-13, and 15-19, Defendant Diana Yates is committed to the Bureau of Prisons for confinement for a period of 18 months on each count, with the sentences in all counts to be served concurrently with each other. The Court also imposes a period of three years of supervised release and a statutorily-mandated fee assessment in the amount of $1,300 ($100 per count of conviction) for each Defendant. The Court further notes that the Court would still impose these sentences even if the guideline adjustment for loss was not included in Defendants' sentencing guideline calculations.

**IT IS SO ORDERED**.

DATED this 14th day of June, 2018.

/s/ Michael H. Simon
Michael H. Simon
United States District Judge